# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **In re: Discover Payment Protection Plan Marketing and Sales Practices Litigation** | **Master File No. 1:10-cv-06994-JWD**<br>**MDL 2217**<br>**This Document Relates to All Cases** |

## DECLARATION OF RANDALL K. PULLIAM IN SUPPORT OF MOTION TO DIRECT OBJECTOR TO POST BOND

Randall K. Pulliam, one of the Plaintiffs' Counsel in the matter of *In re: Discover Payment Protection Plan Marketing and Sales Practices Litigation,* MDL No. 2217 (the "Actions"), declare as follows:

1.      I, Randall K. Pulliam of the law firm of Carney Williams Bates Pulliam & Bowman, PLLC ("Carney Williams") submits this declaration, in Support of Plaintiffs' Motion to Direct Objector To Post Bond.

2.      Objector Aaron Petrus has objected to similar class action settlements.  In one such objection he was represented by Christopher A. Bandas, of the Bandas Law Firm in Corpus Christi, Texas. A true copy of the decision which references this objection and Petrus' representation by counsel is attached hereto as Exhibit A.

3.      In his objection in this case, Petrus lists his address as "J. Petrus, 120 Woodhaven Ingleside, TX 78362." [   ]. J Petrus is listed as the office Manager of the Bandas Law Firm.  A true copy of the website page listing Ms. Petrus which last accessed online on June 22, 2012 at http://www.bandaslawfirm.com/attorneys-staff/jan-petrus/ is attached hereto as Exhibit B hereto.

4.      Attached hereto as Exhibit C is an 2009 Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission ("Order Denying Objections") in the matter, *Brown, et al. v. Wal-Mart Stores, Inc., et al.*, Circuit Court of Rock Island County, Illinois, Oct. 29, 2009.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed this 26 day of June , 2012.

**RANDALL K. PULLIAM**

# Exhibit A

Westlaw.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**



United States Court of Appeals,
Third Circuit.
Shawn SULLIVAN; Arrigotti Fine Jewelry; James
Walnum, on behalf of themselves and all others
similarly situated,
v.
DB INVESTMENTS, INC.; De Beers S.A.; De
Beers Consolidated Mines, Ltd.; De Beers A.G.;
Diamond Trading Company; CSO Valuations A.G.;
Central Selling Organization; De Beers Centenary
A.G.
David T. Murray, Appellant in 08–2784 (Pursuant
to Fed. R.App. P. 12(a))
Susan M. Quinn, Appellant in 08–2785 (Pursuant to
Fed. R.App. P. 12(a))
Marvin L. Union; Tim Henning; Neil Freedman;
Kylie Luke; William Benjamin Coffey, Jr., Appel-
lants in 08–2798 (Pursuant to Fed. R.App. P. 12(a))
Aaron Petrus, Appellant in 08–2799 (Pursuant to
Fed. R.App. P. 12(a))
Janet Giddings, Appellant in 08–2818 (Pursuant to
Fed.R.App.P. 12(a))
Frank Ascione; Rosaura Bagolie; Matthew Delong;
Sandeep Gopalan; Manoj Kolel–Veetil; Matthew
Metz; Anita Pal; Deb K. Pal; Jay Pal; Peter Perera;
Rangesh K. Shah; Ed McKenna; Thomas Vaughan,
Appellants in 08–2819 (Pursuant to Fed.R.App.P.
12(a))
Kristen Dishman; Margaret Marasco, Appellants in
08–2831 (Pursuant to Fed.R.App.P. 12(a))
James B. Hicks, Appellant in 08–2881 (Pursuant to
Fed. R.App. P. 12(a)).

Nos. 08–2784, 08–2785, 08–2798, 08–2799,
08–2818, 08–2819, 08–2831, 08–2881.
No. 08–2785 Argued on Jan. 28, 2010.
Nos. 08–2784/2798/2799/2818/ 2819/2831/2881
Submitted Under Third Circuit L.A.R. 34.1(a) on
Jan. 28, 2010.
Reargued En Banc on Feb. 23, 2011.
Opinion Filed Dec. 20, 2011.

**Background:** Direct and indirect purchasers of
gem-quality diamonds brought class action against
operator of diamond cartel, alleging violations of
federal and state antitrust laws, as well as state con-
sumer protection and unjust enrichment laws. The
United States District Court for the District of New
Jersey, Stanley R. Chesler, J., certified nationwide
direct and indirect purchaser classes and approved
settlements with both classes. Objectors appealed.
The Court of Appeals, Jordan, Circuit Judge, 613
F.3d 134, vacated and remanded.

**Holdings:** After rehearing en banc was granted and
opinion was vacated, the Court of Appeals, Rendell
, Circuit Judge, held that:
(1) common factual and legal issues arising from
cartel operator's alleged conduct and resulting in-
jury from inflated diamond prices predominated
over substantive variations in state law;
(2) certification of settlement class of indirect pur-
chasers did not violate Rules Enabling Act;
(3) certification of settlement class of indirect pur-
chasers did not inappropriately subordinate state
sovereignty;
(4) parameters of class of indirect purchasers was
properly delimited;
(5) certification order sufficiently identified the
claims to be treated on a class basis;
(6) nationwide settlement classes of direct and in-
direct purchasers were appropriately certified for
purpose of awarding injunctive relief under Clayton
Act;
(7) class action settlement was fair; and
(8) district court acted within its discretion in find-
ing that complexity and duration of litigation sup-
ported an award of attorney's fees representing 25%
of class settlement fund.

Affirmed.

Scirica, Circuit Judge, issued concurring opin-
ion.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Jordan, Circuit Judge, issued dissenting opinion in which Smith, Circuit Judge, joined.

West Headnotes

**[1] Federal Courts 170B ⚷813**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk813 k. Allowance of remedy and matters of procedure in general. Most Cited Cases
    Appellate court's role on appeal of trial court's order with respect to a proposed settlement agreement is to ascertain whether or not the trial court clearly abused its discretion in approving or rejecting the agreement.

**[2] Federal Courts 170B ⚷812**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk812 k. Abuse of discretion.
Most Cited Cases
    A district court abuses its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.

**[3] Federal Courts 170B ⚷813**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk813 k. Allowance of remedy and matters of procedure in general. Most Cited Cases
    If the district court's analysis of the facts and applicable law is correct, in approving or rejecting a proposed class action settlement, the Court of Appeals ordinarily defers to the district court's exercise of discretion embodied in the findings on predominance and superiority. Fed.Rules

Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[4] Federal Courts 170B ⚷776**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk776 k. Trial de novo. Most Cited Cases
    Whether an incorrect legal standard has been used by the district court in approving or rejecting a proposed class settlement agreement is an issue of law to be reviewed de novo on appeal.

**[5] Federal Courts 170B ⚷813**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
       170Bk813 k. Allowance of remedy and matters of procedure in general. Most Cited Cases
    District court's determination that a class action settlement was fair, reasonable, and adequate is reviewed by Court of Appeals for abuse of discretion.

**[6] Federal Civil Procedure 170A ⚷164**

170A Federal Civil Procedure
   170AII Parties
     170AII(D) Class Actions
      170AII(D)1 In General
       170Ak164 k. Representation of class; typicality. Most Cited Cases

**Federal Civil Procedure 170A ⚷165**

170A Federal Civil Procedure
   170AII Parties
     170AII(D) Class Actions
      170AII(D)1 In General
       170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases
    Class certification requirements are designed to assure that courts will identify the common in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

terests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[7] Compromise and Settlement 89 ⚷⟳56.1**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
           89k56.1 k. In general. Most Cited Cases
    Before approving a class settlement agreement, a district court first must determine that the requirements for class certification are met. Fed.Rules Civ.Proc.Rule 23(a, b), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⚷⟳181.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
           170AII(D)3 Particular Classes Represented
               170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

**Federal Civil Procedure 170A ⚷⟳182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
           170AII(D)3 Particular Classes Represented
               170Ak182.5 k. Consumers, purchasers, borrowers, and debtors. Most Cited Cases
    Common factual and legal issues arising from alleged price-fixing and monopolization by operator of diamond cartel, and resulting injury from inflated diamond prices, predominated over substantive variations in state law, as required for certification of nationwide settlement class of indirect purchasers of diamonds in action against operator alleging violation of state antitrust, consumer protection, and unjust enrichment laws; inconsistency among states as to whether indirect purchasers had

standing did not override predominance of common issues, particularly given that no proof on merits was required for a settlement, goal of which was to achieve "global peace" avoiding future litigation with all potential plaintiffs. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⚷⟳165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
           170AII(D)1 In General
               170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases
    The class-certification predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, and assesses whether a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⚷⟳165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
           170AII(D)1 In General
               170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases
    Parallel with the class-certification commonality requirement, which provides that a proposed class must share a common question of law or fact, the predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A ⚷⟳165**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

Class-certification commonality requirement is incorporated into the more stringent predominance requirement, and it is appropriate for court to analyze the two factors together, with particular focus on the predominance requirement, when determining whether class certification is appropriate. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.

**[12] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

The focus of the class-certification predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

Variations in the rights and remedies available to injured class members under the various laws of the fifty states do not defeat the commonality and predominance class-certification requirements. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28

U.S.C.A.

**[14] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

A finding of the commonality required for class certification does not require that all class members share identical claims. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[15] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

The class-certification predominance requirement is not considered deficient merely because class members' claims are subject to the varying laws of fifty states. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[16] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

The predominance class-certification requirement cannot be reduced to a mechanical, single-issue test; rather, as long as a sufficient constellation of common issues binds class members together, variations in the sources and application of applicable laws will not foreclose class certification.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[17]** Federal Civil Procedure 170A ⚖︎165

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases
    Where a defendant's singular conduct gives rise to one cause of action in one state, while providing for a different cause of action in another jurisdiction, the predominance class-certification requirement is satisfied and court may group both claims in a single class action. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[18]** Federal Civil Procedure 170A ⚖︎161.1

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak161.1 k. Factors, grounds, objections, and considerations in general. Most Cited Cases

**Federal Civil Procedure 170A ⚖︎165**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases
    Court conducting predominance inquiry for a proposed settlement-class certification is not as concerned with formulating some prediction as to how variances in state law would play out at trial as when the proposed certification is for a litigation class, for the proposal is that there be no trial; as such, court simply need not inquire whether the varying state treatments of claims at issue would present the type of insuperable obstacles or intractable management problems pertinent to certification of a litigation class. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[19]** Federal Civil Procedure 170A ⚖︎165

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases
    Court's responsibility in conducting predominance class-certification inquiry is to protect absentees by blocking unwarranted or overbroad class definitions. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[20]** Federal Civil Procedure 170A ⚖︎165

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases
    State law variations are largely irrelevant to predominance inquiry for certification of a settlement class. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[21]** Federal Civil Procedure 170A ⚖︎165

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases
    The question to determine whether a proposed class meets the predominance class-certification requirement is not what valid claims the plaintiffs can

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

assert; rather, it is simply whether common issues of fact or law predominate. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[22]** Federal Civil Procedure 170A ☞165

170A Federal Civil Procedure
 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak165 k. Common interest in subject matter, questions and relief; damages issues.
Most Cited Cases

**Federal Civil Procedure 170A ☞174**

170A Federal Civil Procedure
 170AII Parties
  170AII(D) Class Actions
   170AII(D)2 Proceedings
    170Ak174 k. Consideration of merits.
Most Cited Cases

 There is no "claims" or "merits" litmus test incorporated into the class-certification predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[23]** Federal Civil Procedure 170A ☞174

170A Federal Civil Procedure
 170AII Parties
  170AII(D) Class Actions
   170AII(D)2 Proceedings
    170Ak174 k. Consideration of merits.
Most Cited Cases

 An analysis into the legal viability of the asserted class claims is properly considered through a motion to dismiss or motion for summary judgment, not as part of the class certification process. Fed.Rules Civ.Proc.Rules 12(b), 23, 56, 28 U.S.C.A.

**[24]** Federal Civil Procedure 170A ☞174

170A Federal Civil Procedure

170AII Parties
 170AII(D) Class Actions
  170AII(D)2 Proceedings
   170Ak174 k. Consideration of merits.
Most Cited Cases

 A court conducting class-certification inquiry may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[25]** Federal Civil Procedure 170A ☞174

170A Federal Civil Procedure
 170AII Parties
  170AII(D) Class Actions
   170AII(D)2 Proceedings
    170Ak174 k. Consideration of merits.
Most Cited Cases

 District court conducting class-certification inquiry may inquire into the merits of the claims presented in order to determine whether the certification requirements are met, but not in order to determine whether the individual elements of each claim are satisfied. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[26]** Federal Civil Procedure 170A ☞174

170A Federal Civil Procedure
 170AII Parties
  170AII(D) Class Actions
   170AII(D)2 Proceedings
    170Ak174 k. Consideration of merits.
Most Cited Cases

 Plaintiffs need not actually establish the validity of their claims at the class certification stage. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[27]** Antitrust and Trade Regulation 29T ☞ 960

29T Antitrust and Trade Regulation
 29TXVII Antitrust Actions, Proceedings, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Enforcement
    29TXVII(B) Actions
        29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
            29Tk960 k. In general. Most Cited Cases

**Federal Courts 170B ⌬12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk12.1 k. In general. Most Cited Cases

    "Statutory standing" to bring an antitrust claim refers to the possession of a viable claim or right to relief and is distinct from jurisdictional standing, in that Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts, whereas lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[28] Antitrust and Trade Regulation 29T ⌬ 960**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk960 k. In general. Most Cited Cases

    Statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place.

**[29] Compromise and Settlement 89 ⌬2**

89 Compromise and Settlement
    89I In General
        89k1 Nature and Requisites

        89k2 k. In general. Most Cited Cases

    Strong presumption in favor of voluntary settlement agreements is especially strong in class actions and other complex cases because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.

**[30] Federal Civil Procedure 170A ⌬181.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

    In action against operator of diamond cartel alleging violation of state antitrust laws, certification of nationwide settlement class of indirect purchasers of diamonds did not recognize or expand substantive rights unavailable in a particular state, and thus did not violate Rules Enabling Act; although state substantive law varied as to whether indirect purchasers had standing, class settlement merely recognized the parties' voluntary compromise of their rights and did not itself affect their substantive state law rights. 28 U.S.C.A. § 2072(b); Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[31] Compromise and Settlement 89 ⌬2**

89 Compromise and Settlement
    89I In General
        89k1 Nature and Requisites
            89k2 k. In general. Most Cited Cases

    Settlement agreements are creatures of private contract law.

**[32] Compromise and Settlement 89 ⌬51**

89 Compromise and Settlement
    89II Judicial Approval
        89k51 k. In general. Most Cited Cases

    Federal district court is not a party to a voluntary settlement agreement between the parties be-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

fore it, nor may it modify the terms of a such an agreement.

**[33] Federal Civil Procedure 170A ☞161.1**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak161.1 k. Factors, grounds, objections, and considerations in general. Most Cited Cases

District court's certification of a class action settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[34] Compromise and Settlement 89 ☞51**

89 Compromise and Settlement
  89II Judicial Approval
    89k51 k. In general. Most Cited Cases

In the absence of a finding that plaintiffs are actually entitled to relief under substantive state law, a court does not abridge, enlarge, or modify any substantive right in violation of the Rules Enabling Act by approving a voluntarily-entered class settlement agreement. 28 U.S.C.A. § 2072(b); Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[35] Federal Civil Procedure 170A ☞181.5**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)3 Particular Classes Represented
        170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

In class action against operator of diamond cartel alleging violation of state antitrust laws, certification of nationwide settlement class of indirect purchasers of diamonds did not inappropriately subordinate state sovereignty, despite inconsistency

among the states as to whether indirect purchasers had standing; states' restriction on indirect purchaser recovery was motivated not by categorical policy judgment but by prudential concerns regarding duplicative liability, complexity in ascertaining passed-on overcharges, and inefficient antitrust enforcement, but settlement at issue marginalized these concerns by providing for specified recovery for both direct and indirect purchasers. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[36] Federal Civil Procedure 170A ☞181.5**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)3 Particular Classes Represented
        170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

In class action against operator of diamond cartel alleging violation of state antitrust laws, certification of nationwide settlement class of indirect purchasers of diamonds properly delineated the parameters of the class, where class was defined as any purchasers of any diamond product in the United States except for those who purchased directly from cartel operator or its competitors. Fed.Rules Civ.Proc.Rule 23(c)(1)(B), 28 U.S.C.A.

**[37] Federal Civil Procedure 170A ☞173**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)2 Proceedings
        170Ak173 k. Hearing and determination; decertification; effect. Most Cited Cases

Class certification order must include: (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified; and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis. Fed.Rules Civ.Proc.Rule 23(c)(1)(B), 28 U.S.C.A.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

**[38] Federal Civil Procedure 170A ☞173**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)2 Proceedings
        170Ak173 k. Hearing and determination; decertification; effect. Most Cited Cases

In the settlement context, class certification order need not draw fine lines among the various theories of relief in listing the claims, issues, or defenses to be treated on a class basis. Fed.Rules Civ.Proc.Rule 23(c)(1)(B), 28 U.S.C.A.

**[39] Federal Civil Procedure 170A ☞181.5**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)3 Particular Classes Represented
        170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

In class action against operator of diamond cartel alleging violation of state antitrust laws brought by direct and indirect purchasers of diamonds, order certifying nationwide classes and approving class settlement sufficiently identified the claims to be treated on a class basis; certification order identified six common legal or factual issues that predominated over individual questions and were susceptible to class treatment, and laid out in depth all the claims to be resolved by the class settlement, obviating any need to cobble together an uncertain category of issues to be tried as a class. Fed.Rules Civ.Proc.Rule 23(c)(1)(B), 28 U.S.C.A.

**[40] Federal Civil Procedure 170A ☞173**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)2 Proceedings
        170Ak173 k. Hearing and determination; decertification; effect. Most Cited Cases

**Federal Courts 170B ☞817**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk817 k. Parties; pleading. Most Cited Cases

No particular format is necessary in order for a class certification order to meet the substantive requirements of defining the class and identifying class claim, and appellate court will not set aside substantively conforming certification orders purely over matters of form. Fed.Rules Civ.Proc.Rule 23(c)(1)(B), 28 U.S.C.A.

**[41] Federal Civil Procedure 170A ☞181.5**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)3 Particular Classes Represented
        170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

In class action against operator of diamond cartel alleging violation of antitrust law, nationwide settlement classes of direct and indirect purchasers of diamonds were appropriately certified for purpose of awarding injunctive relief under Clayton Act, on ground that cartel operator's alleged conduct was generally applicable to the classes, without fact-finding as to whether there was imminent threat of prospective antitrust injury; cartel operator's conduct allegedly caused all members of both classes to pay artificially inflated diamond prices, which they allegedly would continue to pay in the absence of injunctive relief, and settlement posture of case obviated need for proof of imminent injury. Fed.Rules Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[42] Antitrust and Trade Regulation 29T ☞ 995**

29T Antitrust and Trade Regulation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

29TXVII Antitrust Actions, Proceedings, and Enforcement
   29TXVII(B) Actions
      29Tk994 Injunction
         29Tk995 k. In general. Most Cited Cases

Because actions under the Clayton Act seeking injunctive relief for violation of antitrust laws do not present the countervailing considerations in actions seeking damages, such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses, plaintiffs need not satisfy the direct purchaser requirement as a condition of seeking injunctive relief. Clayton Act, § 16, 15 U.S.C.A. § 26 .

**[43] Antitrust and Trade Regulation 29T ☞ 995**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk994 Injunction
            29Tk995 k. In general. Most Cited Cases

To establish the need for injunctive relief to remedy antitrust violations under the Clayton Act, plaintiffs must generally demonstrate three uncomplicated prerequisites: (1) a threat of loss; (2) that the injury in question is of the type the antitrust laws were intended to prevent; and (3) a significant threat of injury from a violation of the antitrust laws. Clayton Act, § 16, 15 U.S.C.A. § 26.

**[44] Compromise and Settlement 89 ☞ 2**

89 Compromise and Settlement
   89I In General
      89k1 Nature and Requisites
         89k2 k. In general. Most Cited Cases

**Compromise and Settlement 89 ☞ 51**

89 Compromise and Settlement

89II Judicial Approval
   89k51 k. In general. Most Cited Cases

Parties to a suit have the right to agree to anything they please in reference to the subject matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings.

**[45] Compromise and Settlement 89 ☞ 71**

89 Compromise and Settlement
   89II Judicial Approval
      89k66 Proceedings
         89k71 k. Determination; findings. Most Cited Cases

District court may provide broader relief in an action that is resolved before trial than the court could have awarded after a trial.

**[46] Compromise and Settlement 89 ☞ 51**

89 Compromise and Settlement
   89II Judicial Approval
      89k51 k. In general. Most Cited Cases

District courts are afforded wide discretion to give effect to joint compromises that timely advance the interests of the parties without wasteful litigation.

**[47] Stipulations 363 ☞ 5**

363 Stipulations
   363k5 k. Supervision and approval of court. Most Cited Cases

District court may approve a mutually agreed-upon stipulation enjoining conduct within the court's jurisdiction regardless of whether the plaintiffs could have received identical relief in a contested suit.

**[48] Declaratory Judgment 118A ☞ 305**

118A Declaratory Judgment
   118AIII Proceedings
      118AIII(C) Parties
         118Ak305 k. Representative or class ac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

tions. Most Cited Cases

**Federal Civil Procedure 170A ⛭165**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common interest in sub-
ject matter, questions and relief; damages issues.
Most Cited Cases

When class certification is sought on ground
that the party opposing the class has acted or re-
fused to act on grounds generally applicable to the
class, making injunctive or declaratory relief appro-
priate, the relief sought must benefit the entire
class, and the putative class must demonstrate that
the interests of the class members are so like those
of the individual representatives that injustice will
not result from their being bound by such judgment
in the subsequent application of principles of res ju-
dicata. Fed.Rules Civ.Proc.Rule 23(b)(2), 28
U.S.C.A.

**[49] Compromise and Settlement 89 ⛭56.1**

89 Compromise and Settlement
  89II Judicial Approval
    89k56 Factors, Standards and Considera-
tions; Discretion Generally
      89k56.1 k. In general. Most Cited Cases

**Compromise and Settlement 89 ⛭57**

89 Compromise and Settlement
  89II Judicial Approval
    89k56 Factors, Standards and Considera-
tions; Discretion Generally
      89k57 k. Fairness, adequacy, and reason-
ableness. Most Cited Cases

Before approving a class settlement agreement,
a district court must find that the requirements for
class certification are met, and must separately de-
termine that the settlement is fair to the class.
Fed.Rules Civ.Proc.Rule 23(a, b, e), 28 U.S.C.A.

**[50] Compromise and Settlement 89 ⛭57**

89 Compromise and Settlement
  89II Judicial Approval
    89k56 Factors, Standards and Considera-
tions; Discretion Generally
      89k57 k. Fairness, adequacy, and reason-
ableness. Most Cited Cases

In determining whether proposed class settle-
ment is fair, reasonable, and adequate, district court
bears the important responsibility of protecting ab-
sent class members, and must be assured that the
settlement represents adequate compensation for
the release of the class claims. Fed.Rules
Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[51] Compromise and Settlement 89 ⛭57**

89 Compromise and Settlement
  89II Judicial Approval
    89k56 Factors, Standards and Considera-
tions; Discretion Generally
      89k57 k. Fairness, adequacy, and reason-
ableness. Most Cited Cases

Where settlement negotiations precede class
certification, and approval for settlement and certi-
fication are sought simultaneously, district courts
should be even more scrupulous than usual when
examining the fairness of the proposed settlement.
Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[52] Compromise and Settlement 89 ⛭70**

89 Compromise and Settlement
  89II Judicial Approval
    89k66 Proceedings
      89k70 k. Evidence; affidavits. Most Cited
Cases

The settling parties bear the burden of proving
that the factors considered by the court in determin-
ing whether a proposed class settlement is fair to
the class weigh in favor of approval of the settle-
ment. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[53] Federal Courts 170B ⛭848**

170B Federal Courts
  170BVIII Courts of Appeals

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

170BVIII(K) Scope, Standards, and Extent
170BVIII(K)5 Questions of Fact, Verdicts and Findings
170Bk848 k. Findings of court in general. Most Cited Cases

Because of the district court's proximity to the parties and to the nuances of the litigation, appellate court accords great weight to the court's factual findings in conducting the fairness inquiry in determining whether to approve class action settlement. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[54]** Compromise and Settlement 89 ⊝64

89 Compromise and Settlement
89II Judicial Approval
89k56 Factors, Standards and Considerations; Discretion Generally
89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Complexity, expense, and likely duration of litigation weighed in favor of approval of class action settlement as fair, in action alleging antitrust violations against operator of diamond cartel by direct and indirect purchasers; settlement provided substantial and immediate resolution of numerous legal and factual issues without further expense to class, and would avoid the uncertainty created by cartel operator's defaults and ongoing denial of personal jurisdiction, moreover, extended motion practice would not only further prolong litigation but also would reduce value of any recovery to class. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[55]** Compromise and Settlement 89 ⊝64

89 Compromise and Settlement
89II Judicial Approval
89k56 Factors, Standards and Considerations; Discretion Generally
89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Minimal number of objections and requests for exclusion weighed in favor of approval of class action settlement as fair, in action alleging antitrust violations against operator of diamond cartel by

direct and indirect purchasers of diamonds. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[56]** Compromise and Settlement 89 ⊝64

89 Compromise and Settlement
89II Judicial Approval
89k56 Factors, Standards and Considerations; Discretion Generally
89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Stage of the proceedings and the amount of discovery completed weighed in favor of approval of class action settlement as fair, in action alleging antitrust violations against operator of diamond cartel by direct and indirect purchasers of diamonds; counsel adequately appreciated the merits of the case prior to reaching settlement, as litigation had been ongoing for years prior to settlement negotiations, with significant factual investigation and legal development. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[57]** Compromise and Settlement 89 ⊝64

89 Compromise and Settlement
89II Judicial Approval
89k56 Factors, Standards and Considerations; Discretion Generally
89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Risks of establishing liability weighed in favor of approval of class action settlement as fair in action alleging antitrust violations against foreign operator of diamond cartel by direct and indirect purchasers of diamonds, although default judgments had already been obtained against cartel operator; plaintiffs faced various difficulties in attempting to collect on default judgments against cartel operator in foreign jurisdictions, particularly given cartel operator's track record of rejecting United States jurisdiction over its legal affairs and the fact that it continued to deny any wrongdoing even in reaching settlement agreement. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

**[58] Compromise and Settlement 89 ⚷64**

89 Compromise and Settlement
   89II Judicial Approval
      89k56 Factors, Standards and Considerations; Discretion Generally
      89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Risks of establishing damages weighed in favor of approval of class action settlement as fair, in action alleging antitrust violations against foreign operator of diamond cartel by direct and indirect purchasers of diamonds; proceedings to establish damages would entail a "battle of the experts," with each side presenting its figures and defenses to the other side's proposals.

**[59] Compromise and Settlement 89 ⚷64**

89 Compromise and Settlement
   89II Judicial Approval
      89k56 Factors, Standards and Considerations; Discretion Generally
      89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Risks of maintaining the class action through trial weighed in favor of approval of class action settlement as fair, in action alleging antitrust violations against operator of diamond cartel by direct and indirect purchasers of diamonds; class certification was tenuous, as district court retained authority to decertify or modify class at any time during litigation if the size and variety of issues implicated by the nationwide class action proved unmanageable. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[60] Federal Civil Procedure 170A ⚷161.1**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak161.1 k. Factors, grounds, objections, and considerations in general. Most Cited Cases

**Federal Civil Procedure 170A ⚷161.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak161.2 k. Superiority, manageability, and need in general. Most Cited Cases

While the standards for class certification are the same for both settlement and litigation classes, certification in the former context need not consider whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial, and this added risk is of utmost significance in determining whether a settlement would best serve the interests of the class. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[61] Compromise and Settlement 89 ⚷64**

89 Compromise and Settlement
   89II Judicial Approval
      89k56 Factors, Standards and Considerations; Discretion Generally
      89k64 k. Antitrust and trade regulation actions. Most Cited Cases

Ability of foreign operator of diamond cartel to withstand greater judgment after trial did not weigh against approval of class action settlement as fair, in action alleging antitrust violations against cartel operator by direct and indirect purchasers of diamonds; it would be extremely difficulty, if not impossible, to collect a judgment from cartel operator. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[62] Compromise and Settlement 89 ⚷57**

89 Compromise and Settlement
   89II Judicial Approval
      89k56 Factors, Standards and Considerations; Discretion Generally
      89k57 k. Fairness, adequacy, and reasonableness. Most Cited Cases

In comparing the value of class action settlement versus trial, court must be careful to judge the fairness of the settlement against the realistic,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

rather than theoretical, potential for recovery after trial. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[63] Compromise and Settlement 89 ⟨⟩57**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k57 k. Fairness, adequacy, and reasonableness. Most Cited Cases
    A defendant's ability to withstand a much higher judgment after trial does not necessarily mean that it is obligated to pay any more pursuant to class action settlement than what the class members are entitled to under the theories of liability that existed at the time the settlement was reached. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[64] Compromise and Settlement 89 ⟨⟩57**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k57 k. Fairness, adequacy, and reasonableness. Most Cited Cases
    In any class action against a large corporation, the defendant is likely to be able to withstand a more substantial judgment after trial than is agreed to in a proposed class action settlement, and this fact alone does not undermine the reasonableness of the settlement. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[65] Compromise and Settlement 89 ⟨⟩57**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k57 k. Fairness, adequacy, and reasonableness. Most Cited Cases
    Reasonableness of a proposed class action settlement is assessed by comparing the present value of the damages plaintiffs would likely recover if

successful at trial, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[66] Compromise and Settlement 89 ⟨⟩64**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k64 k. Antitrust and trade regulation actions. Most Cited Cases
    Reasonableness of proposed settlement, in light of all attendant risks of litigation, weighed in favor of approval of class action settlement as fair, in action alleging antitrust violations against foreign operator of diamond cartel by direct and indirect purchasers of diamonds; settlement would recover 10.93% of overcharge to indirect purchasers and more than 20% of overcharge to direct purchasers that was allegedly caused by cartel operator's anti-competitive conduct, which compared favorably to any recovery after litigation given the profound difficulties in enforcing a judgment against cartel operator in foreign jurisdictions. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[67] Compromise and Settlement 89 ⟨⟩64**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k64 k. Antitrust and trade regulation actions. Most Cited Cases
    In class action alleging antitrust violations against operator of diamond cartel by direct and indirect purchasers of diamonds, district court, in evaluating fairness of settlement, acted within its discretion by comparing value of proposed settlement amount to amount of single damages that could be obtained after trial, rather than treble damages that were an automatic component of antitrust damages recovery in many jurisdictions; using single damages was a commonly accepted proced-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

ure for assessing fairness, adequacy and reasonableness of settlement. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[68] Compromise and Settlement 89 ☞64**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k64 k. Antitrust and trade regulation actions. Most Cited Cases

**Federal Civil Procedure 170A ☞181.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak181.5 k. Antitrust plaintiffs. Most Cited Cases

In class action alleging antitrust violations against operator of diamond cartel by direct and indirect purchasers of diamonds, district court reasonably determined not to use subclasses to allocate settlement funds to indirect purchasers based on variations in the strength or weakness of theories of recovery under applicable state law; there were no intra-class conflicts because all indirect purchasers experienced same injury, sought recovery for overpayment caused by cartel operator's anticompetitive conduct, and shared common interests in establishing damages and injunctive relief, while it was purely speculative that indirect purchasers from certain states could anticipate greater recovery due to variations among state law. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[69] Compromise and Settlement 89 ☞57**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k57 k. Fairness, adequacy, and reason-

ableness. Most Cited Cases

A district court's principal obligation in approving a plan of allocation of a class action settlement fund is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[70] Federal Courts 170B ☞817**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk817 k. Parties; pleading. Most Cited Cases

Court of Appeals affords substantial deference to district courts with respect to their resolution of whether use of subclasses is appropriate to achieve fairness in intra-class allocation of class action settlement funds, because such decisions require a balancing of costs and benefits that can best be performed by a district judge. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

**[71] Compromise and Settlement 89 ☞64**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k64 k. Antitrust and trade regulation actions. Most Cited Cases

In class action alleging antitrust violations against operator of diamond cartel by direct and indirect purchasers of diamonds, district court acted within its discretion in approving $10 minimum for payment of claim from class settlement fund; administrative costs for de minimis payments were too large to justify payments smaller than $10, anticipated claim filing rate was not so high that it would result in all submitted claims falling below the $10 threshold, and settlement also provided injunctive relief for the benefit of all class members regardless of individual monetary recovery. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

**[72] Federal Civil Procedure 170A** ⟴**2737.13**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2737 Attorney Fees
            170Ak2737.13 k. Class actions; settlements. Most Cited Cases
    A robust and thorough judicial review of fee applications is required in all class action settlements, but the amount of a fee award is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[73] Federal Civil Procedure 170A** ⟴**2737.4**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2737 Attorney Fees
            170Ak2737.4 k. Amount and elements. Most Cited Cases
    Lodestar approach for determining an award of attorney's fees multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services.

**[74] Attorney and Client 45** ⟴**155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and payment from funds in court. Most Cited Cases
    The percentage-of-recovery (POR) approach for determining an award of attorney's fees in a class action is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[75] Attorney and Client 45** ⟴**155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and payment from funds in court. Most Cited Cases

    In class action alleging antitrust violations against foreign operator of diamond cartel by direct and indirect purchasers of diamonds, district court acted within its discretion in finding that complexity and duration of litigation supported an award of attorney's fees representing 25% of class settlement fund; although case may have lacked some of the contested motion practice and extensive discovery elicited in others receiving similar percentage awards, case presented other challenges, including cartel operator's denial of jurisdiction and liability, secrecy of diamond industry, unavailability of normal discovery methods, and substantial risk of non-collection of judgment in foreign countries, and case required counsel to devote nearly 39,000 hours to litigation in various federal and state courts and to subsequent negotiations and disputes pertaining to settlement itself. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[76] Attorney and Client 45** ⟴**155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and payment from funds in court. Most Cited Cases
    In determining appropriate attorney's fee award as part of class action settlement under the percentage-of-recovery approach, court considers: (1) size of fund created and number of persons benefited; (2) presence or absence of substantial objections by members of class to settlement terms and/or fees requested by counsel; (3) skill and efficiency of attorneys involved; (4) complexity and duration of litigation; (5) risk of nonpayment; (6) amount of time devoted to case by class counsel; (7) awards in similar cases; (8) value of benefits attributable to efforts of class counsel relative to efforts of other groups, such as government agencies conducting investigations; (9) percentage fee that would have been negotiated had case been subject to private contingent fee arrangement when counsel was retained; and (10) any innovative terms of settlement. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**\*284** John J. Pentz, III, Esq. [Argued], Class Action

---

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Fairness Group, Maynard, MA, for Non Party–Appellant.

Howard J. Bashman, Esq. [Argued], Willow Grove, PA, George M. Plews, Esq., Christopher J. Braun, Esq., Plews Shadley Racher & Braun LLP, Indianapolis, IN, for Non Party–Appellant Susan M. Quinn.

William Bernstein, Esq., Eric B. Fastiff, Esq., Lieff, Cabraser, Heimann & Bernstein, Joseph D. Cooper, Esq., Tracy R. Kirkham, Esq., Cooper & Kirkham, San Francisco, CA, for Plaintiff–Appellee Shawn Sullivan.

Craig C. Corbitt, Esq., Zelle, Hofmann, Voelbel & Mason, San Francisco, CA, Samuel Issacharoff, Esq. [Argued], New York University Law School, New York, NY, Steven A. Katz, Esq., Korein Tilley, St. Louis, MO, Susan G. Kupfer, Esq., Glancy, Binkow & Goldberg, San Francisco, CA, John A. Maher, Esq., Summit, NJ, Joseph J. Tabacco, Jr., Esq., Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, San Francisco, CA, for Plaintiffs–Appellees Arrigotti Fine Jewelry Shawn Sullivan and James Walnum.

Jessica Biggio, Esq., Skadden, Arps, Slate, Meagher & Flom, New York, NY, Francis Ciani–Dausch, Esq., Tara S. Emory, Esq., Steven C. Sunshine, Esq., Skadden, Arps, Slate, Meagher & Flom, Washington, DC, Matthew P. Hendrickson, Esq., Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Defendant–Appellee DeBeers SA.

Ben Kinzler, Esq., Diamond Manufacturers & Importers Association of America, New York, NY, Robert J. LaRocca, Esq., Kohn Swift & Graf, Philadelphia, PA, Joanne Zack, Esq., Bonio & Zack, Bala Cynwyd, PA, for Non–Party Amicus Appellee, Diamond Manufacturers and Importers Association of America.

Edward W. Harris, III, Esq., Taft, Stettinius & Holister, Indianapolis, IN, Robert A. Skirnick, Esq., Meredity, Cohen, Greenfogel & Skirnick, Jared

Stamell, Esq., Stamell & Schager, New York, NY, for Non Party–Appellees Anco Ind. Diamond Corp.; Amer Diamond Tool & Gauge Inc. And British Diamond Import Co.

Cecilia L. Gardner, Esq., Jewelers Vigilance Committee, New York, NY, for Non Party–Amicus Appellee Jewelers Vigilance Comm.

Scott W. Browne, Esq., Browne & Browne, Beaumont, TX, Kenneth E. Nelson, Esq., Kansas City, MO, Edward F. Siegel, Esq. Cleveland, OH, for Non Party–Appellants William Benjamin Coffey, Jr., Marvin L. Union, Tim Henning, Neil Freeman and Kylie Luke.

Christpher A. Bandas, Esq., Bandas law Firm, Corpus Christie, TX, for Non Party–Appellant Aaron Petrus.

Robert E. Margulies, Esq., Margulies Wind, Jersey City, NJ, Jeffrey L. Weinstein, Athens, TX, for Non Party–Appellant Janet Giddings.

Ricky E. Bagolie, Esq., Bagolie FriedmanInjury Lawyers, Jersey City, NJ, Andrea Boggio, Esq., Bryant University, Smithfield, RI, for Non Party–Appellants Frank Ascione, Rosaura Bagolie, Matthew Delong, Ed McKenna Peter Perera, Thomas Vaughan.

Robert J. Gaudet, Jr., Esq. [ARGUED], RJ Gaudet & Associates, Seattle, WA, for Non Party–Appellants Sandeep Gopalan, Manoj Kolel–Veetil, Matthew Metz, Anita Pal, Deb K. Pal, Jay Pal and Rangesh K. Shah.

Eric L. Cramer, Esq., Berger & Montague, Philadelphia, PA, for Non Party–Amicus Appellee American Antitrust Institute.

Kristen Dishman, Wareham, MA, pro se.

**\*285** Margaret Marasco, Lynn, MA, pro se.

James B. Hicks, Hicks Parks, Los Angeles, CA, pro se.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Before: RENDELL and JORDAN, Circuit Judges, and AMBROSE [FN*], District Judge.

> FN* Honorable Donetta W. Ambrose, United States District Court Judge for the Western District of Pennsylvania, sitting by designation.

Before: SCIRICA, RENDELL, AMBRO, FUENTES, SMITH, FISHER, CHAGARES, JORDAN and VANASKIE, Circuit Judges.

### OPINION OF THE COURT

RENDELL, Circuit Judge, with whom Circuit Judges SCIRICA, AMBRO, FUENTES, FISHER, CHAGARES and VANASKIE, join.

At issue on appeal in this class action litigation is the propriety of the District Court's certification of two nationwide settlement classes comprising purchasers of diamonds from De Beers S.A. and related entities ("De Beers").[FN1] The settlement provided for a fund of $295 million to be distributed to both the direct and indirect purchasers: the direct purchasers were to receive $22.5 million of the fund, while the indirect purchasers would receive $272.5 million. A panel of our Court held that the District Court's ruling was inconsistent with the predominance inquiry mandated by Federal Rule of Civil Procedure 23(b)(3), and remanded the matter for further proceedings. See *Sullivan v. DB Investments, Inc., 613 F.3d 134 (3d Cir.2010), reh'g en banc granted and vacated by Sullivan v. DB Investments, Inc., 619 F.3d 287 (3d Cir.2010).* We then granted the plaintiffs' petition for rehearing en banc and vacated the prior order. Accordingly, we address anew the propriety of the District Court's certification of the direct and indirect purchaser classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), and also consider for the first time the objections raised to the fairness of the class settlement.[FN2]

> FN1. The Settlement involved five individual class actions pending in federal

court and two other class suits pending in state court. The individual federal suits presently before us are: *Sullivan v. DB Investments, Inc.,* Index No. 04–cv–02819 (D.N.J.); *Null v. DB Investments, Inc.,* Madison Co. No. 05–L–209 (Madison County, Ill. Cir. Ct., removed to S.D. Ill.); *Leider v. Ralfe,* No. 01–CV–3137 (S.D.N.Y.); *Anco Industrial Diamond Corp. v. DB Investments, Inc.,* No. 01–cv–04463 (D.N.J.); and *British Diamond Import Co. v. Central Holdings Ltd.,* No. 04–cv–04098 (D.N.J.). The two other class actions pending in state court pertinent to the Settlement and this set of appeals are: *Hopkins v. De Beers Centenary A.G.,* San Francisco County No. CGC–04–432954 (Cal.Super.Ct.), and *Cornwell v. DB Investments, Inc.,* Maricopa Co. No. CV2005–2968 (Ariz.Super.Ct.).

> FN2. Because the Panel found the certification of the class to be flawed, it did not reach the Rule 23 fairness objections to the settlement, distribution plan, and fee award, or the District Court's resolution of these objections. See *Sullivan,* 613 F.3d at 142 n. 6. Because we now conclude that the District Court's certification of the proposed settlement was appropriate, we will also address these issues.

We believe that the predominance inquiry should be easily resolved here based on De Beers's conduct and the injury it caused to each and every class member, and that the straightforward application of Rule 23 and our precedent should result in affirming the District Court's order certifying the class. But the objectors to the class certification and our dissenting colleagues insist that, when deciding whether to certify a class, a district court must ensure that each class member possesses a viable claim or "some colorable legal claim," (Dissenting Op. at 344). We disagree, and accordingly, we will

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

reason **\*286** through our analysis in a more deliber-
ate manner in order to explain why the addition of
this new requirement into the Rule 23 certification
process is unwarranted.

*I. Factual & Procedural Background*

*A. Present Litigation & Settlement Proceedings*

The allegations in the present case arose from
De Beers's undisputed position as the dominant par-
ticipant in the wholesale market for gem-quality
diamonds throughout much of the twentieth cen-
tury.[FN3] It is alleged that, beginning in 1890 and
continuing through the filing of the Complaints at
issue in this appeal, De Beers coordinated the
worldwide sales of diamonds by, *inter alia,* execut-
ing output-purchase agreements with competitors,
synchronizing and setting production limits, re-
stricting the resale of diamonds within certain geo-
graphic regions, and directing marketing and ad-
vertising. Through its coordinated network of dia-
mond producers, De Beers was able to value dia-
monds according to certain physical characteristics
and to then control the quantity and prices of dia-
monds in the marketplace by strictly regimenting
sales to preferred wholesalers, known as
"sightholders."[FN4] Sightholders resold these dia-
monds to jewelry manufacturers and retail-
ers—either as rough diamonds or as cut, polished,
and finished stones—and constituted De Beers's
primary channel for distribution of its diamonds.[FN5]

> **FN3.** The vacated Panel Opinion describes
> the history, progression to power, and
> eventual market dominance of De Beers
> and its related entities in greater detail. *See
> Sullivan,* 613 F.3d at 138–39. For the sake
> of brevity, we provide a summary.

> **FN4.** Sightholders are selected by De
> Beers's subsidiary Diamond Trading Com-
> pany ("DTC") based upon specific criteria,
> "including their financial standing and reli-
> ability, their market position, their distri-

bution ability, their marketing ability, and
their compliance with Diamond Trading
Company Diamond Best Practice Prin-
ciples." (App'x 1438.) In 2006, DTC had
ninety-three sightholders, nine of which
had head offices in the United States and
seventy-six of which had sales offices in
the country. (*Id.*) Sightholders sell both
rough and polished diamonds, as well as
diamond jewelry. (*Id.*) By way of example,
the retailer Tiffany & Co. is a majority-own-
er of the South African sightholder Rand
Precision Cut Diamonds, which sells pol-
ished diamonds and manufactures jewelry
for sale in Tiffany stores. (*Id.* 1438–39.)

> **FN5.** The process by which De Beers sold
> its rough diamonds entailed a "diamond
> pipeline," which began with the sale of
> rough diamonds and ended with the pur-
> chase of retail diamond jewelry by con-
> sumers. The participants in the diamond
> pipeline included rough stone wholesalers,
> cutters and polishers of rough diamonds,
> finished stone wholesalers, diamond jew-
> elry manufacturers and wholesalers, and
> retailers.

Between 2001 and 2002, plaintiffs brought suit
complaining that De Beers's aforementioned busi-
ness practices contravened state and federal anti-
trust, consumer protection, and unjust enrichment
laws, and constituted unfair business practices and
false advertising under common law and relevant
state statutes. Specifically, the plaintiffs alleged
that De Beers exploited its market dominance to ar-
tificially inflate the prices of rough diamonds; this,
in turn, caused reseller and consumer purchasers of
diamonds and diamond-infused products to pay an
unwarranted premium for such products. The initial
two price-fixing lawsuits were filed in the United
States District Courts for the District of New Jersey
and the Southern District of New York in 2001, and
five subsequent lawsuits were initiated in federal
and state courts in other parts of the country.[FN6]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

**\*287** Three of the lawsuits were filed in state court in Arizona, California, and Illinois, respectively; the last was then removed to the United States District Court for the Southern District of Illinois. The five suits in federal court were subsequently all transferred to and consolidated in the United States District Court for the District of New Jersey, and are presently before us.

FN6. The theories of recovery in the individual cases are as follows: *Anco Industrial* was filed on behalf of all direct purchasers of rough diamonds pursuant to Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15 and 26, to prevent and restrain violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 – 2. *British Diamond* was filed on behalf of direct purchasers of polished diamonds pursuant to Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15 and 26, to prevent and restrain violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 – 2. *Cornwell* was filed on behalf of all purchasers of diamonds in Arizona pursuant to Ariz.Rev.Stat. Ann. § 44–1402 for monopolization of the market for diamonds, and under § 44–1403 for establishment, maintenance or use of monopoly. *Hopkins* was filed on behalf of California residents who purchased diamonds in California pursuant to Cal. Bus. & Prof.Code § 16720, *et seq.,* alleging engagement in a continuing unlawful restraint of trade; pursuant to § 17200, *et seq.,* for violation of the unfair competition law; and under California common law for monopolization and attempted monopolization. *Leider* was filed on behalf of consumers who purchased diamonds or diamond jewelry pursuant to the Wilson Tariff Act, 15 U.S.C. §§ 8 – 11; under § 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief in connection with §§ 1 and 2 of the Sherman Act, and for damages for violations of § 2 of the Sherman Act; pursuant to federal and New York state common law for damages and injunctive relief; under N.Y. Gen. Bus. §§ 349 – 350; and under New York's Donnelly Act and the antitrust laws of fifteen other states and the District of Columbia. *Null* was filed on behalf of all purchasers of De Beers diamonds pursuant to 815 Ill. Comp. Stat. § 505/1, *et seq.,* and § 510/2, alleging unfair methods of competition and unfair or deceptive acts or practices, and, in the alternative, pursuant to the consumer fraud and deceptive practice laws of the various states where purchases of diamonds were made. *Sullivan* was filed on behalf of a class of all persons and businesses in the United States who purchased polished diamonds indirectly from De Beers pursuant to §§ 1 and 2 of the Sherman Act for injunctive relief, and pursuant to state antitrust and deceptive practices acts for monetary relief.

The plaintiffs in the seven cases are best characterized as falling within one of two types of purchaser classes. The first category includes direct purchasers of gem diamonds, who purchased directly from De Beers or one of its competitors ("Direct Purchaser Class" or "Direct Purchasers"). These plaintiffs advanced claims of price-fixing and monopolization pursuant to §§ 1 and 2 of the Sherman Act, and sought monetary and injunctive relief under §§ 4 and 16 of the Clayton Act. The second category of plaintiffs consists of indirect purchasers of rough or cut-and-polished diamonds; this category of consumers, jewelry retailers and other middlemen acquired diamonds from sightholders or other direct purchasers, rather than directly from De Beers or its competitors ("Indirect Purchaser Class" or "Indirect Purchasers"). While both categories of purchasers alleged the same antitrust injury and sought injunctive relief pursuant to § 16 of the Clayton Act, the Indirect Purchasers sought damages pursuant only to state antitrust, consumer protection, and unjust enrichment statutes and common law.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

As it had for well over a half-century, De Beers initially rejected the plaintiffs' assertion that courts in the United States possessed personal jurisdiction over it and its associated entities, arguing that it never transacted business directly in the United States. De Beers refused to appear in the lawsuits, resulting in defaults or default judgments being entered against it in each of the filed cases with the exception of *Cornwell*. While continuing to insist that these default judgments were unenforceable, counsel for De Beers approached**\*288** plaintiffs' counsel in May 2005 to discuss settlement of the Indirect Purchasers' claims. These discussions yielded an agreement to settle *Sullivan, Hopkins, Null,* and *Cornwell* (the "Indirect Purchaser Settlement"), with De Beers agreeing to establish a settlement fund of $250 million to be distributed to class members, and further agreeing not to contest certification of a settlement class of indirect purchasers.[FN7] The settlement also provided for a stipulated injunction, enjoining De Beers from engaging in certain conduct violative of United States antitrust laws. Pursuant to the settlement, De Beers would consent to the District Court's jurisdiction for the limited purpose of fulfilling the terms of the settlement and enforcement of the injunction.

FN7. The *Leider* plaintiffs subsequently reached agreement with the parties to the Indirect Purchaser Settlement to resolve that matter in accordance with the terms of the Settlement.

The District Court entered an order on November 30, 2005, preliminarily approving the Indirect Purchaser Settlement and conditionally certifying a settlement class of Indirect Purchasers pursuant to Federal Rule of Civil Procedure 23(b)(2) —for purposes of entering the stipulated injunction—and 23(b)(3)—in order to distribute the settlement fund to class members.

De Beers then entered into settlement discussions with plaintiffs' counsel for the Direct Purchasers in *Anco* and *British Diamond,* ultimately reaching an agreement in March 2006. The latter agreement paralleled the Indirect Purchaser Settlement in that De Beers agreed to not contest certification of a Direct Purchaser settlement class, to abide by substantively identical injunctive relief as imposed under the Indirect Purchaser Settlement, and to establish a $22.5 million fund to satisfy the Direct Purchasers' claims. As part of this settlement, De Beers also agreed to increase the Indirect Purchaser Settlement fund by $22.5 million to accommodate those putative class members characterized as Indirect Purchasers in the lawsuits filed by the Direct Purchasers who had not participated in the Indirect Purchaser Settlement.

On March 31, 2006, the District Court modified its November 30, 2005 Order to conditionally certify both the Direct and Indirect Purchaser settlement classes under Rules 23(b)(2) and 23(b)(3), and to preliminarily approve a combined settlement fund for both classes totaling $295 million, of which $22.5 million was allotted to Direct Purchasers and $272.5 million was allocated to the Indirect Purchaser claims. The combined settlement also provided for entry of a stipulated injunction, which required De Beers to, *inter alia,* comply with and abide by federal and state antitrust laws, to limit its purchases of diamonds from third-party producers, to abstain from setting or fixing the prices of diamonds sold by third-party producers, to desist from restricting the geographic regions within which sightholders could resell De Beers diamonds, and barred De Beers from purchasing diamonds in the United States for the principal purpose of restraining supply. Notably, De Beers agreed to subject itself to personal jurisdiction in the United States for purposes of enforcing the combined settlement agreement.

*B. Special Master & Objections*

After granting preliminary approval to the combined settlement agreement, the District Court referred the case to a Special Master pursuant to Rules 23, 53, and 54 of the Federal Rules of Civil Procedure to consider and recommend a plan for dissemination of the Notice of Settlement, a distri-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

bution plan for members of the **\*289** Indirect and Direct Purchaser settlement classes, division of the fund between the Indirect Purchaser reseller and consumer subclasses, the amount of incentive awards for named plaintiffs, and the fee requests filed by plaintiffs' counsel. After two years of proceedings, the Special Master authored several lengthy Report and Recommendations finding the settlement fair, reasonable, and adequate based upon the parties' agreement to seek the certification of the following two nationwide Settlement Classes:

(i) *The "Direct Purchaser Class."* All natural persons and legal entities located in the United States who purchased any Gem Diamond directly from a Defendant or Defendants' Competitors (including any entity controlled by or affiliated with any such party) from September 20, 1997 to the date of settlement class certification. The class shall exclude Defendants, the officers, directors or employees of any Defendant, any entity in which any Defendant has a controlling interest, any affiliate of any Defendant, Defendants' Competitors, any person or entity which is or was a Sightholder for the time period(s) during which such person or entity had Sightholder status, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff; and

(ii) *The "Indirect Purchaser Class."* All natural persons and legal entities located in the United States who purchased any Diamond Product from January 1, 1994 to the date of settlement class certification, provided that any purchases of any Gem Diamond made directly from a Defendant (including any entity in which any Defendant has a controlling interest and any affiliate of any Defendant) or Defendants' competitors (including any entity controlled by or affiliated with any such party) shall be excluded. The class shall also exclude Defendants, the officers, directors or employees of any Defendant, any entity in which

any Defendant has a controlling interest, any affiliate of any Defendant, any federal, state or local governmental entity, and any judicial officer presiding over this Settlement, and any member of the judicial officer's family and court staff

(App'x 270 (quoting September 4, 2007 Report and Recommendation of Special Master Alfred M. Wolin ("R & R") at 21, App'x 1433–34).) The Indirect Purchaser Class was further subdivided into two subclasses for purposes of effectuating the Settlement Agreement:

(1) The "Indirect Purchaser Reseller Subclass," consisting of all members of the Indirect Purchaser Class who purchased any diamond product for resale; and

(2) The "Indirect Purchaser Consumer Subclass," consisting of all members of the Indirect Purchaser Class who purchased any diamond product for use and not for resale.

(*Id.* 270–71.) [FN8]

FN8. The Indirect Purchaser Consumer Subclass is estimated to contain between 67 and 117 million members, while the Indirect Purchaser Reseller Subclass contains an estimated 38,152 members. The Direct Purchaser Class is estimated to contain approximately 130 members. (App'x 275 n.1.)

After reviewing the record, the competing econometric reports furnished by several experts, and other reliable data, the Special Master recommended that, apart from the $22.5 million allocated to the Direct Purchaser Class,[FN9] the Indirect Purchaser**\*290** Settlement Fund of $272.5 million should be allocated 50.3%, approximately $137.1 million, to the Resellers Subclass, and 49.7%, approximately $135.4 million, to the Consumers Subclass.[FN10] (App'x 1508.) Unlike Direct Purchasers, who purchased diamonds only, Indirect Purchasers generally purchased jewelry and other products containing diamonds; given this, the Special Master

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

attempted to ascertain the cost of the diamonds in the final purchased product separate and apart from the cost of other components. The Special Master further recommended that claims that would result in *de minimis* recoveries from the settlement fund—equating to less than ten dollars [FN11]—not be paid in light of high administrative costs. [FN12]

> **FN9.** The Special Master advised that distribution of the Direct Purchaser Settlement Fund be conducted on a pro rata basis and that each Direct Class member receive the Net Settlement amount multiplied by the quotient of the Adjusted Purchases of the claimant divided by the aggregate Adjusted Purchases of all approved direct purchaser claims. The Adjusted Purchases of a claimant would be calculated by multiplying the amount paid for Rough Diamonds by 1.22 (the average Rough to Polished Matrix factor), and adding the total amount paid for Polished Diamonds. (App'x 1533–34.)

> **FN10.** The Special Master recommended that the Indirect Purchaser Consumer Subclass receive a pro rata share of the Indirect Purchaser Settlement Fund, calculated by multiplying the Net Consumer settlement fund amount by the quotient of a consumer's total recognized diamond claim divided by the total recognized diamond claims of all consumers. (App'x 1547.) In contrast, a Reseller Subclass member's claim would be calculated in a three step process: (1) all of the claimant's diamond purchases are converted to the common metric of polished wholesale value and adjusted to reflect the number of years each Reseller operated during the class period; (2) claims are weighted by applying the absorption weighting factor derived from a fixed effects regression analysis for each type of diamond purchase; and (3) the claimant's pro rata share of the Reseller

Subclass settlement fund is the ratio of the claimant's "absorption adjusted purchases" to the sum of all claimants' "absorption adjusted purchases." (*Id.* 1575.)

> **FN11.** The Special Master's report noted that Indirect Purchaser Consumer claims aggregating less than $165 for mixed stone jewelry or products, and less than $95 for diamond only jewelry or products, would be considered *de minimis*. (App'x 1547–48.)

> **FN12.** Additionally, the Special Master recommended a four-part notification program—entailing direct notice, publication notice, "earned media outreach" in the form of press releases and news reporting, and electronic notice—finding that it provided notice "in a reasonable manner to all class members who would be bound by the proposed settlement." (App'x 1518–27 (quoting Fed.R.Civ.P. 23(e)).) The District Court adopted this recommendation and method of notification in its October 1, 2007 Order.

With respect to plaintiffs' counsel's request for attorneys' fees and reimbursement of litigation expenses, the Special Master recommended a percentage of recovery approach with a lodestar cross-check, and concluded that the request for 25% of the settlement fund in fees, and for under 1% of the fund in expenses, was fair, reasonable, and adequate.[FN13] The Special Master further decided that the $220,000 in incentive awards sought on behalf of class representatives was appropriate in light of the benefits conferred upon the class and the risks incurred in engaging in litigation.

> **FN13.** The District Court rejected the Special Master's recommendation of adding a percentage of the interest earned on the total settlement fund to the total attorneys' fees.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

In response to the preliminary certification of the Settlement Agreement and the Special Master's recommendations, the District Court received twenty separate objections on behalf of thirty-seven objectors. All of the objectors were members of the Indirect Purchaser Class; none of the Direct Purchasers objected to the Settlement.**291** [FN14] Fifteen of the twenty objections opposed class certification of the settlement, four objected to the stipulated provision for injunctive relief, six opposed the allocation and distribution of the Settlement Funds, and nine objected to the provisions for attorneys' fees. As required by the Federal Rules, the District Court conducted a Fairness Hearing in the matter on April 14, 2008. Fed.R.Civ.P. 23(e)(2).

> FN14. Four objectors were members of the Indirect Purchaser Reseller Subclass and thirty-three objectors belonged to the Indirect Purchaser Consumer Subclass. (App'x 272.)

The objectors challenging the propriety of certifying the two settlement classes raised two primary arguments. First, the objectors contended that a nationwide class of Indirect Purchasers should not be certified under Rule 23(b)(3) for purposes of administering a monetary settlement of state law claims because significant differences existed among the various antitrust, consumer protection, and unjust enrichment laws of the relevant state jurisdictions. Specifically, the objectors argued that the substantive law of many states prohibits indirect purchasers from recovering damages for antitrust injuries, exposing the class to particularized legal variations and precluding a finding that common questions of law or fact predominated over individual issues.[FN15] Second, the objectors challenged the certification of both Direct and Indirect Purchaser classes for purposes of implementing injunctive relief pursuant to Rule 23(b)(2). The objectors asserted that the market for rough gem diamonds had become competitive during the course of the instant litigation, rendering an injunction to enforce compliance with antitrust laws su-

perfluous, and divesting the Indirect Purchasers of antitrust standing to seek relief.

> FN15. A related objection was filed on grounds that the equal allocation of the Indirect Purchaser Settlement Fund without consideration of a claimant's state of controlling law was improper since some states purportedly prohibited recovery by indirect purchasers. These objectors asserted that class members from states permitting indirect purchaser recovery should be entitled to greater monetary compensation.

Other objections challenged the fairness and adequacy of the Settlement and the plan of allocation for the Indirect Purchaser Settlement Fund as between the Reseller and Consumer Subclasses, averring that each class member would collect only $1–2 in exchange for their full release of claims against De Beers if every single putative class member requested compensation; also, they might receive nothing under the *de minimis* provision in the Settlement. Objectors also urged that the award of attorneys' fees to plaintiffs' counsel was excessive and unreasonable in a default judgment case with minimal litigation.

*C. Acceptance and Certification of Class Settlement*

In its May 22, 2008 Opinion, the District Court considered and rejected each of the objections. Responding to the Rule 23(b)(3) objections, the Court concluded that differences in state antitrust and consumer protection statutes did not override class commonalities. Observing that " 'predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws,' " (App'x 276 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997))), the District Court noted that "at the class certification stage, the Court need not concern itself with whether Plaintiffs can prove their allegations" so long as they " 'make a threshold showing that the elements of impact will predominantly involve **292** generalized issues of proof, rather than questions which are particular to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

each member of the plaintiff class,' " (*id.* 277 (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir.2002)).) In this regard, the District Court presented the following operative factual and legal inquiries that, in its view, constituted common questions that predominated over individual issues in the litigation:

(a) Whether Defendants combined or conspired with others to fix, raise, stabilize and maintain the prices of polished diamonds;

(b) Whether Defendants monopolized or combined or conspired with others to monopolize the supply of polished diamonds;

(c) Whether Defendants' conduct caused the prices of polished diamonds to be maintained at higher levels than would exist in a competitive market;

(d) Whether Plaintiffs and the Classes are entitled to injunctive relief; and

(e) Whether Defendants' conduct caused injury to the business or property of Plaintiffs and the other Class and Subclass Members and, if so, the appropriate class-wide measure of damages.

(App'x 276 (alterations omitted).) The District Court also stressed that all class members shared a common jurisdictional question pertaining to De Beers's refusal to submit to the jurisdiction of United States courts and the potential burden of confirming domestic contacts for purposes of establishing personal jurisdiction. (*Id.* 279.)

Considering the nature of De Beers's central role in the alleged diamond conspiracy, the Court determined that each class member shared "a similar legal question arising from whether De Beers engaged in a broad conspiracy" aimed at affecting diamond prices in the United States; concurrently, all class members shared common factual issues pertaining to the form, duration, and extent of the conspiracy. (App'x 278–79.) The Court concluded that the totality of common issues predominated

over individual questions and, as a result, the objectors' assertion that disparities in state law precluded a nationwide class settlement was unavailing. In its analysis, the Court emphasized the expense, complexity, and imprecision of weighing the relative strengths of different state law claims, the policy interest in securing an expedient resolution to the disparate claims of the Direct and Indirect Purchasers, and De Beers's insistence upon a release of all potential damage claims in all fifty states.

With respect to the Rule 23(b)(2) analysis for injunctive relief, the District Court rejected the objectors' assertion that both of the purchaser classes faced no risk of future harm. The Court observed that De Beers had stipulated to the injunction and "waived the right to demand proof of substantive elements of the claims" advanced by plaintiffs, namely, that De Beers's ongoing conduct would continue to anti-competitively increase the price of all diamonds on the market. (App'x 285.) Accordingly, the Court determined that injunctive relief was appropriate and would benefit all classes and subclasses.

Having ruled that the Rule 23(b) elements were satisfied, the District Court then responded to the other objections relating to the fairness and adequacy of the Settlement and the plan of allocation and distribution, as well as to objections pertaining to attorneys' fees. The District Court conducted a fairness evaluation of the final settlement by applying and weighing the fairness factors set forth in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), "being mindful of the heightened standard of review in place for a settlement-only **\*293** class that has not yet been entirely certified." (App'x 288–89.) The Court concluded that the final settlement agreement and the plan of allocation were fair, reasonable, and adequate. The District Court also reviewed the attorneys' fees application pursuant to *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000), similarly finding the Special Master's recommendation for 25% of the settlement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

fund in fees to be fair, reasonable, and adequate.

Accordingly, the District Court entered a final order on May 22, 2008, certifying the Direct and Indirect Purchaser Classes under Rules 23(b)(2) and 23(b)(3). The Direct Purchaser Class consists of all sightholders who purchased rough gem diamonds directly from De Beers between September 20, 1997 and March 31, 2006. The Indirect Purchaser Class includes all Indirect Purchasers who acquired gem diamonds between January 1, 1994 and March 31, 2006, regardless of whether De Beers or one of its competitors supplied the diamonds.[FN16] The Court's order further included the previously agreed-upon injunction, which is to remain in effect for five years from the date of its issuance. The objectors then filed the appeals presently before us.

> FN16. As the Panel Opinion noted, the parties did not explain, nor did the record reveal, any reason for the disparity in the time periods covered by the Settlement between the Indirect and Direct Purchaser classes. *See Sullivan,* 613 F.3d at 143 n. 8. We do not consider this difference pertinent to the appeals.

*D. Proceedings On Appeal*

On appeal, a divided panel of this Court initially determined that the District Court abused its discretion in certifying the nationwide class of litigants. We vacated this Opinion and granted rehearing en banc. While we do not usually discuss the analysis contained in a vacated opinion, we do so here because the Panel's decision reflected, accepted, and elaborated upon one or more of the views advanced by the objectors, with which we take issue. Our dissenting colleagues also embrace certain of these views.

Addressing the objectors' challenge to the District Court's finding of predominance under Rule 23(b)(3), the Panel undertook a wide-ranging fact-finding review of state antitrust statutes, noting that the variance among states "is mainly a function of

whether a state has chosen to follow the Sherman Act principles regarding standing laid down by the Supreme Court in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)." *Sullivan,* 613 F.3d at 146. There, the Supreme Court decided that only direct purchasers possessed standing under the federal Sherman Act to sue for monetary damages incurred from an antitrust injury. The Panel observed that some states follow this framework and prohibit monetary recovery for indirect purchasers, while other states have enacted statutes known as "*Illinois Brick* repealers," which extend antitrust standing to indirect purchasers and consumers.[FN17] *Id.* As a result, the Panel found that "only some of th[e] jurisdictions recognize the claims for which recovery is sought," and that such distinctions reflected "fundamental policy differences among the several states." *Id.* at 147, 149. Based on its belief that many members of the Indirect Purchaser Class lacked a substantive right to recover damages, the Panel decided that "no question of law or fact regarding their legal rights is uniform **\*294** throughout the class," thereby defeating a finding of predominance. *Id.* at 149.

> FN17. Based on its assessment, the Panel found that at least twenty-five states and the District of Columbia possess *Illinois Brick* repealer statutes or have judicially extended antitrust standing to indirect purchasers.

The Panel then considered the various state consumer protection and unjust enrichment claims implicated by the District Court's certification, again noting several variations among jurisdictions: differences in whether indirect purchasers may invoke consumer protection and unjust enrichment statutes to gain antitrust relief; variations in the extent of elements of proof necessary to establish unjust enrichment or consumer fraud; and dissimilarities in whether a plaintiff must lack an adequate remedy at law to bring an equitable claim. *Id.* at 150–51. Based upon these discrepancies, the Panel decided that "evidence of price-fixing and mono-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

polization does not give rise in every state to an un-just enrichment or consumer protection claim for indirect purchasers," defeating predominance and rendering the District Court's certification of a nationwide class an abuse of discretion. *Id.* at 151.

The Panel further observed that the District Court's certification order contravened the Rules Enabling Act, 28 U.S.C. § 2072(b), by extending antitrust remedies not rooted in state substantive law to putative class members. *Id.* The Panel expressly rejected the plaintiffs' argument that De Beers's willingness to stipulate to liability in all fifty states should suffice for the District Court's predominance inquiry, holding instead that such an approach would invite collusive settlements. *Id.* In the same vein, the Panel expressed concern that the District Court sacrificed principles of federalism in favor of obtaining an expedient settlement by certifying the nationwide class "despite the fact that only some of those jurisdictions recognize the claims for which recovery is sought." *Id.* at 152. Finding that certain states categorically deny to indirect purchasers a right to antitrust recovery as a matter of substantive law, the Panel concluded that the instant certification "wrongly allowed the sovereignty of the states to be subordinated to De Beers's desire to resolve all indirect purchaser claims simultaneously." *Id.*

Finally, the Panel rejected the District Court's certification of the Indirect Purchaser Class under Rule 23(b)(2) for the purpose of awarding injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. Relying upon expert reports written to identify a methodology for calculating damages, the Panel concluded that De Beers's market share fell from approximately 65% in 2000 to 45% in 2006, and determined that, as a result, plaintiffs face "no significant threat of future antitrust harm in the absence of the injunction because ... the market has become increasingly competitive from 2006 onward." *Id.* at 157–58. Accordingly, the Panel found that plaintiffs lacked antitrust standing under § 16 of the Clayton Act and vacated the District Court's

order certifying the injunctive class.

The Panel Opinion remanded the matter to the District Court to consider whether "a more limited class of indirect purchasers is appropriate under Rule 23," and instructed the District Court to more precisely identify "a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Id.* at 154 (quoting Fed.R.Civ.P. 23(c)(2)). The Panel noted that the Court failed to clearly delineate the precise state law claims subject to class treatment and did not explicitly state whether the claims advanced apply to the Indirect Purchasers' antitrust, consumer protection, or unjust enrichment claims, or to some combination of the three. Accordingly, the Panel directed the District Court to "identify with particularity both the prerequisites for membership in the class and the issues or **\*295** claims that will be resolved on a class-wide basis." *Id.* at 155.

In response, Appellees Shawn Sullivan, Arrigotti Fine Jewelry, and James Walnum petitioned for rehearing, urging that the Panel Opinion was inconsistent with our precedent governing class action settlements. In support, they raised several arguments. First, they contended that the Panel's demand that all class members assert at least one "uniform" claim in order for disparate state claims to be settled at once contravened our clear holdings in *Warfarin* and *Prudential*. (*See* Pet. of Appellees for Reh'g or Reh'g En Banc 2.) Next, they urged that the Panel's extensive inquiry into the legal viability of plaintiff's claims at the class certification stage improperly adjudicated the merits of the asserted claims and undermined the "strong judicial policy in favor of class action settlement." (*Id.* (citation omitted).) Finally, the Appellees observed that the Panel's methodology supplanted the District Court as primary fact-finder and unilaterally reached factual conclusions based upon evidence unrelated to the subject at issue. (*Id.* 3–4.)

We granted the petition for the entire Court to address these issues.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

*II. Jurisdiction And Standard of Review*

The District Court exercised federal question jurisdiction over the Direct Purchasers' Sherman Act antitrust claim for damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and over both the Direct and Indirect Purchasers' claims for injunctive relief under § 16 of the same Act, 15 U.S.C. § 26. Original jurisdiction over the federal claims also arose under 28 U.S.C. §§ 1331 and 1337(a). The District Court possessed supplemental jurisdiction over the Indirect Purchasers' state-law antitrust, consumer protection, and unjust enrichment claims pursuant to 28 U.S.C. § 1367. We review final orders of the District Court pursuant to 28 U.S.C. § 1291.

[1][2][3][4] "Our role as an appellate court is to ascertain whether or not the trial judge clearly abused his or her discretion in approving or rejecting a settlement agreement." *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 593 (3d Cir.2010). A district court abuses its discretion if its " 'decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.' " *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 312 (3d Cir.2008) (quoting *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 783 (3d Cir.1995) (" *GM Truck* ")). "If the court's analysis on these points is correct, [however,] then 'it is fair to say that we will ordinarily defer to its exercise of discretion' embodied in the findings on predominance and superiority." *Linerboard,* 305 F.3d at 149–50 (quoting *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 448 (3d Cir.1977)); *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.,* 593 F.3d 802, 807 (9th Cir.2010) ("We review ... the underlying determination whether the predominance requirement of Rule 23(b)(3) has been satisfied for abuse of discretion.") (citation omitted). "Whether an incorrect legal standard has been used is an issue of law to be reviewed *de novo.* " *Id.* (citation omitted).

[5] The District Court's "determination that the settlement was fair, reasonable, and adequate" is likewise reviewed for abuse of discretion. *In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001).

*III. Discussion*

At issue on appeal is the District Court's approval of the class settlement agreement **\*296** and certification of the Indirect Purchaser Class pursuant to Rule 23(b)(3) and both the Direct and Indirect Purchaser Classes under Rule 23(b)(2). We begin by discussing the standards for certifying a settlement class and will address the pertinent objections in light of the District Court's—and the vacated Panel's—Opinions. We will then consider the objections pertaining to the fairness of the settlement, the plan of allocation, and the attorneys' fees award, which we have not previously addressed. [FN18]

> FN18. As mentioned above, because the Panel concluded that certification was inappropriate, it did not reach the Special Master's recommendations or the objections to the distribution plan and fee award. *Sullivan,* 613 F.3d at 142 n. 6. In light of our finding that class certification is appropriate, we assess these objections for the first time.

*A. Certification Pursuant to Rule 23*

[6][7] As we have consistently observed, " Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." *In re Comm. Bank of N. Va.,* 622 F.3d 275, 291 (3d Cir.2010) (" *Comm. Bank II* ") (quoting *GM Truck,* 55 F.3d at 799) (alterations omitted). In turn, before approving a class settlement agreement, "a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met." *In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 341 (3d Cir.2010). Rule 23(a) contains four threshold requirements, which every putative class must satisfy:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see also Amchem,* 521 U.S. at 613, 117 S.Ct. 2231. Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b).

As mentioned, Rule 23(b)(2) authorizes class actions seeking injunctive relief in instances where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2); *see In re Comm. Bank of N. Va. (Comm. Bank I),* 418 F.3d 277, 302 n. 14 (2005). Separately, certification pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *see Collins v. E.I. DuPont de Nemours & Co.,* 34 F.3d 172, 180 (3d Cir.1994). These twin requirements are commonly referred to as predominance and superiority. We address the certification of the damages class first before turning to the certification for injunctive relief.

*1. Predominance of Common Legal or Factual Issues Under Rule 23(b)(3)*

[8] The objectors challenge the District Court's Rule 23(b)(3) analysis with regard to the state law claims asserted by the Indirect Purchasers against De Beers. The District Court concluded that differences in state law did not override predominantly common factual and legal issues*297 presented by De Beers's integral role in perpetuating the alleged

conspiracy. Rejecting this view, the objectors argue that the existence of substantive variations in the state antitrust laws underlying the Indirect Purchaser damages claims should preclude a court from finding that common issues affecting the class as a whole predominate. They also urge that differences among state consumer protection and unjust enrichment laws would likewise preclude a finding of predominance. Our dissenting colleagues focus on this issue as well, and adopt a specific requirement that every class member has "some colorable legal claim" in order for a district court to certify a class. (Dissenting Op. at 344.) In our view, this requirement would result in a radical departure from what Rule 23 envisions and what our precedent demands, and it founders for many reasons.[FN19]

> **FN19.** The objectors also challenge the District Court's purported failure to identify the state law claims that should receive class treatment under the existing certification order, as we discuss below.

*a. Legal Framework*

[9][10][11] The predominance inquiry " 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,' " *In re Ins. Broker. Antitrust Litig.,* 579 F.3d 241, 266 (3d Cir.2009) (quoting *Amchem,* 521 U.S. at 624, 117 S.Ct. 2231), and assesses whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated," Fed.R.Civ.P. 23(b)(3) advisory committee's note to 1966 amendment. *See also* 2 William Rubenstein, Alba Conte & Herbert Newberg, Newberg on Class Actions, § 4:25 (4th ed. 2010) ("[T]he predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit."). Parallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues com-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

mon to the class predominate over those affecting only individual class members. *Ins. Broker.*, 579 F.3d at 266. "Hence, we consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.' " *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir.2004)); *see also Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir.2008) ("[T]he commonality requirement is subsumed by the predominance requirement.").

From our case law, we can distill at least three guideposts that direct the predominance inquiry: first, that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law dissipate when a court is considering the certification of a settlement class. We address each of these guideposts in turn. Then, we turn to case law demonstrating that Rule 23(b)(3) does not, as urged by the objectors and the dissent, require individual class members to individually state a valid claim for relief. Next, we address the flaws inherent in the framework proposed by the dissent. Finally, we discuss why an important by-product of the class action device—settlement**298** of all potential claims—supports the decision we reach here.

### i) Precedent Regarding Predominance: Defendant's Conduct and Class Members' Injuries

[12] Our precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct. Our reasoning in *Warfarin* is instructive on this point. The claims asserted there were remarkably similar to the specific claims at issue here. There, we considered the propriety of the certification of a settlement

class arising out of DuPont Pharmaceuticals' alleged dissemination of misleading information about a competitor's product. 391 F.3d at 522. The plaintiffs averred that DuPont engaged in anticompetitive conduct that allowed it to maintain a 67% market share and to charge supracompetitive prices, in violation of federal antitrust law, the antitrust statutes of *Illinois Brick* repealer states,[FN20] the consumer protection and deceptive practices statutes of all fifty states and the District of Columbia, and the common law prohibitions on unjust enrichment and tortious interference of every jurisdiction. *Id.* at 523–25. After reaching a class settlement with the defendant and receiving the district court's preliminary approval, objections were lodged contesting the certification of a single nationwide class of plaintiffs. The objectors argued that such certification was inappropriate due to inconsistencies in state antitrust and consumer fraud statutes' provision of statutory standing to assert antitrust claims and eligibility for treble or punitive damages recovery, and the relative weakness of certain consumer claims. *Id.* at 529–31.

> FN20. As mentioned, certain states have enacted statutes known as " *Illinois Brick* repealers," which extend antitrust standing to indirect purchasers and consumers. *See supra* n. 17.

Guided by the Supreme Court's observation that "[p]redominance is a test readily met in certain cases alleging consumer[ ] fraud or violations of the antitrust laws," we stated:

> This case falls squarely into that category: plaintiffs have alleged that DuPont engaged in a broad-based campaign, in violation of federal and state consumer fraud and antitrust laws, to deceive consumers, TPPs, health care professionals, and regulatory bodies into believing that generic warfarin sodium was not an equivalent alternative to Coumadin. These allegations naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members, includ-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

ing the unlawfulness of DuPont's conduct under federal antitrust laws as well as state law, the causal linkage between DuPont's conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled.

*Id.* at 528. In light of DuPont's allegedly deceptive "broad-based, national campaign conducted by and directed from corporate headquarters," we emphasized that proof of liability of DuPont's conduct "depends on evidence which is common to the class members" because "liability depends on the conduct of DuPont, and whether it conducted a nationwide campaign of misrepresentation and deception, [and] does not depend on the conduct of individual class members." *Id.* As a result, we affirmed the District Court's ruling that class members shared predominantly common issues as to the conduct of the defendants**299** despite possessing claims arising under differing state laws. *Id.* at 530.
FN21

> **FN21.** Contrary to the objectors' and the Panel's view that *Warfarin's* analysis is inapplicable because the plaintiffs in that case purportedly shared a common claim under the Delaware Consumer Fraud Act, our holding in *Warfarin* did not address the Delaware statute in analyzing predominance. 391 F.3d at 528–29. Indeed, *Warfarin* did not consider whether every class member even possessed a claim under Delaware law, nor did it undertake a choice-of-law analysis to determine whether all members in the nationwide class could assert a claim under the Delaware statute. Rather, we simply concluded that any claims arising under the varying state laws and the Delaware statute could be proved with common evidence, thereby supporting a finding of predominance. *Id.*

We applied a similar approach in *Insurance Brokerage,* where, in evaluating a challenge to certification of a settlement class on the basis of pre-

dominance, we determined that the elements of a Sherman Act violation for concerted anticompetitive activity focused upon "the conduct of the defendants." 579 F.3d at 268. Noting the presence of several shared questions of law and fact—including, among others, whether the defendants conspired to allocate a particular market, whether the conduct actually reduced competition in the market by consolidating the industry, and whether the conspiratorial conduct raised premiums for all members of the class—we concluded that "common questions abound with respect to whether the defendants engaged in illegal, concerted action." 579 F.3d at 268. As a result, we held that "individual issues d[id] not overwhelm the common ones." FN22 *Id.; see also Linerboard,* 305 F.3d at 162 ("[C]ommon issues [ ] predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did.") (citation & quotations omitted); *cf. In re LifeUSA Holding Inc.,* 242 F.3d 136, 145–46 (3d Cir.2001) (reversing certification of litigation class where plaintiffs' claims arose "not out of one single event or misrepresentation," but out of "non-standardized and individualized sales 'pitches' ").

> **FN22.** A comparable approach is evidenced in our decision in *Prudential,* where we affirmed the district court's finding of predominance based upon the central issue in the case—a common nationwide scheme of deceptive conduct by the defendant to defraud millions of customers. 148 F.3d at 315. Similarly, in *Linerboard,* we noted that the "critical inquiry will be whether defendants successfully concealed the existence of the alleged conspiracy," and "the fact of *concealment* [ ] is the polestar in an analysis of fraudulent concealment." 305 F.3d at 163 (emphasis in original). Because it was the defendant's conduct that demanded attention, we found that "allegations of proof are all common to the defendants, not the plaintiffs." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

In this regard, we note the dissent's misreading of the Supreme Court's recent opinion in *Wal–Mart Stores Inc. v. Dukes,* ___ U.S. ___, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) as supporting its thesis that an inquiry into the existence or validity of each class member's claim is required at the class certification stage. To the contrary, *Dukes* actually bolsters our position, making clear that the focus is on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a "colorable" claim. In *Dukes,* the Court held that commonality and predominance are defeated when it cannot be said that there was a common course of conduct in which the defendant engaged with respect to each individual. But commonality is satisfied where common questions generate common answers "apt to drive the resolution of the litigation." 131 S.Ct. at 2551. That is exactly what is presented here, for the answers to questions about De Beers's alleged misconduct and the harm it caused would be **\*300** common as to all of the class members, and would thus inform the resolution of the litigation if it were not being settled.

Specifically, here, plaintiffs allege that De Beers engaged in anticompetitive activity by exploiting its 65% share of the diamond market and control of the world's supply of rough diamonds to impose rigid constraints on the sale and resale of those diamonds. This conduct resulted in a common injury as to all class members—inflated diamond prices—in violation of federal antitrust law, and the antitrust, consumer protection, or unjust enrichment laws of every state and the District of Columbia. [FN23] In this respect, as in *Warfarin* and *Insurance Brokerage,* De Beers's asserted price-fixing and monopolization conduct lies at the core of plaintiffs' claims, as do the common injuries which all class members suffered as a result. Based upon our case law, we can distill that "each class member shares a similar *legal* question arising from whether De Beers engaged in a broad conspiracy that was aimed to and did affect diamond prices in the United States." (App'x 278–79 (emphasis added).) Evidence for this legal question would entail gener-

alized common proof as to "the implementation of De Beers'[s] conspiracy, the form of the conspiracy, and the duration and extent of the conspiracy." (*Id.* 278.)

> FN23. No one seriously disputes that De Beers's alleged conduct, if true, was anti-competitive and violated state antitrust laws. Our disagreement with the dissent arises solely out of the question whether certain class members' potential inability to satisfy some states' statutory standing requirements should have precluded the District Court from certifying the settlement class in this case.

The plaintiffs likewise share common *factual* questions as to whether De Beers "acted in concert to artificially fix, maintain, and stabilize prices and to monopolize trade and commerce in the market for polished diamonds," and whether said activity resulted "in an inflation in the prices of diamonds sold to consumers." (*Id.* 278–79.) These allegations are unaffected by the particularized conduct of individual class members, as proof of liability and liability itself would depend entirely upon De Beers's allegedly anticompetitive activities. Indeed, the presence of these questions stemming solely from De Beers's asserted behavior and the fact that all class members purchased diamonds is an apt illustration of why the predominance test is "readily met in certain cases alleging consumer [ ] fraud or violations of the antitrust laws." [FN24] *Ins. Broker.,* 579 F.3d at 266 (quoting *Amchem,* 521 U.S. at 624, 117 S.Ct. 2231); *see generally* Fed.R.Civ.P. 23(b)(3) advisory committee's notes to 1966 amendment (providing that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action"). Considering this presentation of common issues, a finding that common inquiries predominated over individual questions particular to any putative class member appears reasonably within the discretion of the District Court.

> FN24. As we noted in *Insurance Broker-*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

*age,* we do not presume here "that common issues necessarily predominate in every antitrust case." 579 F.3d at 267 n. 26 (citing *Hydrogen Peroxide,* 552 F.3d at 321–22). Here, we merely conclude that the District Court was free to determine that common issues of law or fact stemming from De Beers's conduct in this instance satisfied the predominance requirement.

The dissent urges that according to our view, the class is "practically limitless." (Dissenting Op. at 344.) This is plainly incorrect: the limits are found in the conduct of the defendant and the injuries sustained by class members as a result of the conduct. These provide sufficient class **301** contours. The instant class is not made up of "everyone on earth," "regardless of diamond purchases." (Dissenting Op. at 343 n. 5.) Instead, each member is a Direct or Indirect Purchaser, harmed by what De Beers did. These class members, moreover, possess a legally cognizable injury acknowledged in hornbook law, as their injuries are real, and stem not from simply feeling "wronged," as the dissent suggests (Dissenting Op. at 343), but from De Beers's alleged anti-competitive conduct, conduct which antitrust laws forbid.

*ii) Precedent Regarding Variations in State Law*
[13][14][15][16] Furthermore, our precedent provides that "variations in the rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat commonality and predominance." *Warfarin,* 391 F.3d at 529 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 315 (3d Cir.1998)). This is so because " 'a finding of commonality does not require that all class members share identical claims,' " and predominance is not considered deficient merely "because claims were subject to the [varying] laws of fifty states." *Id.* " 'Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test' "; rather, " '[a]s long as a sufficient constellation of common

issues binds class members together, variations in the sources and application' " of applicable laws will not foreclose class certification. *Linerboard,* 305 F.3d at 162–63 (quoting with approval *Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 296 (1st Cir.2000) (rejecting argument that variations in twenty states' laws concerning reliance, waiver, and statutes of limitations defeated predominance)); *see also Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 39 (1st Cir.2003) ( " Rule 23(b)(3) requires merely that common issues predominate, not that *all* issues be common to the class.") (emphasis added). Thus, it is not surprising that we can find no support in our Court's jurisprudence for the proposition that commonality and predominance are defeated merely because available rights and remedies differ under the several laws that form the basis for the class claims.[FN25]

FN25. Other courts have similarly declined to examine the controlling substantive law pertinent to asserted claims at the class certification stage. *See, e.g., Schumacher v. Tyson Fresh Meats, Inc.,* 221 F.R.D. 605, 612 (D.S.D.2004) ("Where federal claims and common law claims are predicated on the same factual allegations and proof will be essentially the same, 'even if the law of different states might ultimately govern the common law claims—an issue that need not and is not decided at this juncture—certification of the class for the whole action is appropriate.' ") (quoting *Walsh v. Chittenden Corp.,* 798 F.Supp. 1043, 1055 (D.Vt.1992)) (alteration omitted).

We have never required the presentation of identical or uniform issues or claims as a prerequisite to certification of a class. Rather, our jurisprudence evinces a pragmatic response to certifications of common claims arising under varying state laws. In *Prudential,* we addressed the certification of a settlement class arising under federal securities law and varying state law formulations of common law

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

fraud, breach of contract, bad faith, negligent mis-representation, negligence, unjust enrichment, and breach of state consumer fraud statutes. 148 F.3d at 315. We emphasized our willingness to certify nationwide classes where differences in state law fell "into a limited number of predictable patterns," and any deviations "could be overcome at trial by grouping similar state laws together and applying them as a unit." Id. As such, we affirmed the district court's decision to subsume the relatively**\*302** minor differences in state law within a single class. Id.; see also Ins. Broker., 579 F.3d at 271 (noting that "subclasses are appropriate 'where a class is found to include subclasses divergent in interest' ") (citation & alteration omitted).

Similarly, in GM Truck, we approved the certification of nationwide (b)(3) litigation classes where "the laws of the 50 states could be reduced to [several] general patterns, providing the framework for sub-classes if the nationwide action had proven unmanageable." 55 F.3d at 817–18 (discussing In re School Asbestos Litig., 789 F.2d 996, 1010 (3d Cir.1986)). Observing that "we [could not] conceive that each of the forty-nine states [ ] represented here has a truly unique statutory scheme," we determined that a nationwide class "could have been properly certified." Id. This alternative to outright rejection of certification of a nationwide class was deemed to be especially fitting because it could "surmount[ ] some of the individual issues while retaining some of the substantive advantages of the class action." Id. at 818.

Echoing this approach, our fellow Courts of Appeals have agreed that, for purposes of litigation classes, "if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards," then certification of subgroups "embracing each of the dominant legal standards can be appropriate." Klay v. Humana, Inc., 382 F.3d 1241, 1262 (11th Cir.2004); see also Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C.Cir.1986) (R.B. Ginsburg, J.) (holding that class certification is appropriate where state law

variations can be grouped by similar legal doctrines).

[17] Where "a sufficient constellation of common issues binds class members together," Linerboard, 305 F.3d at 162–63, differences in state law treatment of indirect purchaser claims likely fall into a handful of clearly discernible statutory schemes. Nothing in our case law or the language of Rule 23 commands that everyone in a class must allege precisely identical or "uniform" causes of action, see Sullivan, 613 F.3d at 149, and statutory variations do not defeat predominance in the presence of other exceedingly common issues.[FN26] Instead, as Prudential and GM Truck explain, where a defendant's singular conduct gives rise to one cause of action in one state, while providing for a different cause of action in another jurisdiction, the courts may group both claims in a single class action. This tactic in litigation advances the laudatory purposes of the class action device, "preserv [ing] the resources of both the courts and the parties by permitting issues affecting all class members to be litigated in an efficient, expedited, and manageable fashion." Allison v. Citgo Petrol. Corp., 151 F.3d 402, 410 (5th Cir.1998).

> FN26. We do not reach this conclusion so as to allow district courts to "shirk" the requirements of Rule 23 when certifying the class, as the dissent suggests. (Dissenting Op. at 348 n. 13.) We do not ignore the differences in state law, but rather find, based on our precedent, that those differences do not defeat predominance.

### iii) Certification of Settlement Classes: Diminished Concern Regarding Variations in State Law

But we need not rely merely on certifications involving actual litigation of the class issues for the proposition that differing state laws do not defeat commonality or predominance. The correct outcome is even clearer for certification of a settlement class because the concern for manageability that is a central tenet in the certification of a litigation class is removed from the equation. Indeed, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

class settlement***303** posture of this case largely marginalizes the objectors' concern that state law variations undermine a finding of predominance.

In *Warfarin,* we rejected an objection essentially indistinguishable from the one advanced here, namely, that "variations in and inconsistencies between the state consumer fraud and antitrust laws of the fifty states defeat the commonality and predominance requirements of Rule 23." 391 F.3d at 529. In light of the Supreme Court's guidance that a district court "[c]onfronted with a request for settlement-only class certification" need not inquire whether the case "would present intractable management problems," *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231, in *Warfarin,* we delineated a "key" distinction between certification of a class for settlement versus certification for purposes of litigation, 391 F.3d at 529. Specifically, we observed that, in the settlement context, variations in state antitrust, consumer protection and unjust enrichment laws did not present "the types of insuperable obstacles" that could render class litigation unmanageable.[FN27] *Id.* (citing *Prudential,* 148 F.3d at 315). We emphasized, as a result, that "variations [in state laws] are irrelevant to certification of a settlement class" since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws. *Id.; see, e.g., Davis v. J.P Morgan Chase & Co.,* 775 F.Supp.2d 601, 609 (W.D.N.Y.2011) ("[S]tate-law distinctions impact trial manageability, which is relevant principally with respect to litigation at trial.") (citing *Warfarin,* 391 F.3d at 529–30; *In re Lupron Mktg. & Sales Practices Litig.,* 228 F.R.D. 75, 92 (D.Mass.2005) (finding that "differences in the state consumer protection laws" implicate manageability concerns and do not pose an obstacle to certification of a settlement class).

> FN27. In conducting the analysis in *Warfarin,* we expressly distinguished the Seventh Circuit's decision in *In re Bridgestone/Firestone Inc.,* 288 F.3d 1012 (7th Cir.2002), in which certification of a na-

tionwide class arising under the tort laws of all fifty states was sought for purposes of litigation, rather than settlement. 391 F.3d at 529.

Hence, our consideration of varying laws in the context of predominance has primarily focused on manageability of a litigation class. This is a particularly important point, as the objectors seem to conflate the predicate predominance analysis for certification of a settlement class with that required for certification of a litigation class, relying exclusively upon cases implicating the manageability obstacles inherent in class litigation. *See, e.g., Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.,* 601 F.3d 1159, 1180 (11th Cir.2010); *Cole v. Gen. Motors Corp.,* 484 F.3d 717, 724 (5th Cir.2007). The Panel likewise referenced authority that focused on the manageability issues pertinent to certification of litigation classes in rejecting the settlement class certification. *See Sullivan,* 613 F.3d at 151 (quoting *Clay v. Am. Tobacco Co.,* 188 F.R.D. 483, 501 (S.D.Ill.1999) (discussing "unmanageable" nature of varying state unjust enrichment laws)).

[18][19][20] Because we are presented with a settlement class certification, "we are not as concerned with formulating some prediction as to how [variances in state law] would play out at trial, for the proposal is that there be no trial." *Ins. Broker.,* 579 F.3d at 269 (internal citations & quotations omitted). As such, we simply need not inquire whether the varying state treatments***304** of indirect purchaser damage claims at issue would present the type of "insuperable obstacles" or "intractable management problems" pertinent to certification of a litigation class.[FN28] *Comm. Bank I,* 418 F.3d at 299; *Warfarin,* 391 F.3d at 529. The proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and "the difference is key."[FN29] *Warfarin,* 391 F.3d at 529. Accordingly, while we are cognizant of our responsibility to "protect absentees by blocking un-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 36

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

warranted or overbroad class definitions," *Comm. Bank II,* 622 F.3d at 291, state law variations are largely "irrelevant to certification of a settlement class," *Warfarin,* 391 F.3d at 529.[FN30]

FN28. We are aware that there may still be circumstances, as we and other Courts of Appeals have noted, where " '[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance.' " *Klay v. Humana, Inc.,* 382 F.3d 1241, 1261 (11th Cir.2004) (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 741 (5th Cir.1996)). But these decisions are inapplicable here, as the certification orders at issue pertained to litigation classes and were preoccupied with the attendant manageability aspects of certification. More explicitly, the courts expressed unease that if "more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law," and noted "the difficulties in trying the [ ] claims on a class basis." *Id.* (citation & quotations omitted). Unlike those situations "where the certification inquiry [is] set against the backdrop of an impending trial," *Ins. Broker.,* 579 F.3d at 269, the settlement context here does not present equivalent concerns.

FN29. Unsurprisingly, we are not alone in recognizing the "key" distinction between certification for settlement purposes versus litigation, and "courts are more inclined to find the predominance test met [in the settlement context], even when there are differences in applicable state laws." *Ersler v. Toshiba Am., Inc.,* No. CV–07–2304, 2009 WL 454354, at *4 (E.D.N.Y. Feb. 24, 2009) (citing *In re Grand Theft Auto Video Game Consumer Litig.,* 251 F.R.D. 139, 158 (S.D.N.Y.2008)); *see, e.g., In re Mexico Money Transfer Litig.,* 267 F.3d 743,

746–47 (7th Cir.2001) (noting that while certification of litigation classes arising under varying consumer fraud statutes is often inappropriate, the same is not true for settlement classes where "no one need draw fine lines among state-law theories of relief"); *In re Inter–Op Hip Prosthesis Liability Litig.,* 204 F.R.D. 330, 347 (N.D.Ohio 2001) ("[W]hen taking the proposed settlement [ ] into consideration for purposes of determining class certification, individual issues which are normally present in ... litigation become irrelevant, allowing the common issues to predominate.") (citation and quotations omitted).

FN30. Although we will not here speculate as to the type of "situations where variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class certification," *Warfarin,* 391 F.3d at 530, we are confident that the several common questions of law or fact arising from a "single central issue"—namely, De Beers's alleged anticompetitive conduct and the resulting injury caused to each class member—predominate over any issues concerning individual class members, *Prudential,* 148 F.3d at 314 (citation & quotations omitted).

*iv)* Rule 23(b)(3) *and our Precedent do not Require that Individual Class Members State a Valid Claim*

At bottom, we can find no persuasive authority for deeming the certification of a class for settlement purposes improper based on differences in state law. The objectors and our dissenting colleagues nevertheless insist that, despite the prevalence of the shared issues of fact and law stemming from the defendant's conduct common as to all class members and each class member's resulting injury, states' inconsistent treatment of indirect purchaser damages claims overwhelms the commonalities. They advocate this because approximately

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

twenty-five states have not extended antitrust standing to indirect purchasers through *Illinois Brick* repealer **\*305** statutes or judicial edict; likewise, some uncertain number of states do not permit an end-run around antitrust standing through claims based on consumer protection and/or unjust enrichment statutes. (*See* Quinn Supp. Br. on Reh'g En Banc 21–22.) It follows then, they argue, that a large proportion of the Indirect Purchaser Class lacks any valid claims under applicable state substantive law, and, therefore, cannot "predominantly" share common issues of law or fact with those Indirect Purchasers actually possessing valid claims.[FN31] In turn, they insist that a district court must undertake a thorough review of applicable substantive law to assure itself that each class member has "at least some colorable legal claim" (Dissenting Op. at 344) or "has a valid claim" (Quinn Supp. Br. at 16) before certifying a settlement.

> FN31. As noted, the Panel conducted an extensive review of relevant state statutes and reached the conclusion that "indirect purchasers do not have a right to recover in all states, and, therefore, no question of law or fact regarding their legal rights is uniform throughout the class." *Sullivan,* 613 F.3d at 149.

[21][22][23] But this focus is misdirected. The question is not what valid claims can plaintiffs assert; rather, it is simply whether common issues of fact or law predominate. *See* Fed.R.Civ.P. 23(b)(3). Contrary to what the dissent and objectors principally contend, there is no "claims" or "merits" litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof. Such a view misreads Rule 23 and our jurisprudence as to the inquiry a district court must conduct at the class certification stage. An analysis into the legal viability of asserted claims is properly considered through a motion to dismiss under Rule 12(b) or summary judgment

pursuant to Rule 56, not as part of a Rule 23 certification process. *See Comm. Bank II, 622 F.3d at 303* ("[T]he Rule 23 requirements 'differ in kind from legal rulings under Rule 12(b)(6).' ") (quoting *Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir.2001)*).

[24][25] To adopt the position of the dissent and the objectors is to introduce a Rule 12(b)(6) inquiry as to every claim in the class before a class may be certified. But Rule 23 makes clear that a district court has limited authority to examine the merits when conducting the certification inquiry:

> Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," *limited to those aspects relevant to making the certification decision on an informed basis.*

2003 Amendments to Rule 23 (emphasis added); *see also Hassine v. Jeffes, 846 F.2d 169, 178 (3d Cir.1988)* ("The ability of a named plaintiff to succeed on his or her individual claims has never been a prerequisite to certification of the class."). A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims. Put another way, a district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied.

[26] Citing our holdings in *Hydrogen Peroxide* and **\*306***Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir.2001)*, the objectors argue that the District Court abused its discretion by failing to establish as part of the certification process that each class member possessed a valid claim under the applicable substantive laws.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

[FN32] (*See* Quinn Br. at 17.) But these cases do not stand for this proposition. We explained in *Hydrogen Peroxide* that an examination of the elements of plaintiffs' claim is sometimes necessary, not in order to determine whether each class member states a valid claim, but instead to determine whether the requirements of Rule 23 —namely, that the elements of the claim can be proved "through evidence common to the class rather than individual to its members"—are met. 552 F.3d at 311–12. In *Newton,* we similarly stated that a court may "delve beyond the pleadings to determine whether the requirements for class certification are satisfied," and held that a court's rigorous certification analysis may include a "preliminary inquiry into the merits." 259 F.3d at 167 (citations & quotations omitted). But we did not state that an inquiry into the merits was necessary in order to prove that each class member has state a valid claim as a prerequisite to class certification. Rather, the Rules and our case law have consistently made clear that plaintiffs need not actually establish the validity of claims at the certification stage.[FN33]

> **FN32.** The Panel echoed the objectors' position, concluding after examining the laws of fifty states that many jurisdictions "categorically foreclosed" a legal right to recover on the merits to indirect purchasers. *Sullivan,* 613 F.3d at 151 n. 14.

> **FN33.** The marginal role played by the question of "validity" of claims in class settlement certification situations is further evidenced by considering our subsequent *Prudential* decision. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 261 F.3d 355, 366 (3d Cir.2001) ( " *Prudential II* "). There, we released all state-law claims—including unnamed claims—"arising from the same nucleus of operative facts as the claims" actually considered by the Court without adjudicating the validity of those other allegations. *Id.* We observed that "a judgment pursuant to

a class settlement can bar later claims based on the allegations underlying the claims in the settled class action" even where the "precluded claim was not presented, and could not have been presented, in the class action itself." *Id.* (citations omitted). We reasoned that while our "power to release those claims as part of a judgment" may "seem anomalous," "we have endorsed the rule because it 'serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that "prevent relitigation of settled questions at the core of a class action." ' " *Id.* (quoting *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982)). As such, the unidentified prospective claims could be included in the settlement without adjudication of their validity since they arose from the identical fraudulent scheme perpetrated by the defendant.

Moreover, the merits inquiry is particularly unwarranted in the settlement context since a district court need not "envision the form that a trial" would take, *Newton,* 259 F.3d at 167, nor consider "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove" the disputed element at trial, *Hydrogen Peroxide,* 552 F.3d at 312. In fact, the absence of evidentiary and trial manageability concerns that initially motivated our instruction to conduct a preliminary merits inquiry in the predominance context reinforces the "key" distinction between certification of a litigation and settlement class. *Warfarin,* 391 F.3d at 529. As such, the objectors' focus on the legal strengths and weaknesses of class members' claims misconstrues the requirements of Rule 23.[FN34] *See Newton,* 259 F.3d at 167–69.

> **FN34.** The objectors' associated argument that the predominance inquiry presupposes that every putative class members possesses at least a single valid cause of action

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

likewise misses the point. While Rule 23 may presuppose that every class member does actually allege a predominantly common claim against a defendant, Rule 23 does not mandate that each of these claims must be shown capable of prevailing on the merits at the certification stage.

**\*307** [27][28] Even still, the objectors and the dissent urge that the absence of one particular element for some class members—statutory standing—means that these members cannot state a valid claim, and therefore, the class cannot be certified. While it may be correct that states abiding by *Illinois Brick* require a plaintiff to be a direct purchaser as one element of an antitrust or consumer protection claim, the possibility that some of the Indirect Purchasers in the instant class might be unable to establish this element at trial is beside the point. This element, often confusingly denoted as a statutory standing requirement, is not jurisdictional. [FN35] Statutory standing is distinct from jurisdictional standing in that " Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts," whereas "lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court." *Gerlinger v. Amazon.com Inc.,* 526 F.3d 1253, 1256 (9th Cir.2008) (citation omitted); *see e.g., Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003) (noting that "statutory standing under the antitrust laws is not a prerequisite to federal subject matter jurisdiction"); *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 778 (7th Cir.1994) ("[D]espite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement and is therefore waivable."). Accordingly, statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place.

> FN35. To further clarify, we use the term "statutory standing" to refer to the possession of a viable claim or right to relief, not

to a jurisdictional requirement. *See generally Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction," and "jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action") (citations and alterations omitted).

Here, the supposed lack of one element necessary to prove a violation on the merits—statutory standing—does not establish a concomitant absence of other predominantly common issues. *See Prudential,* 148 F.3d at 315 (affirming a district court's certification of a settlement class despite the fact that some objectors challenged the settlement on the grounds that some plaintiffs could not establish reliance—a necessary element of their state-law fraud claims). This is especially true in the settlement context where no proof on the merits need be adduced. *See Linerboard,* 305 F.3d at 162–63 (" '[T]he mere fact that such concerns [of individualized factual and legal determinations] may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.' ") (quoting *Mowbray,* 208 F.3d at 296). Common questions as to the nature of De Beers's "conduct under federal antitrust laws as well as state law" and "the causal linkage between [De Beers's] conduct and the injury suffered by the class members" may still be found to predominate. *See Warfarin,* 391 F.3d at 528; *see also Pet Food,* 629 F.3d at 342 ("[T]he predominance requirement was satisfied because the same set of core operative facts and theory of proximate cause apply to each member of the class.") (internal quotations omitted). [FN36]

> FN36. The Panel analyzed the antitrust claims separately from the consumer protection and unjust enrichment claims, seemingly concluding that plaintiffs could

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

only prevail if each putative class member alleged either a "uniform" antitrust cause of action, a "uniform" consumer protection cause of action, or a "uniform" unjust enrichment claim. *Sullivan,* 613 F.3d at 146, 150. We will not read into Rule 23 this heightened threshold requirement that plaintiffs must allege an identical cause of action, when all that is required is that common issues of law or fact predominate over questions particular to individual class members.

**\*308** *v) The Dissent's Proposed Framework*

The dissent's proposed framework mistakenly places the cart before the horse by requiring the District Court to establish the validity of the disputed elements of the asserted claims—namely, the viability of indirect purchaser actions under state substantive laws—prior to certifying the class. Under this approach, the dissent seems to require that class members show that they can state a valid claim for relief. But the Rule 23 inquiry does not, and should not, involve a Rule (12)(b)(6) inquiry. FN37

> **FN37.** The dissent describes this requirement in varied ways: under their view, class members who, "according to the plain terms of controlling law have no claim at all" (Dissenting Op. at 347 n. 11), have "no legal claim" (*Id.* at 340), have "no cause of action," (*Id.* at 341), have a claim "clearly lacking a colorable basis" ( *Id.* at 346), or have a claim "nonexistent as a matter of substantive law" (*Id.* at 345), are barred from partaking in this class action settlement. The problem with this requirement, however, is that in order to separate class members possessing an "existent" legal claim from those possessing a "nonexistent" one, district courts would have to perform a Rule 12(b)(6) inquiry into each class member's claim.

Were we to require district courts to ensure that

"each member of a settlement class has a valid claim" in order to establish predominance, (Quinn Supp. Br. at 16), or that each class member has a "colorable legal claim," district courts would be obligated at the class certification stage to, *sua sponte,* conduct a thorough Rule 12(b)(6) analysis of every statutory and common-law claim to ensure that each plaintiff—including absent class members—possesses a valid cause of action or a "colorable claim" under the applicable federal or state substantive law. Such an inquiry into the merits goes beyond the requirements of Rule 23, for Rule 23 does not require a district court to determine whether class members individually have a colorable claim—one that "appear[s] to be true, valid, or right." (Dissenting Op. at 344 n. 8.) In addition to exceeding the plain requirements of Rule 23, in nationwide class settlements, such as the one here, and even if limited to a statutory standing inquiry, this analysis would necessitate an intensive, fifty-state cataloguing of differences in state law at an early stage of the proceedings, and without the benefit of a developed record. FN38 Despite the dissent's view, Rule 23 does not require such an intensive cataloguing of each class member's claim in order to establish predominance. Even more troublesome, this merits**\*309** analysis might not actually answer the salient question of whether common issues of fact or law actually predominate over individual ones.

> **FN38.** At the same time, it is by no means clear that the dissent's proposed analysis could be cabined to only consider the differing statutory standing requirements in the process of evaluating the validity of claims. As discussed *supra,* statutory standing for indirect purchasers is treated as but one element of a cause of action, rather than a jurisdictional requirement, as the dissent mistakenly suggests. If a district court were required to evaluate the statutory standing element to assess a claim's viability, logic and consistency suggest that the court should also consider

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

other aspects of a claim for Rule 12(b)(6) and other deficiencies. This approach would delay proceedings in the trial court, as it would require the parties to engage in ill-timed, protracted merits litigation at the class certification stage.

Moreover, district courts undertaking the scrupulous review of state laws could not ensure the validity of each individual claim without first settling upon the precise state law governing each of the putative class members' claims. This choice-of-law analysis would be particularly difficult in a nationwide class action where an array of factors beyond the residence of the class members must be considered, including, *inter alia*, the location of the parties and the purchased items, and the place of contracting and performance. *See generally Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 467 (3d Cir.2006). The Seventh Circuit rightly noted that "choice-of-law issues in nationwide class actions are rarely so uncomplicated that one can delineate clear winning and losing arguments at an early stage in the litigation"; "the legal uncertainty resulting from the complicated choice-of-law issues" would unduly complicate the process for establishing predominance under Rule 23. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 750 (7th Cir.2006). As a result, many courts find it "inappropriate to decide choice of law issues incident to a motion for class certification." *See, e.g., In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 84 (D.Md.1991); *Singer v. AT & T Corp.*, 185 F.R.D. 681, 691 (S.D.Fla.1998) ("It is well-established that consideration of choice of law issues at the class certification stage is generally premature.").

Even were a district court to properly ascertain the applicable law after conducting the choice-of-law inquiry, it would likely encounter unsettled legal questions, further undermining its ability to assess the viability of some class members' claims and increasing the costs of administration. By way of example, in *Warfarin,* we remarked on the

"unsettled question of law as to whether Tennessee's antitrust statutes ... cover only violations occurring in intrastate commerce or extend to cover violations occurring in interstate commerce as well." 391 F.3d at 530 n. 12. Relegating the issue to a footnote, we did not think it necessary to pry into the legal merits of the Tennessee claims in approving the class settlement. In another instance, the Fifth Circuit confronted the unresolved question of whether Louisiana antitrust law granted standing to indirect purchasers of consumer products as part of the class certification process, and asked the Louisiana Supreme Court to accept certification of the question. *See Free v. Abbott Labs., Inc.,* 176 F.3d 298, 298–99 (5th Cir.1999). When the state court declined, the Fifth Circuit was "le[ft] to fathom Louisiana's unsettled antitrust law." *Id.* By requiring district courts to assess the validity of unsettled state law claims at the certification stage, we would needlessly introduce additional legal uncertainty into a certification process that does not demand it.[FN39]

FN39. Application of the proposed inquiry to the instant matter demonstrates the likely obstacles the District Court would encounter under this approach. The objectors present Ohio's statutory regime as emblematic of the impropriety of the type of class settlement certification at issue here. Citing the Ohio Supreme Court's decision in *Johnson v. Microsoft Corp.,* 106 Ohio St.3d 278, 834 N.E.2d 791 (2005), they urge that Ohio law prohibits all indirect purchaser claims asserting violations of Ohio antitrust law, common law claims for unjust enrichment where a purchaser cannot establish that he conferred a benefit upon a defendant, and claims alleging violations of the Ohio Consumer Sales Practices Act predicated upon monopolistic pricing practices. (Quinn Br. at 60–61.) As a result, they insist that, "[d]irectly contrary to the district court's [certification], an Ohio class member does not have a valid

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

claim under Ohio law." (*Id.* at 61.) The objectors contend that a similar problem exists for other *Illinois Brick* states.

This inference is flawed for several reasons. First, the objectors fail to engage in the type of choice-of-law exercise necessitated by their proposed approach—the evaluation of whether an Ohio class member is asserting a claim pursuant to Ohio law or pursuant to the law of a repealer state or a state affording an alternative basis for recovery. Undoubtedly, this analysis would present significant hurdles and potentially alter the presumed outcome. Second, although *Johnson* provides that an indirect purchaser lacking an antitrust claim under *Illinois Brick* cannot circumvent this limitation by relying upon the Ohio consumer protection statute, the Ohio Supreme Court did not, nor could it, preclude consumer protection claims predicated on fraud or deception. As the plaintiffs point out, the claims settled here include allegations of fraud and deception separate from the antitrust allegations, suggesting that some avenue of recovery arising from the same defendant conduct remains available to indirect purchasers even in Ohio. (*See* Pls.' Br. in Response to Quinn's Response to Class Counsel's Mot. for Leave to File Record Excerpts 13–14.) Finally, if the court is to evaluate the viability of plaintiffs' statutory standing element under Ohio law at the class certification stage, the objectors presented no sensible reason why the court should not likewise inspect the viability of every other aspect of an antitrust, consumer protection, or unjust enrichment claim, such as statutes of limitation, conditions precedent to suit, and the like. We do not doubt that such an exhaustive analysis would produce ab-

surd results and cause undue delay in our trial courts.

**\*310** We raise the following questions to further demonstrate the error of the proposed framework adopted by our dissenting colleagues. If the dissent's "colorable legal claim" test is a threshold inquiry for commonality, why should the court not consider every potential disqualifier from one's having a "colorable legal claim?" For example, in any class certification case, should the court consider whether all potential class members complied with applicable pre-notice requirements under the relevant substantive law? Should the court consider whether every potential class member exhausted her administrative remedies under the relevant substantive law? Should the court evaluate whether each class member's claim complies with the applicable statute of limitations? The answers to these questions most certainly implicate whether a litigant, in a class action or otherwise, has a "colorable legal claim." These questions, moreover, show how flawed, from an administrative, logical, and practical standpoint, the dissent's and objectors' approach really is. No class would ever be certified because it would be impossible to demonstrate that every class member has a "colorable legal claim." (Dissenting Op. at 344.) More than this, it would gut commonality, for, most certainly, individual issues would then predominate. There would simply be no class that could meet this commonality and predominance test.

*vi) Settlements*

Finally, were we to mandate that a class include only those alleging "colorable" claims, we would effectively rule out the ability of a defendant to achieve "global peace" by obtaining releases from all those who might wish to assert claims, meritorious or not. We need not take judicial notice of the fact that plaintiffs with non-viable claims do nonetheless commence legal action. Here, in an effort to avoid protracted litigation and future relitigation of settled questions in federal and state courts across numerous jurisdictions, De Beers pursued a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

global settlement and demanded a release of potential damage claims in all fifty states. *See Prudential,* 148 F.3d at 326 n. 82 (noting that release of all claims "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements\*311 that prevent relitigation of settled questions at the core of a class action") (citation & quotations omitted). Specifically, De Beers sought "global peace" in a settlement covering plaintiffs in every federal and state case, as well as potential plaintiffs who had not yet filed cases in either federal or state court. *See generally Klein v. O'Neal, Inc.,* 2009 WL 1174638, at \*3 (N.D.Tex. Apr. 29, 2009) ("In a class action settlement setting, defendants seek and pay for global peace—i.e., the resolution of as many claims as possible."); *In re Vioxx Prods. Liability Litig.,* 574 F.Supp.2d 606, 613 (E.D.La.2008) (quoting *In re Guidant Corp. Implantable Defibrillators Prods. Liability Litig.,* MDL No. 05–1708, 2008 WL 682174, at \*3 (D.Minn.2008) (noting that the parties "contemplated a global settlement covering Plaintiffs from both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases")). The parties entered a mutual agreement and sought certification of a settlement class with the aim of avoiding countless individual suits in diverse jurisdictions.

Our dissenting colleagues disparage the concept of "global peace" as if it were an impermissible objective in using the class action device. From a practical standpoint, however, achieving global peace is a valid, and valuable, incentive to class action settlements. Settlements avoid future litigation with all potential plaintiffs—meritorious or not. If the dissent's position were adopted, there would be no settlements, collusive or otherwise. First of all, litigating whether a claim is "colorable" and defending who is in and who is not in the class would be an endless process, preventing the parties from seriously getting to, and engaging in, settle-

ment negotiations. And, as discussed above, the "individualized" nature of the task would doom the class certification process from the outset. Second, since releases would necessarily be limited to the qualifying class members, those ultimately excluded would no doubt go right back into court to continue to assert their claims. No defendants would consider settling under this framework, for they could never be assured that they have extinguished every claim from every potential plaintiff.[FN40]

> **FN40.** Of course, some global settlements may nevertheless be rejected for failing to meet the requirements of Rule 23. In *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), the Supreme Court rejected a global settlement in a mandatory class action based on a limited fund theory under Rule 23(b)(1)(B). There, the plaintiffs seeking class certification failed to demonstrate that the fund available to pay claims was limited beyond the fund amount agreed to by the parties. There, the requirements of Rule 23(b)(1)(B) were not met; here, the requirements of Rule 23(b)(3) are met.

[29] As applied here, the objectors' approach would subject De Beers to numerous individual suits brought by claimants excluded from the class, undermining "the strong presumption in favor of voluntary settlement agreements, which we have explicitly recognized with approval." *Ehrheart,* 609 F.3d at 594 (citing *Pennwalt Corp. v. Plough,* 676 F.2d 77, 79–80 (3d Cir.1982)). "This presumption is especially strong in class actions and other complex cases ... because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts." *Id.* (citations omitted). By contrast, requiring a class to assert uniform or identical questions of law or fact and to preemptively demonstrate their legal viability "would seriously undermine the possibility for settling any large, multi district class action." \*312

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

*Prudential II,* 261 F.3d at 367. Apart from imposing immense administrative costs, the extraordinary requirement that class members individually possess a "colorable legal claim" would make it increasingly difficult to approve nationwide class settlements entailing predominantly common issues but arising under varying state laws. The resulting framework would likely siphon the various state law claims from federal class actions, and defendants seeking to settle "in such suits would always be concerned that a settlement of the federal class action would leave them exposed to countless suits in state court despite settlement of the federal claims." *Id.; see also Pet Food,* 629 F.3d at 342 ("[A]bsent class certification, the Court may be faced with litigating over 100 individual lawsuits all of which would arise out of the same set of operative facts.").

Rather than "concentrating the litigation of the claims" in a superior single action, Fed.R.Civ.P. 23(b)(3)(C), this would serve to frustrate "[t]he core purpose of Rule 23(b)(3)," which "is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation," *Amchem,* 521 U.S. at 617, 117 S.Ct. 2231.

*b. Rules Enabling Act & Federalism Concerns*

[30] The objectors further contend that the District Court's certification of the settlement class was flawed because it "recognized as valid, for purposes of Rule 23, claims that are not recognized as valid under applicable state law." (Quinn Supp. Br. at 28.) Accordingly, they argue, the order ran afoul of the Rules Enabling Act, which provides that the rules of procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).[FN41] We cannot agree.

> FN41. The Panel agreed with this characterization, holding that "the order contravenes the Rules Enabling Act" because it "extends antitrust remedies that, in many instances, have no root in state substantive law." *Sullivan,* 613 F.3d at 149. The Panel

rejected the argument that De Beers's willingness to stipulate to liability obviated this concern, noting that a court was obligated even in the settlement context to ensure that all of Rule 23's requirements were met and could not "effectively grant [ ] relief to individuals to whom De Beers had no antitrust liability." *Id.* The dissent repeats this argument.

In *Prudential,* we approved a district court's certification of a proposed settlement despite objections that the certification modified or abridged state law rights. 148 F.3d at 324 (discussing 962 F.Supp. 450, 461–62 (D.N.J.1997)). We agreed with the district court that "approval of a settlement under Rule 23 merely recognizes the parties' voluntary compromise of their rights and does not itself affect their substantive state law rights." *Id.* (citation & alterations omitted). As a result, we also agreed with the district court's assessment that the proposed settlement could not violate the Rules Enabling Act since a "court's approval of a voluntary settlement, by nature a compromise of rights, does not affect substantive state rights." *Prudential,* 962 F.Supp. at 462.

[31][32][33][34] It is well established that "settlement agreements are creatures of private contract law." *See, e.g., Bauer v. Trans. Sch. Dist. of City of St. Louis,* 255 F.3d 478, 482 (8th Cir.2001). "A district court is not a party to the settlement, nor may it modify the terms of a *voluntary* settlement agreement between parties." *Ehrheart,* 609 F.3d at 593 (emphasis added). Thus, a district court's certification of a settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action. **\*313** In the absence of a finding that plaintiffs are actually entitled to relief under substantive state law, we reiterate that a court does not "abridge, enlarge, or modify any substantive right" by approving a voluntarily-entered class settlement agreement. § 2072(b).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

In the same vein, we disagree with the contention that the District Court violated principles of federalism by extending to the plaintiffs a substantive right that they could not have asserted in state court.[FN42] As an initial matter, the District Court's approval of the parties' settlement should not be considered a recognition or expansion of substantive rights unavailable in a particular state.[FN43] *See supra.* In this regard, the disputed certification order did not subordinate the states' interests, as it did not in fact validate any asserted claims purportedly rejected by the states.[FN44]

> FN42. The Panel agreed with this argument, noting that certain states' "categorical refus[al] to allow indirect purchasers to bring a price-fixing claim" was "not trivial" and represented "fundamental policy differences among the several states." *Sullivan,* 613 F.3d at 152, 148. The Panel concluded that these state interests were in effect "subordinated to De Beers's desire to resolve all indirect purchaser claims simultaneously" and "in a quest to clear the queue in court." *Id.* at 152 (citation & quotations omitted).

> FN43. The dissent concludes that approving class certification here endorses the enlargement of substantive rights because had some class members brought these claims individually in state court, they would "be immediately shown the exit." (Dissenting Op. at 352.) This is incorrect, for the state court would not automatically dismiss them without a motion from De Beers. More significantly, nothing would prevent De Beers from settling those claims in lieu of moving to dismiss them, and doing so in that scenario would not be an enlargement of substantive rights.

> In responding to this point, the dissent equates an objection to class certification with a motion to dismiss, but such treatment demonstrates the very flaw in its

position. Class certification and motions to dismiss involve two distinct (and different) standards, and the former does not permit as extensive an inquiry into the merits as the latter does. (*See* Dissenting Op. at 352–53 n. 21.)

> FN44. The dissent decries this position, contending that including Indirect Purchasers in the class who could not, on an individual basis, state a claim for recovery impermissibly modifies the rights of those Indirect Purchasers who could recover individually. In so asserting, the dissent assumes that the size of the settlement fund would be the same if the Indirect Purchasers who cannot recover individually were excluded from the class. Surely this cannot be the case, for the settlement amount to which De Beers has agreed must be based in large part on the number of potential class members and on securing global peace. Had those Indirect Purchasers who could not recover individually been excluded, we seriously doubt that the Indirect Purchaser settlement fund would still be $272.5 million.

[35] Moreover, consideration of the policy imperatives underlying *Illinois Brick* confirms that the District Court's certification of a settlement class here did not infringe upon federalism principles. *Illinois Brick*'s restriction on indirect purchaser recovery was motivated by prudential concerns for manageability; it does not reflect a categorical policy judgment that indirect purchasers do not merit antitrust protection. As we previously highlighted, the *Illinois Brick* Court offered "three policy reasons for its holding":

(1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge; (2) the evidentiary complexities and uncertainties involved in ascertaining the portion of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and (3) permitting direct and **\*314** indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue.

*Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.,* 424 F.3d 363, 369–70 (3d Cir.2005) (citing *Illinois Brick,* 431 U.S. at 730–35, 740–43, 97 S.Ct. 2061).[FN45] Nevertheless, the Supreme Court acknowledged that its aversion to administering indirect purchaser recoveries undoubtedly "denie[d] recovery to those indirect purchasers who may have been actually injured by antitrust violations." *Illinois Brick,* 431 U.S. at 746, 97 S.Ct. 2061. [FN46]

> **FN45.** Other Courts of Appeals have recognized a similar functional focus in the Supreme Court's decision. *See, e.g., Freedom from Religion Found., Inc. v. Chao,* 433 F.3d 989, 991 (7th Cir.2006) ("An example of the prudential limitations on standing is the judge-made 'indirect purchaser' doctrine of antitrust law," which is premised on minimizing complicated litigation), *rev'd on other grounds, Hein v. Freedom from Religion Found., Inc.,* 551 U.S. 587, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007); *County of Oakland v. City of Detroit,* 866 F.2d 839, 852 (6th Cir.1989) ("The question of whether a plaintiff has standing to sue under the antitrust laws depends largely on prudential considerations").

> **FN46.** States on both sides of the indirect purchaser restriction have likewise appreciated the pragmatic origins of and purposes served by *Illinois Brick. See, e.g., Lorix v. Crompton Corp.,* 736 N.W.2d 619,

624 (Minn.2007) (noting that antitrust standing "has prudential limits based on remoteness of injury and complexity of proof"); *Comes v. Microsoft Corp.,* 646 N.W.2d 440, 449 (Iowa 2002) ("[T]he *Illinois Brick* court was wholly concerned with the complexity of litigation and the possibility of multiple liability."); *Abbott Labs., Inc. v. Segura,* 907 S.W.2d 503, 506–07 (Tex.1995) (discussing the prudential policy concerns underlying *Illinois Brick* ).

Here, contrary to the dissent's and the objectors' argument, the District Court's certification order did not undermine these prudential considerations. De Beers's agreement to a specified recovery payment—and the interrelated removal of a need to ascertain and prove the amount of passed-on overcharges—marginalizes the first two *Illinois Brick* concerns for duplicative liability and complexity in ascertaining the passed-on overcharges. The third prudential concern is similarly inapposite since the Direct Purchaser Class pursued and approved a separate settlement agreement and there is no indication that the Indirect Purchaser Settlement undermined "the direct purchasers' incentive to sue." *Dentsply,* 424 F.3d at 370. Indeed, the immediate relief offered by the instant settlement appears to offer the most "[ ]efficient enforcement of the antitrust laws," *id.,* when compared to the highly uncertain result the plaintiffs would encounter by engaging in protracted litigation against a party with a long track record of avoiding the jurisdiction of courts in the United States. *See generally* Comment, The Diamond Cartel, 56 Yale L.J. 1404, 1411 (1947) (discussing De Beers's avoidance of effective antitrust prosecution in light of "the twin difficulties of obtaining jurisdiction over the foreign corporations and of retaining within the court's reach tangible assets sufficient to enforce a decree").

Accordingly, we reject the assertion that the District Court inappropriately subordinated state

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

sovereignty in certifying the class.

### c. Identification of Class Claims Pursuant to Rule 23(c)(1)(B)

[36] Apart from our disagreement with the objectors' arguments regarding commonality and predominance, we similarly reject the view that the District Court's Order in this case failed to satisfy all of ***315** Rule 23(c)(1)(B)'s substantive requirements.

[37] As we have explicated, Rule 23(c) provides that a certification order "must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." Hydrogen Peroxide, 552 F.3d at 320–21 (citation & quotations omitted); see also Fed.R.Civ.P. 23(c)(1)(B) ( "An order that certifies a class action must define the class and the class claims, issues, or defenses...."). The District Court's Order "easily meets the requirements of Rule 23(c)(1)(B) with respect to the definition of the class itself." Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 188 (3d Cir.2006). The Court properly delineated the parameters of the Indirect Purchaser Class, defining class members as any purchasers of any diamond product in the United States except for those who purchased directly from De Beers or its competitors. (App'x 270.)

[38] As to the second prong of the above test, the contention is raised that the Court's Order did not "explicitly define which claims, issues, or defenses are to be treated on a class basis." Wachtel, 453 F.3d at 189. We disagree with this characterization, as the settlement posture of this class action makes our decision on this front particularly simple. As we noted in Wachtel, a "critical" purpose of Rule 23(c)(1)'s requirement of a "full and clear articulation of the litigation's contours at the time of class certification" was the "need [ ] to determine how the case will be tried" through presentation of "a 'trial plan' that describes the issues

likely to be presented at trial and tests whether they are susceptible to class-wide proof." 453 F.3d at 186 (quoting Fed.R.Civ.P. 23(c)(1)(A) advisory committee's note) (quotations omitted). In the settlement context, however, this concern evaporates, "for the proposal is that there be no trial." Comm. Bank II, 622 F.3d at 291 (citing Amchem, 521 U.S. at 620, 117 S.Ct. 2231). As such, we agree with the Seventh Circuit's sentiment that "[g]iven the settlement, no one need draw fine lines among [the various] theories of relief." Mexico Money, 267 F.3d at 747.

[39][40] The District Court's Order identified six common legal or factual issues it reasonably found to "predominate" over individual questions and susceptible to class treatment, (see App'x 276); the Court also expressly included in its Opinion a background section titled "Underlying Claims, Cases & Parties," which laid out in depth all the claims asserted in each individual suit to be resolved by the class settlement, (App'x 263–65). See also supra note 6. It is undisputed that the Settlement Agreement resolves and releases each and every one of these asserted claims and issues, obviating any need to "cobble together" some uncertain category of issues to be tried as a class. Wachtel, 453 F.3d at 189. "[N]o particular format is necessary in order to meet the substantive requirement of [Rule 23(c) ], and we will not set aside substantively conforming certification orders purely over matters of form." Id. at 188 n. 10. The District Court's Opinion "facilitate[d] meaningful appellate review of [this] complex certification decision[ ]" by providing us with ample guidance as to the "contours" of the settlement. Id. at 186. [FN47]

FN47. We find additional support for our conclusion from the First Circuit's recent ruling in In re Pharmaceutical Industry Average Wholesale Price Litigation, 588 F.3d 24 (1st Cir.2009). There, the Court remarked that " Rule 23(c)(1)(B) was added ... to help appellate courts reviewing an order better understand the district court's de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 48

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

cision," and to allow "appellate courts, attorneys, and parties [to] proceed with more information and mutual understanding." *Id.* at 40 (citing *Wachtel,* 453 F.3d at 186–87). As a result, the Court upheld a district court's certification order that "plainly defined the class and the class claims, issues, and defenses in sufficient detail," "devoted many pages to the class's factual allegations against the defendant," "carefully analyzed the proposed class's suitability for certification, again explaining the issues common to the class," and also "discussed the state consumer protection statutes underlying the class's claims, noting differences among them." *Id.* Likewise here, the District Court clearly defined the class, listed six common claims and issues, devoted significant discussion to the factual allegations, analyzed the class's suitability for certification by explaining the predominantly common issues, and noted the differences among the various statutes implicated in the claims. As succinctly stated by our fellow Court of Appeals, "[t]hat is enough." *Id.* at 41.

**\*316** Accordingly, we conclude that the District Court did not run afoul of the requirements of Rule 23(c)(1)(B) and properly certified the two classes of claims.

*2. Injunctive Relief Pursuant to Rule 23(b)(2)*

[41] In addition to certifying the Direct and Indirect Purchaser Classes under Rule 23(b)(3), the District Court further certified the purchaser classes pursuant to Rule 23(b)(2) for the purpose of awarding injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26.[FN48] (App'x 285.) Plaintiffs alleged that, in the absence of injunctive relief, De Beers's anticompetitive conduct would continue to cause the entire membership of all classes to pay artificially inflated prices. The objectors counter that class members lack antitrust standing to seek injunctive relief because they cannot demonstrate a significant threat of injury from an impending violation of the antitrust laws. In support, they point to expert reports submitted in 2008 for the targeted purpose of identifying a common methodology benchmark for calculating damages; these reports suggested that the market for rough diamonds became more competitive in the interim between mid-2006 and 2008, in concert with De Beers's weakening position in the market.[FN49] In making this argument, the objectors reject the District Court's conclusion that De Beers's willful entry into the settlement removed the plaintiffs' burden to establish the likelihood of future injury. (*See* App'x 285.)

FN48. 15 U.S.C. § 26 reads in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust law ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.

FN49. After evaluating the mentioned expert reports, the Panel agreed with the objectors that plaintiffs no longer faced "a significant threat of future antitrust harm in the absence of the injunction," and, therefore, lacked antitrust standing under § 16 of the Clayton Act. *Sullivan,* 613 F.3d at 157–58.

[42][43] In contrast to the damages provision of § 4 of the Clayton Act, " 'Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4 ... and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy....' " [FN50] **\*317** *McCarthy v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

*Recordex Serv., Inc.,* 80 F.3d 842, 856 (3d Cir.1996) (quoting *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 210 (3d Cir.1980)). Because actions seeking injunctive relief under § 16 do "not present the countervailing considerations—such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analyses," plaintiffs need not "satisfy the direct purchaser requirement as a condition of seeking injunctive relief." *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 400 (3d Cir.2000) ( *Warfarin I* ) (quoting *Mid–West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573, 594 (3d Cir.1979)) (quotations omitted). Instead, to establish the need for injunctive relief, plaintiffs must generally demonstrate three uncomplicated prerequisites: "a threat of loss"; that the injury in question "is of the type the antitrust laws were intended to prevent"; and "a significant threat of injury from a violation of the antitrust laws." *Id.* at 399 (citations & quotations omitted; alterations added).

FN50. Section 16 provides in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.

15 U.S.C. § 26.

[44][45][46][47] Despite this burden, it is well established that "parties to a suit have the right to agree to anything they please in reference to the subject matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings." *Sansom Comm. by Cook v. Lynn,* 735 F.2d 1535, 1548 (3d Cir.1984) (quoting *Pac. R.R. v. Ketchum,* 101 U.S. 289, 297, 25 L.Ed. 932 (1879) (quotations & alterations omitted)). In turn, "[a]s the Supreme Court has recognized, a district court may 'provide broader relief in an action that is resolved before trial than the court could have awarded after a trial.' " *In re Agent Orange Prod. Liability Litig.,* 818 F.2d 179, 185 (2d Cir.1987) (quoting *Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (alterations omitted)). Accordingly, district courts are afforded wide discretion to give effect to joint compromises that timely advance the interests of the parties without wasteful litigation.FN51 In exercising this discretion, the District Court here could reasonably approve a mutually agreed-upon stipulation enjoining conduct within the Court's jurisdiction regardless of whether the plaintiffs could have received identical relief in a contested suit by satisfying each of the aforementioned requirements at trial.

FN51. Unsurprisingly, a paucity of case law addresses the issue of whether parties to a lawsuit may consent to the issuance of an injunction that is agreeable to all parties without a court's asking whether the prerequisites of Rule 23(b)(2) have been satisfied. This dearth of precedent is to be expected since it would be highly illogical for a defendant to dispute an injunction to which it in fact agreed, and for a plaintiff beneficiary to object to an injunction entered for its benefit. Curiously, the latter situation is presented here.

[48] Yet because of the class nature of the instant suit, the District Court's approval of the stipulated injunction borne out of a class settlement did need to satisfy an additional test. Specifically, Rule 23(b)(2) authorizes class certification only when "the party opposing the class has acted or refused to act on grounds generally applicable to the class,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Fed.R.Civ.P. 23(b)(2). [FN52] Important to the analysis is **\*318** that the relief sought ... should benefit the entire class," and "the putative class [must] 'demonstrate that the interests of the class members are so like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of res judicata.' " *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 59 (3d Cir.1994) (quoting *Hassine, 846 F.2d at 179).* "[I]njunctive actions, seeking to define the relationship between the defendant and the 'world at large,' will usually satisfy the requirement." *Id.*

> FN52. "This rule applies when the putative class seeks injunctive or declaratory relief, and 'does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages,' " as with a certification pursuant to Rule 23(b)(3). *Beck v. Maximus, Inc.,* 457 F.3d 291, 301 (3d Cir.2006) (quoting Fed.R.Civ.P. 23(b)(2) advisory committee's note).

Here, we have no difficulty concluding that Rule 23(b)(2)'s requirement that De Beers's alleged conduct be "generally applicable to the class" was satisfied. Indeed, much of our discussion of "predominance" in the previous section of this Opinion specifically emphasized the common elements of the complained of conduct that are equally applicable to "the class as a whole." *See supra.* As the District Court discussed, the plaintiffs alleged that De Beers's anticompetitive behavior "caused the entire membership of all classes to pay artificially inflated prices," and that, in the absence of injunctive relief, all classes would continue to pay artificial premiums. (App'x 285.) These claims demonstrate shared interests between the members of the putative class, and, these allegations, if proven, would support injunctive relief respecting

the class as a whole. Likewise, the parties' mutual decision to settle claims "on grounds generally applicable to the class" complies with the text of Rule 23(b)(2) and should be respected.

In reaching this decision, we also reject the objectors' request that we engage in fact-finding as to whether all class members could show an imminent threat of prospective antitrust injury. Due to the settlement posture of this case, which controls, we need not concern ourselves with this issue. Moreover, the District Court never addressed the question of whether changes in the market negatively affected De Beers's ability to extract higher rents from diamond sightholders and subsequent purchasers.[FN53] Without the benefit of the **\*319** District Court's factual findings on the matter in any event, "[w]e deem it inappropriate to treat this question without any evidence having been presented on [it] and without the benefit of the findings and opinion of the district judge." *Merola v. Atl. Richfield Co.,* 515 F.2d 165, 173 (3d Cir.1975).

> FN53. The objectors urge, based on the damages methodology expert reports, that De Beers's market share fell to approximately 46% in 2006, and, therefore, posed little continuing threat of future antitrust harm. (Quinn Br. 19.) Although the experts mentioned that De Beers lost its dominant share of an increasingly competitive market, the experts never opined—as the objectors contend—that plaintiffs face no significant threat of future antitrust harm. Were we to conduct our own independent analysis, we might draw a very different conclusion as to De Beers's asserted ability to inflict future harm: we might decide that De Beers's ongoing leadership position—considering its purported 46% market share in the diamond market—afforded it ample opportunity to influence diamond prices, posing an ongoing and significant threat of antitrust injury. *See generally United States v. Continental Can Co.,* 378

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

U.S. 441, 459, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964) (discussing defendant's "dominant position" based upon a 43%–46% market share in a highly concentrated industry). The objectors place far too much stock in De Beers's purported market share, ignoring one of the basic tenets in assessing market power: "Obviously no magic inheres in numbers; the relative effect of percentage command of a market varies with the setting in which that factor is placed." *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 612, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Curiously, the objectors and the Panel also rejected the plaintiffs' contention that the injunction entered by the District Court in 2006—an injunction directly tailored to fostering competition—played any role in the increasingly competitive market. *Sullivan,* 613 F.3d at 157. The Panel opined that although the mid–2006 competitive increases "roughly coincided with the District Court's issuance of the injunction," this coincidence did not support the reasonable deduction that the injunction "played a meaningful role in producing those competitive gains." *Id.* at 157–58. An equally logical inference would be that increased competition approximating the issuance of the injunction evidenced the efficacy of the relief. That said, we will abstain from extrapolating broad legal conclusions of market competitiveness from data narrowly focused on damages methodology.

At bottom, we hold that the District Court acted within its discretion in accepting De Beers's stipulation to the injunctive relief.

**B. Fairness of the Class Action Settlement & the Plan of Allocation**

Apart from contesting the certification of the settlement class, the objectors raise two other arguments as to the fairness and adequacy of the proposed settlement. First, they quarrel with the District Court's approval of the settlement as a whole under Federal Rule of Civil Procedure 23(e)'s requirement that the settlement be "fair, reasonable, and adequate." (*See* Bagolie Br. at 18–28.) Second, the objectors dispute the fairness and adequacy of the settlement's plan of allocation for a portion of the settlement. Specifically, they urge that the proposed Indirect Purchaser Settlement distribution is "patently unfair" and presents "an intra-class conflict of interest that renders Class Counsel, as well as the class representative, inadequate." (*See* Murray Consol. Br. at 13; Quinn Br. at 63–64; Petrus Br. at 12–13.) We address each objection in order.

*1. Approval of the Settlement*

[49][50][51] Before approving a class settlement agreement, a district court must find that the requirements for class certification under Rule 23(a) and (b) are met, and must separately "determine that the settlement is fair to the class under [Rule] 23(e)." *Ins. Broker.,* 579 F.3d at 257. Rule 23(e) provides that a proposed settlement may only be approved "after a hearing and on finding that it is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). In this process, "trial judges bear the important responsibility of protecting absent class members," and must be "assur[ed] that the settlement represents adequate compensation for the release of the class claims." *Pet Food,* 629 F.3d at 349 (citation & quotations omitted); *see also Ehrheart,* 609 F.3d at 593 (stressing that "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class," and that a "district court acts as a fiduciary" for absent class members) (citing *Warfarin,* 391 F.3d at 534). "[W]here settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, district courts should be even 'more scrupulous than usual' when examining the fairness of the proposed settlement." *Warfarin,* 391 F.3d at 534 (quoting *GM Truck,* 55 F.3d at 805).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 52

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

In assessing the fairness of a proposed settlement, we have articulated nine well-established primary factors for a district court to consider in conducting its inquiry:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the **\*320** risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Pet Food,* 629 F.3d at 350 (quoting *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975)). (internal quotation marks and alterations omitted).

[52][53] Furthermore, a district court may consider several other factors "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms," *id.*:

[T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* (quoting *Prudential,* 148 F.3d at 323). The "settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement" throughout this analysis.[FN54] *Id.* (citation omitted). "Because of the district court's proximity to the parties and to the nuances of the litigation, we accord great weight to the court's factual findings" in conducting the fairness inquiry. *Prudential,* 148 F.3d at 317.

> FN54. We have separately observed that "an initial presumption of fairness" may apply when reviewing a proposed settlement where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Warfarin,* 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 232 (3d Cir.2001) (" *Cendant* ")). The District Court did not consider or rely upon this presumption in assessing fairness. Because we find no error in the Court's thorough analysis, we will likewise disregard this presumption.

The District Court in this instance engaged in a thorough review of the *Girsh* factors, holding that the relevant considerations on balance weighed in favor of a finding of fairness under Rule 23(e). We conclude that the Court did not abuse its discretion in finding the settlement to be fair, reasonable, and adequate.

*a. Complexity, Expense, and Likely Duration of the Litigation*

[54] The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin,* 391 F.3d at 536 (citation omitted). The District Court found that this litigation "would have been difficult, as multiple parties, multiple claims, extensive jurisdictional problems, and complicated discovery would be involved." (App'x 289.) The Court further discussed the likeli-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

hood of extensive motion practice as to jurisdiction, the lifting of default judgments, statute of limitations issues, and the concern for protecting**\*321** foreign litigants in United States courts. (*Id.* 289–90.)

We agree with the District Court's conclusion that litigation of the numerous legal and factual issues discussed would have inevitably contributed to the expense and duration of the proceedings. Faced with the uncertainty arising from the existing defaults and De Beers's ongoing denial of personal jurisdiction, the settlement provided substantial and immediate relief to the class without further expense. Moreover, extended motion practice "would not only further prolong the litigation but also reduce the value of any recovery to the class." *Warfarin,* 391 F.3d at 536. Accordingly, this first factor favors the settlement.

*b. The Reaction of the Class to the Settlement*

[55] The second *Girsh* factor "attempts to gauge whether members of the class support the settlement," by considering the number of objectors and opt-outs and the substance of any objections. *Prudential,* 148 F.3d at 318. The District Court determined that the reaction of the class was overwhelmingly positive,[FN55] and noted that all twenty of the objections pertained to the Indirect Purchaser Class, with all but four objections relating to the consumer subclass, which consists of between 67 and 117 million members. (App'x 290–91.) We agree with the District Court's observation that the minimal number of objections and requests for exclusion are consistent with class settlements we have previously approved, and we are satisfied that the District Court acted within its discretion in finding this factor to favor settlement.

FN55. The Court noted that, as of March 31, 2008, it had received 433,891 claims forms from all classes—nine from members of the Direct Purchaser Class and 433,882 from the Indirect Purchaser Class, with 431,380 from the Consumer Subclass and 2,502 from the Reseller Subclass.

(App'x 291.) The Court also stated that five requests for exclusion had been received from the Direct Purchaser Class and 139 from the Indirect Purchaser Class (66 from the Reseller Subclass and 69 from the Consumer Subclass). (*Id.*) The Court received no objections from any direct purchasers and also noted that notice was provided to the United States Attorney General and the Attorney Generals of all fifty states, with none seeking to participate in the proceedings. (*Id.* 290–291, 1449–1450.)

*c. The Stage of the Proceedings and the Amount of Discovery Completed*

[56] The third *Girsh* factor "captures the degree of case development that class counsel had accomplished prior to settlement," and allows the court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Warfarin,* 391 F.3d at 537 (citation, quotations & alterations omitted). The District Court thoroughly discussed the development of this case prior to settlement, highlighting the extensive factual discovery of industry participants, consumers, and experts in the field; the retention of economic experts; the review of publicly available information; the experiences of counsel who had previously sued De Beers for price-fixing; and the analysis of proceedings relating to De Beers's other contractual entanglements in the field. (App'x 292.) The Court further observed that several of the individual suits had been in litigation for years before negotiation of the settlement, and emphasized that classes had been certified in several individual suits after significant factual investigation and legal development. (*Id.*) The Court committed no error in concluding that counsel adequately appreciated the merits of the case prior to reaching a settlement, and we agree that this factor favors approval of the settlement.

**\*322** *d. The Risks of Establishing Liability*
[57] The fourth *Girsh* factor "examine[s] what

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Cendant,* 264 F.3d at 237. As already highlighted, the District Court discussed at length the various difficulties plaintiffs would likely encounter in attempting to collect on default judgments in foreign jurisdictions, observing that the Court's monetary judgments would likely be perceived as "beyond its authority" and "effectively void." (App'x 294–95.) The objectors' misguided contention that no risk of establishing liability exists entirely disregards the potential drawbacks of litigating and attempting to collect in foreign jurisdictions, including the extensive motion practice and expense such an uncertain tactic would entail. We are also influenced by De Beers's track record of rejecting United States jurisdiction over its legal affairs and the fact that De Beers has continued to deny any wrongdoing even in reaching a settlement agreement in this matter. Accordingly, we discern no error in the District Court's conclusion that this factor favors settlement.

*e. The Risks of Establishing Damages*

[58] As with the fourth *Girsh* factor, "this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant,* 264 F.3d at 238–39 (citation & quotations omitted). The District Court found that entry of a default judgment against De Beers would prompt the court to "conduct such hearings or order such references as it deems necessary and proper" to ascertain the amount of damages since the damages had not presently been established with certainty. (App'x 296 (quoting Fed.R.Civ.P. 55(b)).) The expert reports submitted by the various parties indicated that these proceedings would likely entail a "battle of the experts," with each side presenting its figures and defenses to the other side's proposals. (*Id.* 297.) Because of the "uncertainty attendant to such a battle," the District Court determined this factor to weigh in support of settlement, (*id.*), and the objectors do not contest this finding on appeal. Accordingly, we find no flaw in the District Court's

decision that the additional "risk in establishing damages" counsels in favor of approval of the settlement. *Cendant,* 264 F.3d at 239.

*f. The Risks of Maintaining the Class Action Through Trial*

[59][60] The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." *Warfarin,* 391 F.3d at 537 (internal quotations & citation omitted). Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id.* (citation omitted). As we have discussed *supra,* although the size and variety of issues implicated in this nationwide class action do not present an obstacle to certification of a settlement class, "there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified." *Id.* Accordingly, we agree with the District Court that the considerable risk of maintaining the class action through trial weighed in favor of settlement.[FN56]

FN56. The objectors aver that drawing a distinction between settlement and litigation classes "would create two standards for class certification" although "the federal rules do not provide for such a difference." (Bagolie Br. at 25.) This argument patently disregards our clear and consistent precedent on the subject. While the standards for class certification are the same for both settlement and litigation classes, certification in the former context need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Comm. Bank II,* 622 F.3d at 291 (citing *Amchem,* 521 U.S. at 620, 117 S.Ct. 2231). This added risk is of utmost significance in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

determining whether a settlement would best serve the interests of the class.

**\*323** *g. Ability of Defendants to Withstand a Greater Judgment*

[61] The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *Warfarin,* 391 F.3d at 537–38 (citation, quotations, & alteration omitted). The District Court observed that "little fact-finding has been done on this issue," and noted that the parties did not dispute De Beers's ability to withstand a greater judgment. (App'x 298–99.) Even so, the Court found this factor to neither favor nor disfavor the proposed settlement because "it would be extremely difficult, if not impossible, to collect a judgment from De Beers." (*Id.*) The objectors contend that the District Court made insufficient findings as to De Beers's market capitalization, which suggested an ability to withstand a much higher judgment, and, therefore, should have weighed this factor against the settlement. (Bagolie Br. at 26–27).

[62][63] In comparing the value of settlement versus trial, we must be careful to judge the fairness factors "against the realistic, rather than theoretical, potential for recovery after trial." *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 461 (S.D.N.Y.2004). In this regard, a finding that an immediate settlement is preferable to the high unlikelihood of collecting a theoretical judgment against De Beers appears entirely reasonable. Moreover, a defendant's ability to withstand a much higher judgment does not necessarily "mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin,* 391 F.3d at 538. That said, "[t]he proponents of a settlement bear the burden of proving that the *Girsh* factors weigh in favor of approval," and we have previously found that defendants' speculative ability to pay "substantially more than they did under the Settlement" cut against approval, "albeit only moderately." *Cendant,* 264

F.3d at 241.

[64] At bottom, we agree that, "in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." *Weber v. Gov't Empl. Ins. Co.,* 262 F.R.D. 431, 447 (D.N.J.2009). As such, we find no error in the District Court's conclusion that De Beers's ability to withstand a greater judgment does not necessarily undermine the fairness of the settlement.

*h. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation*

[65][66] The final two *Girsh* factors consider "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin,* 391 F.3d at 538. The reasonableness of a proposed settlement is assessed by comparing "the present value of the damages plaintiffs would likely recover if successful **\*324** [at trial], appropriately discounted for the risk of not prevailing ... with the amount of the proposed settlement." *Prudential,* 148 F.3d at 322. Notably, in conducting the analysis, the court must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *GM Truck,* 55 F.3d at 806 (citations omitted).

Applying this framework, the District Court described the methodology utilized by the Indirect Purchaser Consumer Subclass's expert, who theorized that the average overcharge for diamond sales was 4.85% and the total worldwide overcharge equalled \$4.99 billion; the United States consumes approximately 50% of the diamonds and diamond jewelry worldwide, rendering the overcharge to the U.S. market equal to \$2.49 billion. (App'x 300.) Accordingly, the proposed \$272.5 million Indirect Purchaser Settlement Fund represented 10.93% of this overcharge. (*Id.*) The expert further posited that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

although the Direct Purchaser Class recovery could not be precisely quantified in the absence of data as to the exact amount of non-De Beers sales to Direct Purchasers, the value could reasonably be estimated. Placing the total value of United States imports of rough diamonds during the Direct Purchaser Class Period at $4.3 billion, the expert estimated that at least 46%—or approximately $2 billion—of the rough diamond sales were excluded sales; applying the 4.85 weighted overcharge percentage to that $2 billion, the expert theorized that the overcharge percentage was near $100 million. (*Id.*) As such, the proposed $22.5 million recovery represented more than 20% of the single damages. (*Id.*) The District Court found this estimate reasonable and the objectors do not protest this methodology.

[67] Instead, the objectors contend that the District Court abused its discretion in overvaluing the settlement by considering only estimated *single* damages in its "best possible recovery" inquiry, rather than comparing the settlement amount to the *treble* damages that are an automatic component of antitrust damages recovery in many jurisdictions. (Bagolie Br. 28, 32–43.) Although the objectors correctly note that the District Court compared the settlement recovery to single damages in evaluating the propriety of the settlement's monetary component, (App'x 301), we do not agree with the objectors that this methodology constituted legal error.

Some disagreement exists in the case law as to whether the reasonableness of a settlement amount should be evaluated by comparison to the potential single damages of a class or the trebled damages authorized in certain jurisdictions. *Compare County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1324 (2d Cir.1990) ("[T]he district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing to a trebled base recovery figure."), *Carnegie v. Household Intern., Inc.,* 445 F.Supp.2d 1032, 1035 (N.D.Ill.2006) ("[N]umerous courts have held that in determining a settlement value, the potential for

treble damages should not be taken into account."), and *Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 376 (D.D.C.2002) ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages."), *with In re Auction Houses Antitrust Litig.,* 2001 WL 170792, at *7 (S.D.N.Y. Feb. 22, 2001) ("[T]here are few perceptible justifications of the single damages standard for the determination of the fairness of antitrust class actions," which "places the settlement court, [acting] as a fiduciary for the absent class members, in **\*325** a position in which it may be forced to approve a settlement that no non-representative plaintiffs would accept"), and *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 210 n. 30 (D.Me.2003) ("[I]f a settlement reflects a potential damage recovery, it should logically reflect the other parts of that recovery (trebling and attorneys' fees) that the statute awards automatically.").

That said, "we know of no authority that *requires* a district court to assess the fairness of a settlement in light of the potential for trebled damages." [FN57] *Comm. Bank II,* 622 F.3d at 312 (emphasis in original); *see also Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 964–65 (9th Cir.2009) ("We have never precluded courts from comparing the settlement amount to both single and treble damages. By the same token, we do not require them to do so in all cases."). Rather, "courts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages." [FN58] *Rodriguez,* 563 F.3d at 964; *see also City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 458–59 (2d Cir.1974) ("[T]he vast majority of courts which have approved settlements ... have given their approval ... based on an estimate of single damages only."), *overruled on other grounds as recognized by U.S. Football League v. Nat'l Football League,* 887 F.2d 408, 415–16 (2d Cir.1989). Without delving into the debate over whether single or treble damages are the proper variable of comparison, we cannot label the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

District Court's adherence to the commonly accepted procedure for assessing the fairness, adequacy, and reasonableness of a settlement an abuse of discretion. [FN59] Moreover, many of the state law claims asserted would not provide for treble damages recovery.

FN57. Peculiarly, the objectors at once argue "that treble damages *could* be considered in assessing" fairness while also presuming without cause that a fairness inquiry " *necessarily* involves consideration of treble damages." (Bagolie Br. 38–39 (emphasis added).)

FN58. We agree with our fellow Court of Appeals that, in reaching a private consensual settlement, the "parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez,* 563 F.3d at 965. Our principal role in this engagement "is to protect the unnamed members of the class." *Ehrheart,* 609 F.3d at 593. As such, we must remain cognizant that our " 'intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties.' " *Rodriguez,* 563 F.3d at 965 (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998)); *see also GM Truck,* 55 F.3d at 805 (same). No assertion of collusion, fraud, or overreaching is advanced or evidenced in the settlement at issue here.

FN59. The objectors also allege legal error in the District Court's estimate of the "best possible recovery" for the Indirect Pur-

chaser Class by reference to the class as a whole, rather than by making separate findings as to estimated damages for the Consumer and Reseller subclasses. (Bagolie Br. at 27.) This argument falls short. The Special Master—whose findings were accepted by the District Court—thoroughly considered several expert reports and econometric models submitted by various counsel discussing the proper share of damages within the Indirect Purchaser class. The Special Master established an appropriate distribution of the Indirect Purchaser fund based upon estimated damages to both the Consumer and Reseller subclasses, and the objectors have not demonstrated the inaccuracy of this analysis. (*See* App'x 1473–1508.)

Finding no abuse in the District Court's conclusion that the proposed settlement offered a reasonable recovery, particularly **\*326** "when accounting for the additional relief provided by the injunction," (App'x 301), we are also not persuaded that the Court erred in assessing the reasonableness of the settlement in light of all of the attendant risks of litigation. *Girsh,* 521 F.2d at 157. The District Court found the "magnitude of the potential risks in litigation, including likely profound difficulties enforcing United States default judgments in the relevant foreign countries, establishing personal jurisdiction, and establishing liability," to compare unfavorably to the recovery offered by the proposed settlement. (App'x 301–02.) Based on this assessment, we find the District Court's conclusion that these final factors weigh in favor of the settlement compelling.

On balance, we conclude that the District Court did not abuse its discretion in finding the Settlement as a whole fair, adequate, and reasonable.

*2. Plan of Allocation*

[68] The objectors next aver that the previously discussed differences in state law mandate a differential allocation in the percentage of recovery within the Indirect Purchaser Consumer Settlement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Fund, which should "account for the[ ] varying strengths and weaknesses" of consumer claims as informed by the applicable state law treatments of indirect purchaser causes of action. (Murray Br. at 15–18.) Accordingly, they contend that the District Court should utilize subclasses in accounting for the varied rights to recovery caused by *Illinois Brick* disparities in state laws. (Quinn Answer to Pet. for Reh'g En Banc at 11.)

[69][70] A district court's "principal obligation" in approving a plan of allocation "is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund." *Walsh v. Great Atl. & Pac. Tea Co., Inc.,* 726 F.2d 956, 964 (3d Cir.1983). In prior instances where objectors challenged the fairness of intra-class allocation of settlement funds, we have explained that "where a class is found to include subclasses divergent in interest," the use of subclasses may be appropriate and "is designed to prevent conflicts of interest in class representation." *Ins. Broker.,* 579 F.3d at 271. We have likewise noted the potential drawbacks of subclassing, including the potential " 'Balkanization' of the class action," and creation of "a huge obstacle to settlement if each subclass has an incentive to hold out for more money." *Id.* (quoting *In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 202 (3d Cir.2005) (" *Cendant Sec.* ")). We accord "substantial deference to district courts with respect to their resolution of this issue" because such decisions "require[ ] a balancing of costs and benefits that can best be performed by a district judge." *Ins. Broker.,* 579 F.3d at 271. "Where the district court has declined to certify a subclass" and treats all class members as falling within a single class for purposes of a fund allocation, "we will ordinarily defer to its decision unless it constituted an abuse of discretion." *Id.* (quoting *Cendant Sec.,* 404 F.3d at 202) (quotations & alterations omitted).

In *Insurance Brokerage,* the objectors asserted that the district court abused its discretion in failing to require the establishment of subclasses where "the increased recovery of one sub-class was

achieved at the expense of another subclass's diminished recovery." *Id.* at 270. There, the plan of allocation tied reimbursement "to the extent of damages incurred on certain policies of insurance," and was "allocated in such a way that policyholders who likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe." *Id.* at 272–73. Although we observed that the proposed subclasses **\*327** "ha[d] some appeal" in remedying an unequal division of the settlement fund, we deferred to the district court's thorough explanation that the objectors had failed to evidence "divergent or antagonistic interests between the three groups," and had not established that "these groups have claims of varying merit." *Id.* at 272 (citation & quotations omitted). Indeed, despite the factual disparities in the type of insurance at issue, the district court had highlighted that "all of the class members shared a unified interest in establishing [ ] liability for engaging in anticompetitive conduct which increased the cost of premium for all policyholders," undermining the showing of divergent interests. *Id.* at 273. We further noted that the plan of allocation "was carefully devised to ensure a fair distribution of the settlement fund," and "merely created a structure for ensuring that reimbursement [was] tied to the extent of damages incurred." *Id.* at 272. Accordingly, we found the settlement allocation fair and within the district court's discretion. *Id.*

We reached a different conclusion in *Pet Food,* 629 F.3d at 353. There, the district court carefully examined the fairness of the total settlement fund, but did not discuss whether an allocation of the fund to a sub-segment of claims—namely, to consumers who had received refunds outside of the settlement—was inadequate and rendered the settlement unfair and unreasonable to those who had received nothing on account of their claims. 629 F.3d at 353 (noting that although "we do not doubt the able District Court properly determined that the fund was a fair and adequate settlement of all the claims advanced by plaintiffs in this case[,] ... [w]e are unable to determine whether the $250,000 al-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 59

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

location was a fair and adequate settlement of the Purchase Claims"). There, we decided that the district court lacked sufficient information to decide whether the allocation to certain claimants was fair, and, thus, we remanded for further proceedings. *Id.* at 356.

Like the progressive settlement contemplated in *Insurance Brokerage,* the settlement at issue here provides for a pro rata distribution to all class members, and does not distinguish based upon any variables, such as the applicable state law of claimants' states of residence or location of purchase. While the District Court here did not specifically evaluate the pro rata allocation through the fairness lens, it did consider the differential allocation question in conducting the predominance analysis, noting the imprecision inherent in weighing class member claims "based on the relative strength of different state law claims." (App'x 279.) The District Court further noted in its Rule 23(a) analysis that the various "individual classes were represented by separate counsel during settlement negotiations, allowing for 'adequate structural protections to assure that differently situated plaintiffs negotiate for their own unique interests.' " (App'x 220 (quoting *Warfarin,* 391 F.3d at 533).) Moreover, the Court observed that there were no intra-class conflicts since all putative members experienced injury caused by De Beers, all sought recovery for overpayment caused by allegedly anticompetitive behavior, and all shared common interests in establishing damages and injunctive relief. (*Id.* at 220–21.)

It may be entirely reasonable to apply the same damages calculation to claimants from all states because, as the district court in *Warfarin* observed, "[i]t is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than claimants from other states." *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 260 (D.Del.2002); *see also Cendant,* 264 F.3d at 250 (given **\*328** the "speculative" nature of such an inquiry, differences in the liability standards between § 11 and § 10(b) securities claims did *not*

warrant differential plan of allocation). And only by engaging in the type of fact-intensive merits and choice-of-law analyses that we have rejected could a district court attempt to assay the "varying strengths and weaknesses" of asserted state claims. (*See* Murray Br. at 15–18.) We can find no support in our case law for differentiating within a class based on the strength or weakness of the theories of recovery. Accordingly, we decline to require such an analysis.

Moreover, it is noteworthy that each putative class member suffered the same alleged injury as a result of De Beers's anticompetitive conduct, irrespective of the vagaries of applicable state laws. Recognizing this, the plan of allocation here "adjust[s] diamond purchases to a common measure," allowing an "apples to apples" comparison "of the relative amount of damages suffered by various claimants within the classes and subclasses and permits distribution pro rata based on the relative amounts of damages suffered." (App'x 1530.) Courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable," *In re Corel Corp. Inc., Sec. Litig.,* 293 F.Supp.2d 484, 493 (E.D.Pa.2003), and we are mindful that "district courts have broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably," *McCoy v. Health Net, Inc.,* 569 F.Supp.2d 448, 469 (D.N.J.2008). The record here confirms that the District Court carefully considered expert advice in accepting the plan of allocation, and "[t]his kind of decision is intensely factbased, falling within the purview of the District Court's decision." *Cendant,* 264 F.3d at 254. In light of the foregoing analysis, we cannot conclude that the District Court abused its discretion in accepting the carefully negotiated plan of allocation.

[71] Lastly, the objectors contend that the settlement's minimum claim payment requirement of $10 provides inadequate settlement relief, as it will eliminate the rights of many class members without

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

providing any compensation. (Petrus/Giddings Br. at 12.) They urge that a minimum payment provision contradicts the purpose of the class action mechanism to provide recovery even where the amount is "paltry." (*Id.* at 16 (quoting *Yang v. Odom,* 392 F.3d 97, 106 (3d Cir.2004)).) We disagree and find no abuse in the District Court's decision to approve the minimum claim payment threshold.

As other courts have observed, " *de minimis* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10." *In re Gilat Satellite Networks, Ltd.,* No. CV–02–1510, 2007 WL 1191048, at *9 (E.D.N.Y. Apr. 19, 2007); *see, e.g., In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 463 (S.D.N.Y.2004) (noting that the minimum recovery requirement is a common procedure that addresses "the undeniable fact that claims-processing costs money, which comes out of the settlement fund"); *Mehling v. New York Life Ins. Co.,* 248 F.R.D. 455, 463 (E.D.Pa.2008) (approving settlement plan with $50 minimum payment). The District Court adopted the Special Master's considered decision that "administrative costs to make *de minimis* payments are too large to justify the small payments," and the objectors have offered only conclusory counter-allegations. (App'x 1531). Indicative of the disingenuous**329 nature of their responses is the objectors' assertion that "[i]n exchange for their release, millions of class members [will] receive no money." (Quinn Br. at 63–64.) This argument fails to acknowledge the injunctive relief offered by the settlement, however, which is intended to benefit all class members regardless of individual monetary recovery.[FN60]

> FN60. The objectors' related argument that the *de minimis* provision will deprive 57 million consumers of monetary recovery even if they file a claim is equally weak.

(Giddings/Petrus Br. 9.) This contention unfairly presumes that every single putative class member will timely submit claims forms, rendering every member's *pro rata* recovery below $10. By contrast, the evidence accepted by the Special Master demonstrated that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns." (App'x 1550 (citation & quotations omitted).) In the absence of any credible evidence subjecting the objectors' position, we cannot conclude that the District Court abused its discretion in adopting the distribution plan.

Furthermore, the objectors appear to ignore a key rationale underlying the class action mechanism. In addition to providing individual class members with payments, " '[t]he policy at the very core of the class action mechanism' " is to provide sufficient incentive to prosecute an action " 'by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor,' " *Yang,* 392 F.3d at 106 (quoting *Amchem,* 521 U.S. at 617, 117 S.Ct. 2231). In this instance, the representative parties and their counsel were properly incentivized to bring and prosecute this action through settlement, resulting in a net benefit to the class. As a result, based upon the evidence offered before the Special Master and the arguments alleged herein, we cannot conclude that the District Court abused its discretion in approving this element of the plan of allocation.

*C. Objections to the Fee Award*

The objectors likewise aver that the District Court abused its discretion in awarding attorneys' fees that they urge are excessive. (Quinn Br. at 65; Hicks Prelim. Op. Br. at 7; Petrus/Giddings Br. at 12.) They contend that class counsel will receive in excess of $73 million—equal to approximately 25% of the $293 million principal settlement fund—despite this being a default judgment case, which entailed minimal motions practice and dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

covery. Additionally, considering the large number of putative class members and the alleged lack of risk undertaken by class counsel in prosecuting this case to settlement, the objectors urge that the award is unjustified under our jurisprudence. We disagree.

[72] Our case law makes clear that a "robust" and "thorough judicial review of fee applications is required in all class action settlements," *In re Diet Drugs,* 582 F.3d 524, 537–38 (3d Cir.2009) (citation & quotations omitted), but that "the amount of a fee award ... is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous," *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 299 (3d Cir.2005) (citation & quotations omitted). *See also Ursic v. Bethlehem Mines,* 719 F.2d 670, 675 (3d Cir.1983) ("[T]he district court has discretion in determining the amount of a fee award ... in view of [its] superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.") (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

**\*330** [73][74] Attorneys' fees requests are generally assessed under one of two methods: the percentage-of-recovery ("POR") approach or the lodestar scheme. "The former applies a certain percentage to the settlement fund," while "[t]he latter multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Diet Drugs,* 582 F.3d at 540 (citation, quotations, & alterations omitted). The POR method "is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *Rite Aid,* 396 F.3d at 300 (citation & quotations omitted). The lodestar method, which is more commonly utilized in statutory fee-shifting cases and "where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation," *Diet Drugs,* 582 F.3d at 540–41, is

then used "to cross-check the reasonableness of a percentage-of-recovery fee award," *In re AT & T Corp.,* 455 F.3d 160, 164 (3d Cir.2006).[FN61] Because the case at issue entailed a common fund, the District Court applied the POR method and utilized a lodestar crosscheck. (App'x 310.). The objectors do not dispute the propriety of this approach, and we find no fault with this decision.

> FN61. The lodestar crosscheck "is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *AT & T Corp.,* 455 F.3d at 164. The multiplier endeavors "to account for the contingent nature or risk involved in a particular case," and may be adjusted "to account for particular circumstances, such as the quality of representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented." *Id.* at 164 n. 4 (citations & quotations omitted).

[75][76] In determining the appropriate percentage fee award, the District Court then devoted detailed consideration to each of the ten factors that we identified in *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190 (3d Cir.2000),[FN62] and *Prudential,* 148 F.3d 283,[FN63] finding, *inter alia,* that the complexity and duration of the litigation, the time and skill committed to the litigation, the ever-present risk of nonpayment from De Beers's tenuous status in the United States, the absence of substantial objections, and the achievement of both monetary and injunctive relief without any governmental investigation or assistance all weighed in favor of approving the Special Master's recommended 25% attorneys' fee award. (App'x 311–21.) The objectors do not contend that the District Court applied incorrect legal standards or procedures or that the Court improperly "brushed over our required analysis." *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 735 (3d Cir.2001). Rather, they disagree with the Court's factual findings as to two of the factors; they contend that we **\*331** should find an

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 62

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

abuse of discretion because this case is " 'neither legally nor factually complex and did not require significant motion practice or discovery' by class counsel." (Quinn Br. at 65 (quoting *Cendant PRIDES,* 243 F.3d at 743).)

FN62. The *Gunter* factors are as follows:

(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

223 F.3d at 195 n. 1.

FN63. The *Prudential* factors are:

(8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*Diet Drugs,* 582 F.3d at 541 (citing *Prudential,* 148 F.3d at 338–40).

Because of the objectors' narrow focus before us and the District Court's thorough analysis of each of the *Gunter* and *Prudential* factors, we will only address the specific objections raised herein. As an initial matter, the objectors neglect to mention the primary reason for our finding of error in *Cendant PRIDES* —the principal case advanced in support of their position. There, we criticized the

district court's failure to "explicitly consider any of [the *Gunter* ] factors," and its neglect to " 'make its reasoning and application of the fee-awards jurisprudence clear.' " *Cendant PRIDES,* 243 F.3d at 734–35 (quoting *Gunter,* 223 F.3d at 196). We engaged in our own analysis of the propriety of the fee award only because the district court failed to consider the fee award factors that we had deemed "essential to a proper exercise of discretion." *Id.* at 735; *see also Ne. Women's Ctr. v. McMonagle,* 889 F.2d 466, 475 (3d Cir.1989) ("[A]n appellate court, which relies on a cold record, is even more poorly positioned to assess the nature and quality of the legal services performed at the trial court level."). We have no such concern here, as the District Court clearly set forth its reasoning for the fee award. Indeed, the objectors never explain exactly where in its lengthy analysis the District Court misapplied the *Gunter* factors; the objectors simply dislike the conclusion reached by the Court. *See generally McMonagle,* 889 F.2d at 475 ("[T]he appellate court may not upset a trial court's exercise of discretion on the basis of a visceral disagreement with the lower court's decision.") (citation & quotations omitted).

Moreover, the District Court's factual findings as to the complexity and demands of this case further distinguish the instant circumstances from *Cendant PRIDES* and do not suggest an abuse of discretion. As we discussed in *Rite Aid,* the *Cendant PRIDES* counsel "only spent approximately 5,600 hours on the action," "Cendant had conceded liability and no risks pertaining to liability or collection were pertinent." 396 F.3d at 304 (discussing *Cendant PRIDES,* 243 F.3d at 735). These factors are absent in this case. Contrary to the objectors' contention, the Special Master and District Court both observed that counsel devoted nearly 39,000 hours to litigating this matter in the various federal and state courts and to the subsequent negotiations and disputes pertaining to the settlement itself. The Court noted that, apart from addressing complicated legal questions and the secrecy surrounding the diamond industry, plaintiffs' counsel was forced to lit-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 63

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

igate against opposition from intervenors and amicus curiae, engaged in protracted settlement negotiations lasting approximately one year, and ultimately confronted the difficult settlement, distribution, and injunctive issues addressed in this appeal. (App'x 317–18.) Given the complexity of the legal and factual issues implicated and the difficult questions raised in the post-settlement process, we find no abuse of discretion in the District Court's conclusion that the complexity and duration of the litigation supported the requested fee.[FN64]

FN64. The objectors' further contention that the size of the percentage fee award should decrease in light of the large size of the overall settlement, (Quinn Br. at 66), is premised on several of our opinions in which we stated that "the percentage of a recovery devoted to attorneys' fees should decrease as the size of the overall settlement or recovery increases." *Cendant,* 264 F.3d at 284 n. 55 (citations & quotations omitted). We so ruled because "in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* In particular, we have vacated large fee awards " 'when much of the settlement apparently resulted from the work of state regulators and a multi-state insurance task force.' " *Rite Aid,* 396 F.3d at 303 (quoting *Prudential,* 148 F.3d at 338–342). But "there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund," and we have approved large settlements where "class counsel's efforts played a significant role in augmenting and obtaining an immense fund." *Id.* Ultimately, "the fact-intensive *Prudential/ Gunter* analysis" must trump all other considerations. *Id.*

Here, plaintiffs' counsel prosecuted this matter through settlement with no cer-

tainty as to their ability to enforce any judgment against De Beers. The District Court's fact-intensive *Gunter* analysis found that plaintiffs' counsel deftly and efficiently handled this complex matter and played a significant role in the outcome. Accordingly, we disagree that the size of the overall settlement bears no relationship to the efforts of counsel and will defer to the District Court's considered judgment.

**\*332** Furthermore, unlike in *Cendant PRIDES,* the risk of nonpayment here remained ever-present throughout the litigation and settlement proceedings. The objectors dispute that counsel faced such risk after agreeing to settle and the depositing of the settlement amount into an escrow account. It is unclear, however, whether an agreement to settle after inception and prosecution of a matter should play a role in a court's evaluation of the risk of nonpayment; indeed, our case law has "never addressed whether courts must reconsider the risk of nonpayment as the action evolves." *Diet Drugs,* 582 F.3d at 543. Although we previously approved a district court's evaluation of risk "as of 'the inception of the action and not through the rosy lens of hindsight,' " we emphasized that our endorsement took into consideration the district court's "more comprehensive" reevaluation of the risk over the course of the proceedings. *Id.* (quoting *In re Diet Drugs,* 553 F.Supp.2d 442, 478 (E.D.Pa.2008)). There, we did not directly resolve whether a district court should reassess risk throughout a litigation, but found the risk of nonpayment to be ongoing, noting that while a settlement agreement and "the escrow funds undoubtedly reduced the risk of nonpayment, those funds were but one part of an intricate agreement" and the efforts of counsel could still "have been for naught." *Id.*

Here, we are similarly satisfied that counsel faced a legitimate risk of nonpayment throughout the litigation. The District Court found that De Beers possessed few assets in the United States

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

against which a judgment could be enforced and effectively dodged jurisdiction in the United States for over fifty years, evidencing a cognizable risk of nonpayment at the inception stage. (App'x 319.) Although the District Court's order did not address the prospects for nonpayment post-settlement, it is evident that De Beers never conceded liability or admitted any wrongdoing, and that the escrow funds "were but one part of an intricate agreement" that—as demonstrated by the Panel's original decision to reject settlement class certification—continued to pose a genuine risk of nonpayment to counsel. As such, the objectors' "view of the risk of nonpayment is more myopic than the Court's," *Diet Drugs,* 582 F.3d at 543, and we are not persuaded that the District Court abused its discretion in finding this factor to favor the requested fee.

Finally, the objectors' assertion that the award improperly exceeds the awards in similar cases is equally unavailing. In *Cendant PRIDES,* we discussed fee awards in class actions in which the settlement fund exceeded $100 million and which relied upon the POR method, finding**333** that "the attorneys' fee awards ranged from 2.8% to 36% of the total settlement fund." 243 F.3d at 737. Similarly, in *Rite Aid,* we found no abuse of discretion in a district court's reliance on three studies that demonstrated an average percentage fee recovery in large class action settlements of 31%, 27–30%, and 25–30%. 396 F.3d at 303. Here, the District Court determined that the 25% fee requested by counsel fell within this range. (App'x 320.)

We are cognizant that a comparison of this award to fees ordered in other cases is a complex analytical task, in light of variations in the efforts exerted by attorneys and the presence of complex legal and factual issues. That said, we have emphasized "that a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *Cendant PRIDES,* 243 F.3d at 736. Although this case may

have lacked some of the contested motion practice and extensive discovery elicited in some of the other cases receiving similar percentage awards, *see id.* at 740–41, the case presented other challenges, including "De Beers'[s] denial of jurisdiction [and liability], the secrecy of the diamond industry, and unavailability of ordinary discovery methods, the substantial risk of non-collection of a U.S. judgment in foreign countries and the historic injunction obtained." (February 15, 2008 Report and Recommendation of Special Master on Incentive Awards, Cost Reimbursement & Attorneys' Fee Awards at 31.) The District Court here properly considered the relevant *Gunter* and *Prudential* factors, and determined that the case presented all of the factors we had recognized as supporting a higher award: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." (App'x 320 (quoting *Cendant PRIDES,* 243 F.3d at 741).)

Because the District Court employed the "correct standards and procedures" and its findings of fact are not clearly erroneous, we do not find an abuse of discretion in its calculation of the attorneys' fee award. *Rite Aid,* 396 F.3d at 299.[FN65]

> FN65. We also reject the sole objection pertaining to the District Court's decision to grant incentive awards to class representatives. "Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class." *Lorazepam,* 205 F.R.D. at 400 (internal quotations omitted). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation," and to "reward the public service of contributing to the enforcement of mandatory laws." *Bredbenner v. Liberty Travel, Inc.,* No. 09–905, 2011 WL 1344745, at *22 (D.N.J.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Apr. 8, 2011) (citations & quotations omitted). Contrary to the objectors' contention, the District Court—relying upon the Special Master's more detailed findings—discussed the role played by the several class representatives and the risks taken by these parties in prosecuting this matter. (App'x 326–27; R & R on Awards at 42–46.) We find no error in the District Court's decision.

*IV. Conclusion*

For the foregoing reasons, we will affirm the District Court's Order.

SCIRICA, Circuit Judge, concurring.

I fully concur in the Court's opinion. I write separately to address this case in the wider context of the evolving law on settlement classes.

Ever since the Supreme Court's landmark decisions in *Amchem Products Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and **\*334***Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), one of the most vexing questions in modern class action practice has been the proper treatment of settlement classes, especially in cases national in scope that may also implicate state law. Grounded in equitable concepts of structural and procedural fairness for absent plaintiffs—competent and conflict-free representation, fair allocation of settlement, absence of collusion— *Amchem* and *Ortiz* set down important standards and guidelines for settlement classes.[FN1]

> FN1. The class action device has a venerable pedigree in equity practice. As early as the seventeenth century, English chancery courts employed bills of peace to facilitate representative suits analogous to "common question" suits under Rule 23(b)(3). Geoffrey C. Hazard, Jr. et al., *An Historical Analysis of the Binding Effect of Class Suits,* 146 U. Pa. L.Rev. 1849, 1861–65 (1998). Inchoate class actions continued in the American legal system

until codified under Rule 23 in Federal Rules of Civil Procedure in 1938. *Id.* at 1878–1942. The 1966 amendments to Rule 23 substantially modified earlier practice and ushered in a class action "revolution" by introducing most of the current aspects of class action litigation, particularly the broad provisions of 23(b)(3) and the concomitant procedural safeguards requiring predominance and notice. Stephen B. Burbank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View,* 156 U. Pa. L.Rev. 1439, 1484–89 (2008).

Despite initial uncertainty the opinions might pose formidable obstacles for settling massive, complex cases, this has not, for the most part, proved to be the case. Nonetheless, class settlement in mass tort cases (especially personal injury claims) remains problematic, leading some practitioners to avoid the class action device—most prominently in the recent $4.85 billion mass settlement of 50,000 claims arising out of use of the drug Vioxx. In fact, some observers believe there has been a shift in mass personal injury claims to aggregate non-class settlements. "The *Zyprexa* and *Ephedra* settlements, as well as the more recent *Guidant* and *Vioxx* settlements, suggest that the MDL process has supplemented and perhaps displaced the class action device as a procedural mechanism for large settlements." Thomas E. Willging & Emery G. Lee III, *From Class Actions to Multidistrict Consolidations: Aggregate Mass–Tort Litigation after Ortiz,* 58 U. Kan. L.Rev. 775, 801 (2010); *see also* Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does It Make?,* 81 Notre Dame L.Rev. 591, 636 tbl. 12 (2006) (presenting evidence that, in sample, 41% of cases denied class certification ended in non-class settlement). This is significant, for outside the federal rules governing class actions,[FN2] there is no prescribed independent review of the structural and substantive fairness of a settlement including evalu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

ation of attorneys' fees, potential conflicts of interest, and counsel's allocation of settlement funds among class members.[FN3]

> **FN2.** Bankruptcy may also provide a vehicle for some measure of compensation to mass claimants (creditors) and for resolution of liability.

> **FN3.** Nevertheless, some MDL transferee judges have treated the MDL proceedings as quasi class actions and restricted contingent fee agreements in non-class aggregate settlements under their equitable and supervisory powers. *See In re Vioxx Prods. Liab. Litig.,* 650 F.Supp.2d 549, 558–62 (E.D.La.2009); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* MDL No. 05–1708 (DWF/AJB), 2008 WL 682174 (D.Minn. Mar. 7, 2008); *In re Zyprexa Prods. Liab. Litig.,* 424 F.Supp.2d 488, 491 (E.D.N.Y.2006).

Because of the pivotal role and ensuing consequences of the class certification decision, trial courts must conduct a "rigorous analysis" of Rule 23's prerequisites. **\*335***Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2011); *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 315–21 (3d Cir.2008); *In re Initial Pub. Offerings Secs. Litig.,* 471 F.3d 24, 31–42 (2d Cir.2006).[FN4] The same analytical rigor is required for litigation and settlement certification, but some inquiries essential to litigation class certification are no longer problematic in the settlement context. A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof. But the settlement class presents no management problems because the case will not be tried. Conversely, other inquiries assume heightened importance and heightened scrutiny because of the danger of conflicts of interest, collusion, and unfair allocation. *See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 ("[O]ther specifications of the Rule

[23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.").

> **FN4.** For a litigation class, the key decision is whether or not to certify the class. Once a class is certified, the dynamics of the case change dramatically. For many plaintiffs, denial of certification may sound the death knell of the action because the claims are too small to be prosecuted individually. For many defendants, class certification may create hydraulic pressure to settle, even for claims defendants deem non-meritorious. For these reasons, the Supreme Court adopted Federal Rule of Civil Procedure 23(f) to permit a discretionary interlocutory appeal from the grant or denial of class certification.

In conducting a "rigorous analysis" under Rule 23, lower courts have applied the strictures laid down in *Amchem* and *Ortiz,* and added some of their own. So far, the developing jurisprudence appears to have justified the judgment of the Judicial Conference's Committee on Rules of Practice and Procedure and Advisory Committee on Civil Rules to defer consideration of a variant rule for settlement class actions.

Rule 23(a) sensibly provides that every certified class must share common questions of law or fact. For (b)(3) classes, common questions must predominate over individual questions, claims must be typical, and the class action device must be superior to other available methods for fairly and efficiently adjudicating the controversy. Naturally, there is some overlap in the requirements for commonality, typicality, and predominance—all of which must be shown.

Commonality for a settlement class should be satisfied under the standard for supplemental jurisdiction first set forth in *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

1130, 16 L.Ed.2d 218 (1966), allowing joinder of claims deriving from a common nucleus of operative fact. *See also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* —— U.S. ——, 130 S.Ct. 1431, 1443, 176 L.Ed.2d 311 (2010) (Scalia, J., plurality opinion) ("A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits."). Variation in state law should not necessarily bar class certification. The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence. The claim or claims must be related and cohesive and should all arise out of the same nucleus of operative fact. The "common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. The interests of the class members should be aligned.

**\*336** The nature of the predominance analysis reflects the purpose of the inquiry, which is to determine whether "a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23 advisory committee note). This is important even though, in the settlement context, a court need not worry about the challenge of litigating the claims to a verdict in a single proceeding. If the class presented a grab-bag of unrelated claims, a trial court would be unable to ensure that absent class members' interests were protected. The question, then, is what kind of common issues a settlement class must share to satisfy commonality and predominance.

In certain areas, such as antitrust, common issues tend to predominate because a major focus is

the allegedly anticompetitive conduct of the defendant and its downstream effects on plaintiffs. *See In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 268 (3d Cir.2009). Commonality and predominance are usually met in the antitrust settlement context when all class members' claims present common issues including (1) whether the defendant's conduct was actionably anticompetitive under antitrust standards; and (2) whether that conduct produced anticompetitive effects within the relevant product and geographic markets. *See id.* at 267.

Even when a settlement class satisfies the predominance requirement, the inclusion of members who have a questionable chance of a favorable adjudication may present fairness concerns that demand the district court's attention. Trial courts must enforce the Rule 23(a) and (b) requirements in order to obtain a "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem,* 521 U.S. at 627, 117 S.Ct. 2231. In discharging this responsibility, district courts have a number of ways to address fairness concerns.[FN5] Due to the context-specific nature of these judgments, district courts should be afforded a broad ambit of discretion.

FN5. Trial courts can certify subclasses in situations where divergent interests implicate fair allocation—a situation not presented here, as all indirect class members have aligned interests. Certifying subclasses may be proper "[w]here a class is found to include subclasses divergent in interest." *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d at 271 (quoting Fed.R.Civ.P. 23(c) advisory committee note). Even the conflicts in *Amchem* were amenable to resolution through sub-classes. *See Ortiz,* 527 U.S. at 856, 119 S.Ct. 2295 (explaining that *Amchem* requires "a class divided between holders of present and future claims" to be "divi[ded] into homogeneous subclasses ... with separate representation to eliminate conflicting interests of coun-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

sel"). Objector Quinn, in her answer to the petition for rehearing, states that sub-classes would adequately address the *Illinois Brick*-based disparities in this case; she does not argue that it would be cat-egorically improper to afford class treat-ment to indirect purchasers governed by *Illinois Brick. See* Quinn Answer at 11. The District Court here examined whether indirect purchasers' interests diverged de-pending on the law applied to their claims, and found such differences to be irrelevant in the context of this settlement. I find no abuse of discretion in such a conclusion.

For viable settlement classes, *Amchem* and *Ort-iz* made clear that expediency could not negate the requirements of Rule 23, which serve to protect ab-sent class members. *See Amchem,* 521 U.S. at 621, 117 S.Ct. 2231 ("Subdivisions (a) and (b) [of Rule 23] focus court attention on whether a proposed class has sufficient unity so that absent members can be fairly bound by decisions of class represent-atives. That dominant concern persists when settle-ment, rather than trial, is proposed."). The principal danger of collusion **\*337** lies in the prospect that class counsel, induced by defendants' offer of attor-neys' fees, will "trade away" the claims of some or all class members for inadequate compensation. There is also the possibility that a settlement will not serve the interests of all of the class members, which may be in tension. In *Amchem,* for instance, the Court concluded the settlement was not demon-strably fair-there was insufficient allocation to as-bestos claimants who were seriously injured (e.g. mesothelioma) and insufficient protection of non-impaired plaintiffs. 521 U.S. at 625–28, 117 S.Ct. 2231. The Court worried that the claims of the ex-posure-only class members were being released without adequate protection. *Id.; see also In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 315 (3d Cir.1998) (" *Prudential* ") (identifying and distinguishing *Amchem's* con-cerns); *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.,* 55 F.3d 768,

784–86 (3d Cir.1995) (providing summary of the debate regarding propriety of mass tort settlements prior to *Amchem* ).

These observations elucidate the issues of pre-dominance and fairness present in this case. Here, the objectors contend certain claims (claims under state-law following *Illinois Brick* ) are not vi-able—that is, they fail to state a cause of action. [FN6] For this reason, objectors believe that defend-ants are barred from settling these claims in a set-tlement class action because of the predominance requirement. Under objectors' view of Rule 23, trial courts would be obligated at the settlement class certification stage to decide which state's law would govern for that particular plaintiff, and whether a plaintiff has stated a valid cause of action, even if no defendant has raised a Rule 12(b)(6) objec-tion—the usual way to contest the validity of a claim. Objectors contend they seek to protect ab-sent class members, but fail to explain how absent class members—all of whom claim injury—are harmed by the defendants' willingness to settle all potential claims.

> FN6. Objectors also claim that variance on state claims (based on consumer protection and unjust enrichment laws) defeats pre-dominance as well.

This interpretation also presents significant ad-ministrative problems. Objectors view the indirect purchaser class as composed of members who either have valid claims under the laws of states with *Illinois Brick* repealers or members who have invalid claims under the laws of non-repealer states. But a claim cannot be declared invalid without proper analysis, which would require a choice-of-law examination for each class member's claim. Such analyses may pose difficulties in cases where the residence of the class member is not the sole consideration; modern choice-of-law standards of-ten consider an array of factors particular to indi-vidual plaintiffs. Consequently, individual 12(b)(6) inquiries for settlement class certification could present serious difficulties in administration and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

greatly increase costs and fees, and may deplete rather than increase the recovery of even successful plaintiffs.[FN7]

> FN7. The purported "overbreadth" of the putative class at issue here is qualitatively different from the Supreme Court's concerns in *Amchem*. Under *Amchem* the significance of variations in state laws is properly assessed in terms of the interests of absent class members. The proposed *Amchem* settlement, extinguishing claims for different injuries with different onsets incurred at different times due to conduct of different defendants, undercompensated exposure-only claims and those with mesothelioma. Here, objectors contend some class members do not have a valid cause of action, but these class members with non-repealer state law claims have lost nothing through inclusion in the class. Objectors speculate inclusion of non-repealer state law claims necessarily diminishes the settlement accrued to class members whom they contend have undisputedly valid claims. But they provided no support for their assertion. In *Amchem* the objectors provided evidence of intraclass conflicts detrimental to class members. For example, 15% of the proposed *Amchem* settlement's mesothelioma claims arose in California, where the average recovery for a mesothelioma claim was more than double their maximum recovery in the settlement. *Amchem,* 521 U.S. at 610 n. 14, 117 S.Ct. 2231.

> The objectors have not shown that plaintiffs suffering identical economic injuries due to a single course of conduct on the part of the defendant have conflicting interests solely because some class members may have stronger claims depending upon variation in state law. Objectors assume that the non-repealer

state claims have zero settlement value and that defendants would contribute the same amount to the common settlement fund regardless of how many claims the settlement may extinguish. But the settlement of the considerable bulk of claims against the defendants for a prior course of conduct may be of substantially greater value to defendants than a settlement of only the strongest claims against them. And, unlike in *Amchem,* objectors have not shown the inclusion of more claims was achieved by grossly underpaying some class members.

**\*338** Issues of predominance and fairness do not undermine this settlement. All plaintiffs here claim injury that by reason of defendants' conduct—market manipulation and fraud—has caused a common and measurable form of economic damage. They seek redress under federal antitrust laws and state antitrust, consumer protection, and unjust enrichment laws. All claims arise out of the same course of defendants' conduct; all share a common nucleus of operative fact, supplying the necessary cohesion. Class members' interests are aligned. The entire DeBeers settlement class consists of members with some pleaded claim (but not necessarily the exact same one) arising out of the same course of allegedly wrongful conduct such that shared issues of fact or law outweigh issues not common to the class and individual issues do not predominate. As the class structure and settlement assure fairness to all class members, there appears to be nothing in Rule 23 that would prohibit certification and settlement approval.

Moreover, the focus on the alleged insufficiency of some members' claims is misplaced. Settlement of a class action is not an adjudication of the merits of the members' claims. It is a contract between the parties governed by the requirements of Rule 23(a), (b), and particularly (e),[FN8] and establishes a contractual obligation as well as a contractual defense against future claims. Here, class

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 70

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

members and DeBeers want to settle all state and federal claims arising out of defendant's alleged misconduct. *Amchem* recognized the legitimacy of such a settlement under **\*339**Rule 23, setting forth applicable parameters. The court's responsibility is to supervise and assume control over a responsible and fair settlement. Those requirements have been met here.

> FN8. Rule 23(e) is especially relevant in this context because it governs the settlement, dismissal, or compromise of a class action. It requires court approval of any agreement, and establishes five procedural requirements that must be satisfied:
>
>> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>>
>> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>>
>> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>>
>> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>>
>> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.
>
> Fed.R.Civ.P. 23(e).

A responsible and fair settlement serves the in-

terests of both plaintiffs and defendants and furthers the aims of the class action device. Plaintiffs receive redress of their claimed injuries without the burden of litigating individually. Defendants receive finality. Having released their claims for consideration, class members are precluded from continuing to press their claims. Collateral attack of settlements and parallel proceedings in multiple fora are common realities in modern class actions—features that can imperil the feasibility of settlements if defendants lack an effective way to protect bargained-for rights. *See Prudential,* 314 F.3d at 104–05. If the indirect-purchaser claims at issue here were excluded, nothing would bar the plaintiffs from bringing them as separate class actions or as aggregate individual actions, leaving defendants "exposed to countless suits in state court" despite the settlement. *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 261 F.3d 355, 367 (3d Cir.2001) (" *Prudential II* "). (Here, prior to removal and MDL consolidation, it appears an Illinois state court certified a nationwide litigation class asserting indirect-purchaser claims under the laws of all 50 states.) Perhaps a defendant will be willing and able to defend or settle all of these actions separately, or perhaps it won't. Either way, the costs (direct and indirect) and risks of continuing litigation will be greater. A defendant, therefore, may be motivated to pay class members a premium and achieve a global settlement in order to avoid additional lawsuits, even ones where it might be able to file a straightforward motion to dismiss for failure to state a claim.[FN9]

> FN9. Facing liability for alleged misconduct, a defendant may desire global settlement for several possible reasons: (1) redressing plaintiffs' injuries; (2) the possibility of liability; (3) the direct costs of defending suits, often in multiple fora; (4) the risk of financially unmanageable jury verdicts which may threaten bankruptcy; (5) the effects of pending or impending mass litigation on its stock price or access to capital markets; (6) the stigma of brand-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
(Cite as: 667 F.3d 273)

damaging litigation; and (7) maintaining financial stability.

Finally, new limitations such as those proposed by objectors would, I believe, undercut the policy goals of the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109–2, 119 Stat. 4, and the Multidistrict Litigation Statute, 28 U.S.C. § 1407, both of which are designed to encourage the consolidation of mass claims national in scope—and in the case of CAFA, with particular reference to class actions based on state law claims. Of course, district courts must fully enforce the requirements of Rule 23. But the limitations objectors propose here "would seriously undermine the possibility for settling any large, multi district class action." *Prudential II*, 261 F.3d at 367. [FN10]

FN10. In *Prudential II*, we affirmed the grant of an injunction enjoining a state-court action brought by policyholders who were members of the *Prudential* class to the extent the state-law claims were based on or related to claims released in the class action. We agreed with the district court that allowing the policyholders to prosecute their civil actions in state court "would allow an end run around the Class settlement by affording them (and other class members who might later attempt the same strategy) an opportunity for relitigation of the released claims." 261 F.3d at 367 (internal quotation marks omitted). We noted that the position urged by the policyholders "would seriously undermine the possibility for settling any large, multi district class action. Defendants in such suits would always be concerned that a settlement of the federal class action would leave them exposed to countless suits in state court despite settlement of the federal claims.... [S]uch state suits could number in the millions." *Id.* It is for this reason that releases of all claims—whether state or federal—have been held valid, "provided

they are based on the same factual predicate." *Prudential*, 148 F.3d at 326 n. 82. So long as a sufficient factual predicate exists, a release can even bar later claims which could not have been brought in the court rendering the settlement judgment. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

**\*340** The class action device and the concept of the private attorney general are powerful instruments of social and economic policy. Despite inherent tensions, they have proven efficacious in resolving mass claims when courts have insisted on structural, procedural, and substantive fairness. Among the goals are redress of injuries, procedural due process, efficiency, horizontal equity among injured claimants, and finality. Arguably a legal system that permits robust litigation of mass claims should also provide ways to fairly and effectively resolve those claims. Otherwise, mass claims will likely be resolved without independent review and court supervision. [FN11]

FN11. The final draft of the American Law Institute's *Principles of the Law of Aggregate Litigation* points out the current lack of judicial oversight over non-class aggregate settlement. § 3.15 cmt. a (2010). It notes that, unlike class settlements, "[n]on-class aggregate settlements are governed primarily by ethical rules and are rarely subject to court review or approval for fairness" and so advocates "a fresh look ... at how non-class aggregate settlements should be regulated." *Id.* In particular, it proposes a rule to provide each plaintiff a nonwaivable right to challenge in court a settlement that is allegedly "not procedurally and substantively fair and reasonable." § 3.18(a). The ALI *Principles* analogizes these proposed requirements to those applied to class settlements. § 3.17 cmt. e.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 72

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

JORDAN, Circuit Judge, joined by SMITH, Circuit Judge, dissenting.

This is the Majority's considered view of the law: in certifying a class action, it makes no difference whether the class is defined to include members who lack any claim at all. As my colleagues in the Majority see it, "were we to mandate that a class include only those alleging 'colorable' claims, we would effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not." (Op. at 310.) So, "come one, come all," regardless of substantive legal rights. That remarkable declaration sets the class action ship in our Circuit badly adrift.

To be clear, the problem with the enormous, nationwide class most particularly at issue in this case is not that it may include people with marginal or dubious claims. The class of indirect purchasers of De Beers diamonds actually presents a far more troubling problem than that. It includes people who have no legal claim whatsoever. That is clear on the face of the statutory and decisional law of several states whose laws are invoked as the basis for this class action,[FN1] and no one has been able to mount a cogent argument to the contrary. Despite the Majority's elaborate construction and dismantling of straw man arguments about commonality and predominance, those state laws ought to stand as an insurmountable barrier to any proper certification of a nationwide indirect purchaser class. By treating the dictates of state law as irrelevant, to be passed over in the name of "global peace," the Majority has endorsed the fabrication of substantive rights where none before existed. This is, in short, a bad day for **\*341** Rule 23, for federalism, and for those who thought the Rules Enabling Act was a restraint on judicial legislating. I therefore dissent.

> FN1. More precisely, we are dealing here with a set of class actions, since the settlement involves the resolution of several cases, as the Majority opinion notes. For ease of reference, however, I will often

refer to these matters in the singular.

**I. Where We Agree**

The Majority devotes much attention to the question of whether "commonality and predominance are defeated merely because available rights and remedies differ under the several laws that form the basis for the class claims." (Op. at 301.) In addressing that question, the Majority inaccurately characterizes the now-vacated panel opinion as having required "that everyone in a class must allege precisely identical or 'uniform' causes of action." [FN2] (Op. at 302) (citing *Sullivan v. DB Investments, Inc.,* 613 F.3d 134, 149 (3d Cir.2010), *reh'g en banc granted and vacated by Sullivan v. DB Investments, Inc.,* 619 F.3d 287 (3d Cir.2010)). But the panel opinion made no such statement, nor have the objectors claimed that all class members must share a "uniform cause of action." The only "uniformity" required by the panel opinion, or argued for by the objectors, is that at least some "question of law or fact regarding [class members'] legal rights [be] uniform throughout the class." *Sullivan,* 613 F.3d at 149. Insisting that there be a uniform question of law or fact is nothing more than an application of the Rule 23(a)(2) requirement that there be "questions of law or fact common to the class." The Majority's assertion that the panel demanded there be uniform causes of action—a requirement far different than requiring uniform questions—is unfounded and should not detain us any longer.

> FN2. The Majority is oddly persistent in this confusion. Despite the clear language in the panel opinion and repeated assurance in this dissent that class members need not all share a "uniform cause of action" to satisfy the requirements of Rule 23, the Majority continues to say by implication and assertion that the panel opinion suggested that all members of the class must assert a "uniform" cause of action or "identical ... issues or claims." *See* Op. at 301 ("We have never required the present-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

ation of identical or uniform issues or claims as a prerequisite to certification of a class."); *id.* at 302 ("Nothing in our case law or the language of Rule 23 commands that everyone in a class must allege precisely identical or 'uniform' causes of action ... and statutory variations do not defeat predominance in the presence of other exceedingly common issues." (internal citations omitted)); *id.* at 308 n. 36 ("The Panel ... seemingly conclude[d] that plaintiffs could only prevail if each putative class member alleged either a 'uniform' antitrust cause of action, a 'uniform' consumer protection cause of action, or a 'uniform' unjust enrichment claim.").

On this much we can agree: that, as the Majority says, "where a defendant's singular conduct gives rise to one cause of action in one state, while providing for a different cause of action in another jurisdiction, the courts may group both claims in a single class action." (Op. at 302.) If that were the case before us, we would have unanimity. The problem, though, is that the defendants' singular conduct here gives rise to causes of action in some states while providing for no cause of action at all in others. Under these circumstances, there can be no grouping of claims into a single class action, because, by definition, some would-be class members have no claim. As a result, and as discussed in the following section, there can be no common questions of law or fact with respect to that subset of would-be class members and, therefore, neither the commonality requirement of Rule 23(a)(2) nor the predominance requirement of Rule 23(b)(3) can be satisfied.

## II. Commonality And Predominance Under Rule 23

The objectors [FN3] have challenged the commonality of the indirect purchaser **\*342** class, stating that "putative class members who do not even have an arguable cause of action under applicable

law do not qualify for inclusion in a class action for failure to satisfy [the] Rule 23(a)(2) requirement of 'questions of law or fact common to the class.' " (Supplemental Brief of Appellant Susan M. Quinn on Rehearing En Banc at 11–12) (quoting Fed.R.Civ.P. 23(a)(2).) While they initially couched their arguments about commonality in terms of predominance under Rule 23(b)(3), the objectors' position has always been that common questions of law or fact do not predominate because there simply are no questions of law or fact common to the entire class of indirect purchasers. (*See, e.g.,* Brief for Appellant Susan M. Quinn at 32 ("The evidence supporting a lack of commonality is abundant."); *id.* at 38 ("[T]he question of antitrust conspiracy is not common to the class."); *id.* at 44 ("The district court did not even determine that there was a common question involving unjust enrichment."); *id.* at 45 ("The district court did not find a common question regarding [the consumer protection/deceptive trade practice] claims.").) The panel opinion thus addressed the objectors' arguments in that light, holding that there was no predominance because there were no questions of law or fact common to the entire class. *Sullivan,* 613 F.3d at 148 ("[T]here can be no certification of a nationwide class of state indirect purchaser plaintiffs because there is no common question of law or material fact.").

> FN3. Both before the panel and the en banc court, objector Susan M. Quinn has taken the lead on the issues of commonality and predominance, and my references to the arguments of the objectors come from her briefs.

Ultimately, though, whether the objectors' argument is framed as a Rule 23(a)(2) commonality challenge or a Rule 23(b)(3) predominance challenge is immaterial.[FN4] As noted by the Majority, we have said before that " 'we consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

analyze the two factors together.' " (Op. at 297 (quoting *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 266 (3d Cir.2009)).) Whatever label we hang on the objectors' argument, it always has been clear that their basic contention is that there are no questions of law or fact common to all class members, which necessarily means that common questions do not predominate. Whether coined as a Rule 23(a)(2) problem or as a *343 Rule 23(b)(3) problem, the determinative question of commonality is the same.

> FN4. Although the parties do not particularly press the issue in their briefs, an argument can be made that the proposed class might also fail to meet the requirements of Rule 23(a)(4), which provides that a court may certify a class only if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). By proposing a class that consists of individuals who have no cause of action under state or federal law, the class representatives have diluted the recovery for those who actually have claims. Moreover, the class representatives also unnecessarily incur the cost of giving notice under Rule 23 to individuals who have no right to relief, as well as the cost of compensating class counsel for undertaking unnecessary tasks associated with such notice. *Cf. In the Matter of Aqua Dots Prods. Liability Litig.,* 654 F.3d 748, 752 (7th Cir.2011) ("A representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to produce a refund that is already on offer is not adequately protecting the class members' interests." (citing *Thorogood v. Sears, Roebuck & Co.,* 627 F.3d 289, 293–94 (7th Cir.2010))). Those costs reduce the total amount of recovery available to the appropriate members of the proposed class (*i.e.,* individuals who may assert an antitrust claim under federal or state law). In other words, a class representative who unnecessarily increases the cost of litigating a class action by including improper plaintiffs in the class definition is at risk of being found to not "adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4).

The Majority spends little time explaining what makes questions "common," but the principle they seem to espouse is that questions are common when the "defendant's conduct was common as to all of the class members" and when "all of the class members were harmed by the defendant's conduct." (Op. at 298.) Based on that, the Majority asserts that, as to the indirect purchaser class, "each class member shares a similar *legal* question arising from whether De Beers engaged in a broad conspiracy that was aimed to and did affect diamond prices in the United States" (Op. at 300 (internal quotation marks omitted)) and shares "common *factual* questions as to whether De Beers 'acted in concert to artificially fix, maintain, and stabilize prices and to monopolize trade and commerce in the market for polished diamonds.' " (Op. at 300 (quoting App. 278–79).) Those questions are common to the class, according to the Majority, because the "allegations are unaffected by the particularized conduct of individual class members, as proof of liability and liability itself would depend entirely upon De Beers's allegedly anticompetitive activities." (Op. at 300.)

In seeking to justify its "welcome all comers" approach to class certification, the Majority has produced an internally inconsistent definition of commonality. On the one hand, as just noted, the Majority emphasizes that "proof of liability and liability itself would depend entirely upon De Beers's allegedly anticompetitive activities" (Op. at 300), as if no reference need be made to the status of individual class members. Indeed, if one examines what the Majority identifies as "common *factual* questions" and "similar *legal* question[s,]" it is apparent that no reference to anyone but De Beers is called for, which means that the class is entirely un-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

bounded. Everyone in the world could share in a class defined on those lines.[FN5] On the other hand, evidently recognizing the problem with a commonality definition that looks only at De Beers's activities, the Majority adds as something of an afterthought that, well yes, there must be some limiting feature of the class and that feature is injury; class members must have been injured by De Beers's unlawful conduct. (Op. at 297–98.)

> FN5. If one were actually to accept a test that looked solely at the behavior of the alleged wrongdoer, it would make no difference who was in the class. Thus, in this case, it would be appropriate to certify a class consisting of everyone on earth, regardless of diamond purchases, since the supposedly common questions would stay the same.

Of course, as soon as one acknowledges that commonality requires a consideration of whether class members have sustained injury, one ought also to acknowledge, by logic grounded in hornbook law, that "injury" is not an abstraction but rather refers to a concrete and legally cognizable injury. A definition of commonality that says, in effect, "if you feel wronged, you have a claim" is a giant step away from precedent and the underlying premise of Rule 23, which is designed to efficiently handle claims recognized by law, not to create new claims. Cf. *Shady Grove Orthopedic Associates. v. Allstate Ins. Co.,* —— U.S. ——, 130 S.Ct. 1431, 1442, 176 L.Ed.2d 311 (2010) ( "Congress authorized ... promulgat[ion] [of] rules of procedure subject to its review, 28 U.S.C. § 2072(a), but with the limitation that those rules 'shall not abridge, enlarge or modify any substantive right,' § 2072(b)."). Never before has any court, to my knowledge, tried to take the position effectively adopted by the Majority here, namely that, in deciding commonality, one need not be concerned **\*344** with whether the alleged injuries of class members are legally cognizable.[FN6]

> FN6. While trying to distance itself from

the consequences of its own ruling today, the Majority asserts that the "[indirect purchaser] class members ... possess a legally cognizable injury acknowledged in hornbook law, as their injuries are real, and stem not from simply feeling 'wronged,' as the dissent suggests ..., but from De Beers's alleged anticompetitive conduct, conduct which antitrust laws forbid." (Op. at 301.) If only my colleagues in the Majority actually applied that assertion, this dissent would be unnecessary, since the assertion concedes that (1) recovery should be preconditioned on the existence of an injury that is legally cognizable, and (2) whether an injury is legally cognizable depends on the operative substantive law.

In stark contrast to the Majority's practically limitless definition of commonality is the measured definition provided by the Supreme Court in its recent decision in *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). The Court there clarified the meaning of "commonality" under Rule 23, saying that the concept is "easy to misread." *Id.* at 2551. In a passage particularly apropos of the Majority's new rule, the Supreme Court said:

> [A]ny competently crafted class complaint literally raises common 'questions,' For example: Do all of us plaintiffs indeed work for Wal–Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting those questions is not sufficient to obtain class certification.

*Id.* (internal quotation marks and citations omitted). Emphasizing a point that the Majority ignores, the Court explained that " '[w]hat matters to class certification ... is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate *answers* apt to drive the resolution of the litigation.' " *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U.L.Rev.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 76

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

97, 132 (2009)). In other words, common questions must have answers that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Thus, as defined by *Dukes,* "common questions" are those that, because they have answers that will affect the validity of all class members' claims, can be said to be legally relevant. [FN7]

> FN7. Similarly, if predominance means anything, it must mean that the resolution of *something* will actually affect *somehow* the claims of all class members. The claims might vary among the class members, but, at a minimum, some legal right to recover has to be held by everyone in the class.

A necessary corollary of that definition is that, for there to be any common questions, all class members must have at least some colorable legal claim. [FN8] Otherwise, it is nonsense to speak of "resolv[ing] an issue that is central to the validity of each one of the claims...." *Id.* It cannot be sufficient, as the Concurring Opinion in this case suggests, simply for each class member to have "some pleaded claim." (Concurring Op. at 338.) Merely pleading a claim is not enough, because " Rule 23 does not set forth a mere pleading standard. A party seeking class certification must ... prove that there are in fact ... common questions of law or fact.... [S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." **\*345** *Dukes,* 131 S.Ct. at 2551 (internal quotation marks omitted); *see In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 316 (3d Cir.2008) ("[T]he requirements set out in Rule 23 are not mere pleading rules. The court may delve beyond the pleadings to determine whether the requirements for class certification are satisfied." (internal quotation marks and citations omitted)). As the panel opinion explained it, "to obtain certification of an indirect purchaser class, plaintiffs would have to show that all class members share a right to recover for antitrust harms,

such that one or more common issues affect all members' claims." [FN9] *Sullivan,* 613 F.3d at 154.

> FN8. A colorable claim is one that at least "appear[s] to be true, valid, or right." BLACK'S LAW DICTIONARY 301(9th ed.2009). Requiring a district court to consider whether a claim appears to be valid before certifying class, when the court is expressly apprised of good reasons to doubt the same, does not transform the Rule 23 inquiry into one under Rule 12(b)(6), as I discuss *infra.*

> FN9. To the extent that the quoted statement, read in isolation, might suggest a rule that all class members had to share an antitrust claim, the context of the statement—coming after a discussion of other types of statutory or common law claims that might give rise to common questions—makes it clear that the panel was requiring only that all class members' right to recover arise from the same harm or injury—something unambiguously required under Supreme Court precedent. *See, e.g., Dukes,* 131 S.Ct. at 2551 ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." (internal quotation marks omit- ted)).

*Dukes*'s instruction that, for questions to be "common" in the sense contemplated by Rule 23, their answers must affect the validity of claims, does not set forth a new principle.[FN10] In *Amchem Products, Inc. v. Windsor,* the Supreme Court, in a discussion of predominance, said that the common questions that matter are those "that qualify each class member's case as a genuine controversy." 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). It seems self-evident that there can be no "genuine controversy" with respect to plaintiffs whose claims are nonexistent as a matter of substantive law. Likewise, in *Hydrogen Peroxide,* we noted that Rule 23 requires plaintiffs to show that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 77

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

the elements of their claim are "capable of proof at trial through evidence that is common to the class rather than individual to its members." 552 F.3d at 311–12. Again, for plaintiffs who lack any claim, there are certainly no elements of a claim that are "capable of proof," either common or individual. Accordingly, in assessing commonality or predominance, an inherent step is deciding that class members possess at least some legal basis for asserting a claim.

> FN10. The following passage in the American Law Institute's *Principles of the Law of Aggregate Litigation* articulates this basic principle:
>
> The legal and factual issues involved in any individual civil claim are a function of applicable substantive law.... Factual issues concern disputes about whether the evidence at trial demonstrates, under the applicable standard of proof, the existence of a given element.... A factual issue may rise to the level of a common issue if ... a common body of evidence to be presented on behalf of multiple claimants at trial is capable of proving the existence of a material fact as to all such claimants.
>
> ALI, Principles of Law: *Aggregate Litigation* § 2.01(b)(2010). Thus, the treatise supports the proposition that in order to satisfy Rule 23(b)(3)'s commonality requirement, there must be some "material" issue. Materiality is a "function of applicable substantive law." *See id.; In re Lemington Home for the Aged,* 659 F.3d 282, 290 (3d Cir.2011) ("A material fact is '[a] fact[ ] that might affect the outcome of the suit under the governing law.'" (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) )). By necessary implication, if certain members of the proposed class cannot

assert a claim under either federal or state law, then there can be no common questions of law or fact that are "material."

By misconstruing Supreme Court precedent, the Majority denies that district courts have either the need or the power to take that essential step. My colleagues declare that "[a] court may inquire [at the class certification stage] whether the elements of asserted claims are *capable* of **\*346** proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims." (Op. at 305 (emphasis added).) However, the Majority's position is contrary to what the Supreme Court has just said in *Dukes:*

A statement in one of our prior cases, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), is sometimes mistakenly cited ...: "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." But in that case, the judge had conducted a preliminary inquiry into the merits of a suit, not in order to determine the propriety of certification under Rules 23(a) and (b) (he had already done that, *see id.* at 165, 94 S.Ct. 2140), but in order to shift the cost of notice required by Rule 23(c)(2) from the plaintiff to the defendants. To the extent the quoted statement goes beyond the permissibility of a merits inquiry for any other pretrial purpose, it is the purest dictum and is contradicted by our other cases.

131 S.Ct. at 2552. Thus, any suggestion that a district court is prevented from "adjudging the legal validity or soundness of the substantive elements of asserted claims" at the class certification stage is clearly mistaken after *Dukes.* That should already have been clear, however, from our statement in *Hydrogen Peroxide* that "[a] concern for merits-avoidance should not be talismanically invoked to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." 552 F.3d at 318 n. 17 (internal quotation marks omitted).

   The Majority repeatedly suggests that requiring adherence to substantive law would "introduce a Rule 12(b)(6) inquiry as to every claim in the class." (Op. at 305.) More specifically, my colleagues in the Majority say that, if my approach were followed, "district courts would be obligated at the class certification stage to, *sua sponte,* conduct a thorough Rule 12(b)(6) analysis of every ... claim to ensure that each plaintiff ... possesses a valid cause of action...." (Op. at 308.) That characterization is incorrect. Rather, I advocate a procedure essentially identical to the one that occurred here: A district court is approached with a class complaint requesting relief under a variety of state statutes. Because of differences among those statutes, it is clear that some class members are entirely without a cognizable claim. Objectors bring those issues to the district court's attention. Because "such variances ... are so significant as to defeat commonality and predominance even in a settlement class certification," *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 529–30 (3d Cir.2004) (hereinafter " *Warfarin Sodium II* "), the district court should deny certification. Assuming the parties revise the class to eliminate claims clearly lacking a colorable legal basis, and assuming the class otherwise satisfies Rule 23, the district court could then certify the class. [FN11]

> FN11. There are at least two other problems with the Majority's assertion that "[t]o adopt the position of the dissent and the objectors is to introduce a Rule 12(b)(6) inquiry as to every claim in the class before a class may be certified." (Op. at 305.) First, it ducks the difficulty at the center of this case, which is not and never has been about merely dubious claims.

Claims that are of doubtful quality still have, as the adjective indicates, some doubt about them, which means they still retain at least some superficial possibility of being valid. Such claims, because they cling to that possibility, will typically not need to cause a district judge any agita in addressing the certification of a class for settlement purposes. The central problem in this case, however, goes beyond factual disputes or debatable points of law. The problem here is that there are class members who, according to the plain terms of controlling law, have no claim at all, not even a dubious one. We are not rightfully at liberty to ignore that, nor was the District Court. The second problem with the Majority's parade-of-horribles rhetoric in response to the suggestion that class members should actually have claims (*see* Op. at 307 – 11) is that objectors have always been entitled to raise a legal challenge to claims being included in a class, even a settlement class. *Cf. Hydrogen Peroxide,* 552 F.3d at 320 ("[A] district court exercising proper discretion in deciding whether to certify a class will ... make findings that each Rule 23 requirement is met or not met, having considered all relevant evidence and arguments presented by the parties."). In other words, district courts have always been required to ensure that the requisites of Rule 23 have been met, and that includes an obligation to address the non-frivolous arguments and objections that are put to them. A court does not need to assess *sua sponte* every potential problem, nor need it engage in "an intensive cataloguing of each class member's claim" (Op. at 308), but it must give objections their due.

   **\*347** Note that the court in this hypothetical has neither performed a Rule 12(b)(6) inquiry, nor conducted an individualized assessment of claims.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 79

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

FN12 It has simply engaged in a straightforward analysis of the applicable law. This is by no means unusual in considering the certification of a settlement class. In *Prudential,* the plaintiffs "compiled a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims." 148 F.3d at 315 (internal quotation marks omitted). There, we concurred with the district court's conclusion that "the elements of the[ ] common law claims are substantially similar and any differences fall into a limited number of predictable patterns." *Id.*

FN12. The Majority's recoiling at the individualized assessment of claims also reflects a failure to appreciate that some such assessment does typically take place at some point during the settlement process. The parties share a common interest in ensuring that individuals falling outside the class do not share the benefits of the settlement. For that reason, a class member here must submit a proof of claim demonstrating his or her purchase of a diamond within the relevant time period. As is often the case, parties to an antitrust settlement want to ensure that individuals seeking a share of the settlement actually bought a product with an allegedly inflated price, demonstrating their membership in the class. *See Warfarin Sodium II,* 391 F.3d at 525. Some settlements create elaborate systems for evaluating not only the validity but the severity of each class member's injury. *See In re Prudential Insurance Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 295–96 (3d Cir.1998). These proofs of claim are rarely evaluated by the court. "Although the court has general supervisory powers over settlements, it usually does not handle the actual administration. As a rule, the administration is delegated either to a special master or to the plaintiff's counsel or a committee of counsel." 4 Alba Conte & Herbert Newberg,

*Newberg on Class Actions* § 11:33 at 68–69 (4th ed.2002). It is universally recognized that the special master, committee, or other body created to administer the settlement agreement is responsible for evaluating the validity of claims and calculating the individualized recovery of a particular class member. *See* David F. Herr, *Manual for Complex Litigation* § 21.661 (4th ed. 2011) ("The administrator or special master may be charged with reviewing the claims and deciding whether to allow claims that are late, deficient in documentation, or questionable for other reasons.").

In short, I have proposed only what the law has heretofore always required: one must actually have a legal claim before getting in line for a legal recovery. When objections are raised that persuasively demonstrate that a portion of a proposed class does not have any such claim, courts of law are obliged to follow the law. That is the circumstance we face, as was detailed at length in the panel opinion and is again described briefly herein.

**\*348 III. Some Class Members Lack A Claim**

As noted by the Majority, the indirect purchasers in the consolidated actions "sought damages pursuant only to state antitrust, consumer protection, and unjust enrichment statutes and common law." (Op. at 287.) Unlike the direct purchasers, the indirect purchasers did not seek damages under federal law, because, pursuant to the Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), only direct purchasers may bring an antitrust claim under federal law.

Although most states have traditionally followed federal law in interpreting their own state antitrust laws, some have enacted " *Illinois Brick* Repealers," rejecting the rule that only direct purchasers may recover for an antitrust violation. *See, e.g.,* CAL. BUS. & PROF.CODE § 16750(a). By contrast, others have expressly followed *Illinois Brick* and declared unequivocally that, in their

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

states, indirect purchasers lack standing to bring a claim. *See, e.g., Johnson v. Microsoft Corp.,* 106 Ohio St.3d 278, 834 N.E.2d 791, 798 (2005). Several states have been even more precise, explaining that indirect purchasers lack standing to bring what is effectively an antitrust claim, regardless of how the claim is labeled, so that recovery is precluded even if, for example, it is sought under a consumer protection act ("CPA") or the common law. *See, e.g., Abbott Labs., Inc. (Ross Labs. Div.) v. Segura,* 907 S.W.2d 503, 507 (Tex.1995) ("We will not interpret the [Texas CPA] in a manner that rewards creative pleading at the expense of consistent application of legal principles.... Our holding today only forecloses the recovery of damages for seeking a prohibited antitrust recovery under the masquerade of our [CPA]."); *Johnson,* 834 N.E.2d at 801 (holding that Ohio antitrust statute "provides the exclusive remedy for" claims predicated upon "monopolistic pricing practices," and thus dismissing claims under Ohio's CPA and common law). In at least some states, then, indirect purchasers are absolutely precluded from bringing an antitrust claim, no matter how they dress it up.[FN13]

> **FN13.** For a more detailed discussion of which states preclude claims entirely, *see Sullivan,* 613 F.3d at 147–48 & n. 10–11, 150–51. According to the Majority, the panel opinion "undertook a wide-ranging fact-finding review of state antitrust statutes...." (Op. at 293.) That description is puzzling, however, because there was no fact-finding involved. The review of state law was just that: a review of law. The panel opinion took the very ordinary approach of examining the laws on which the plaintiffs purported to base their claims, including state antitrust laws. The opinion also stated:
>
> > We are certainly not saying that nuanced differences among state laws will prevent the certification of a class, nor are we suggesting that a state-by-state cata-

loguing of differences in state law is necessary every time a multi-jurisdiction class is certified. We are saying that the difference between having an antitrust claim under state law and having none is no mere nuance and cannot be solved by any reconfiguration of the nationwide class short of changing it from a nationwide class to one or more classes that exclude those who have no claim.

> *Sullivan,* 613 F.3d at 148 n. 12. Both the Majority and the Concurring Opinions claim that it is wrong for us to pay attention to the differences in state law because, as the Concurrence puts it, "trial courts would be obligated at the settlement class certification stage to decide which state's law would govern...." (Concurrence Op. at 337.) It bears repeating, then, that nothing said by the panel opinion or in this dissent would entail the cataloguing of differences in state law in the mine run of cases. However, when, as in this case, an objection has been raised pointing out that there is a body of claims that are undeniably impermissible under the law of the state which governs them, we are not free to shirk the responsibility of separating those unfounded claims from the class.

**\*349** Nevertheless, the Majority declares that those class members whose claims purportedly arise in states that preclude indirect purchaser recovery can still be part of the indirect purchaser class. The Majority offers two arguments in support of that conclusion. First, noting that indirect purchasers lack only statutory standing under *Illinois Brick,* rather than Article III standing, the Majority asserts that "statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place." (Op. at 307.) The Majority does not cite any author-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

ity to support that assertion, and there is reason to doubt it.[FN14] But, in any event, it misses the point. Even if the Majority's *ipse dixit* were true as to anti-trust claims under federal law, there is no basis for saying it is so with respect to claims under the laws of the several states that have adopted the ultimate holding of *Illinois Brick.* Indeed, in several of those states, courts have indicated that indirect purchasers are barred from asserting a claim because they lack standing.[FN15] For instance, the Ohio Supreme Court has stated that "an indirect **350** purchaser of goods may not assert a Valentine Act [, i.e., a state antitrust act] claim for alleged violations of Ohio antitrust law." *Johnson,* 834 N.E.2d at 798. Likewise, the New Jersey Supreme Court has held that "indirect purchasers ... have no standing to assert a private right of action under the New Jersey Anti-trust Act." *Wilson v. Gen. Motors Corp.,* 190 N.J. 336, 921 A.2d 414, 416 (2007). The Connecticut Supreme Court has said the same, explaining that Connecticut law allows "only those consumers who purchase directly from the antitrust defendant to bring suit under our state antitrust law." *Vacco v. Microsoft Corp.,* 260 Conn. 59, 793 A.2d 1048, 1058 (2002). Thus, it is clear that there are states that decidedly do treat statutory standing [FN16] as "a predicate for asserting a claim in the first place." (Op. at 307.)

> FN14. It is not clear, to begin with, that the Majority's "statutory standing" label accurately describes the substantive law of the several states denying a claim to indirect purchasers. That aside, and although a dismissal for lack of statutory standing may be viewed as akin to a dismissal under Federal Rule of Civil Procedure 12(b)(6), *see Baldwin v. Univ. of Pittsburgh Med. Ctr.,* 636 F.3d 69, 73 (3d Cir.2011) (noting that "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim"), compelling authority teaches that the absence of statutory standing can also implicate the court's power to adjudicate a dispute under

Article III, *see Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the adequacy of the federal claim is proper ... when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." (internal quotation marks omitted)). We have suggested this ourselves, *see Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co. Ltd.,* 436 F.3d 349, 359 (3d Cir.2006) (stating that "non-Article III jurisdictional issues like statutory standing" fit within a category of cases somewhere between cases that have "jurisdictional issues that cannot be by-passed because Article III or our Constitution requires that they be addressed" and cases "with merits-related issues, which cannot be reached without first verifying jurisdiction" (internal citations and quotation marks omitted)), *rev'd on other grounds,* 549 U.S. 422, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007), and other circuits have held the same, *see Crawford v. Lamantia,* 34 F.3d 28, 32 (1st Cir.1994) (statutory standing under ERISA) ("[W]e note that the basis for '[s]tanding, since it goes to the very power of the court to act, must exist at *all stages* of the proceeding, and not merely when the action is initiated or during an initial appeal.' "); *Alexander v. Anheuser–Busch Co.,* 990 F.2d 536, 538 (10th Cir.1993) (statutory standing under ERISA) ("In reviewing Alexander's ERISA claims, we raise, sua sponte, the question whether he has standing to bring such claims. The issue of standing is jurisdictional in nature."); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 349 (5th Cir.1989) (statutory standing under ERISA) ("We have recognized, however,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

that standing is essential to the exercise of jurisdiction, and that lack of standing can be raised at any time by a party or by the court."); cf. *MainStreet Org. of Realtors v. Calumet City,* 505 F.3d 742, 747 (7th Cir.2007) (Posner, J.) (describing lack of statutory standing under *Illinois Brick* as "not jurisdictional, at least in the conventional sense[,]" but nonetheless "belong[ing] to an intermediate class of cases in which a court can notice an error and reverse on the basis of it even though no party has noticed it").

FN15. Whether a party has standing under Article III is a distinct inquiry from whether the party may assert a cause of action under state or federal law. In *Bond v. United States,* ___ U.S. ___, 131 S.Ct. 2355, 2362, 180 L.Ed.2d 269 (2011), the Supreme Court made clear that a party may have standing under Article III, but fail to assert a cause of action under state law. *See id.* at 2362 ("Still, the question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion." (internal citation and quotation marks omitted)). However, even assuming indirect purchasers have standing under Article III, they have no claim under federal law and many of them lack standing to assert any claim under relevant state law. Because the proposed class includes such individuals, it cannot satisfy Rule 23(b)(3)'s commonality requirement.

FN16. Again, assuming that "statutory standing" is the appropriate description of the principle under state law. *See supra* n. 13.

Second, the Majority asserts, using the Ohio Supreme Court's *Johnson* case as an example, that "although *Johnson* provides that an indirect pur-

chaser lacking an antitrust claim under *Illinois Brick* cannot circumvent this limitation by relying upon the Ohio consumer protection statute, the Ohio Supreme Court did not, nor could it, preclude consumer protection claims predicated on fraud or deception." (*Id.* at 310 n. 39.) The Majority then says that "claims settled here include allegations of fraud and deception separate from the antitrust allegations." (*Id.* at 310 n. 39.) While the Majority is correct that Ohio does not "preclude consumer protection claims predicated on fraud or deception," it is not correct that such claims were brought in this case under the Ohio CPA—or under the CPA of any state following *Illinois Brick.* Of the seven complaints covered by the proposed class action settlement, only two made allegations referencing violations of the Ohio CPA, *Sullivan v. DB Investments, Inc.,* No. 04–cv–02819 (D.N.J.) and *Null v. DB Investments, Inc.,* No. 05–L–209 (S.D.Ill.), and both of those complaints predicated their Ohio CPA claims on monopolistic pricing practices. In *Sullivan,* the only allegation with respect to the Ohio CPA is that "Defendants' contract, combination and conspiracy in unreasonable restraint of trade and to monopolize and defendants' monopolization constitute a violation of various state antitrust and/or consumer protection and deceptive and unfair business practices acts and laws." (App. at 652 ¶ 47.) Likewise, the allegations in *Null* are that the CPA "laws of the various states" were violated "through one or more of the following unfair and/or deceptive acts and/or practices: illegally and artificially restraining trade and increasing the price of diamonds by controlling inventory, limiting supply, restricting purchase and falsely advertising the scarceness of diamonds." (App. at 629 ¶ 61, 626 ¶ 45.) Thus, the only claims brought under the Ohio CPA in any of the class actions now at issue were "predicated upon monopolistic pricing practices," and, therefore, according to the highest court in Ohio, those claims are precluded. *Johnson,* 834 N.E.2d at 801.

Moreover, even if any of the complaints could be construed as raising claims for fraud under some state CPAs,[FN17] those **\*351** claims were, it ap-

**667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736**
**(Cite as: 667 F.3d 273)**

pears, never brought to the attention of, or considered by, the District Court, nor were they raised before the Panel. As a result, the District Court made no findings with respect to fraud claims under state CPAs, including whether the elements of those claims could be proven by "evidence common to the class," as required by *Hydrogen Peroxide, 552 F.3d at 325.* Of the five common questions identified by the District Court, none pertain to fraud. [FN18] Thus, even if there were fraud claims for all class members—which, for the reasons I have identified, there are not—there has been no finding of commonality and predominance with respect to those claims and, therefore, the District Court's class certification cannot rightly be affirmed on that basis.

> **FN17.** The Majority uses Ohio's CPA as an example and does not discuss whether fraud claims were brought under the CPAs of other states following *Illinois Brick.* Nonetheless, the pleading deficiency is the same for allegations involving the laws of other states. The *Sullivan* and *Null* complaints are the only complaints to invoke the CPAs of the states following *Illinois Brick* and, as discussed above, neither of those complaints allege fraud; they merely pin the "fraud" label on the price-fixing behavior at issue. Consequently, there is no claim for fraud under the laws of any state adhering to *Illinois Brick.*

> **FN18.** Those questions are:

> (a) Whether [D]efendants combined or conspired with others to fix, raise, stabilize and maintain the prices of polished diamonds;

> (b) Whether [D]efendants monopolized or combined or conspired with others to monopolize the supply of polished diamonds;

> (c) Whether [D]efendants' conduct

caused the prices of polished diamonds to be maintained at higher levels than would exist in a competitive market;

> (d) Whether [P]laintiffs and the Class[es] are entitled to injunctive relief; and

> (e) Whether [D]efendants' conduct caused injury to the business or property of [P]laintiffs and the other [Class and] Subclass Members and, if so, the appropriate class-wide measure of damages.

> (App. at 276.)

The bottom line is that, as to those class members who purport to bring claims under the laws of states following *Illinois Brick,* the status of being an indirect purchaser is not only the gateway to membership in the class, it is what entirely disqualifies them from asserting any claim based on De Beers's price-fixing conduct. That is a straightforward application of state law. [FN19] The class thus includes members who are barred from asserting a claim in the first place. And, because those class members lack any claim, there are no questions common to all class members for which the answers "will resolve an issue that is central to the validity of each one of the claims." *Dukes,* 131 S.Ct. at 2551. Consequently, pursuant to long-standing principles of aggregate litigation, most recently reaffirmed in *Dukes,* there is neither commonality nor predominance under Rule 23.[FN20]

> **FN19.** In its effort to diminish the significance of the state laws denying a cause of action to indirect purchasers, the Majority likens those laws to pre-suit notice requirements or other issues of form that may vary from state to state. (Op. at 310.) But we are not talking here about the niceties of notice. In a class action invoking the laws of multiple jurisdictions, there will often be variations in the law pertaining to how a particular claim is to be presented.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

Those variations may at times be framed as prerequisites to the bringing of a cause of action or restrictions on the manner in which the action is brought. Were the aggregated claims to be brought individually, those prerequisites would in all likelihood be met on a claim-by-claim basis, but, since the claims are aggregated, those prerequisites are appropriately bypassed. They amount to nothing more than variations in form, not in kind, and neither the panel opinion in this case nor the objectors nor this dissent have advocated the elevation of form over substance. Differences in form are not at issue here; it is the very existence of any cause of action at all that is at stake. The distinction is crucial.

FN20. I am not suggesting that no class of indirect purchasers could have been certified here. On the contrary, as the panel opinion noted,

It may be that the antitrust and consumer protection statutes in a more limited number of states are sufficiently similar that common issues of law or fact would predominate with respect to plaintiffs in those jurisdictions. However, it was improper for the District Court to certify a nationwide class of plaintiffs based on state law when many states withheld antitrust standing from indirect purchasers and where the variability in consumer protection and unjust enrichment law in a context like this is extreme.

*Sullivan,* 613 F.3d at 153–54.

**\*352 IV. The Rules Enabling Act and Federalism**
In addition to violating the terms of Rule 23, certifying this class violates the Rules Enabling Act and basic principles of federalism. The Rules Enabling Act authorizes the creation of "rules of practice and procedure," but states that "[s]uch rules shall not abridge, enlarge, or modify any substant-

ive right." 28 U.S.C. § 2072(a), (b). In *Dukes,* the Supreme Court highlighted the role of the Rules Enabling Act in class certification decisions, holding that, "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" the proposed class could not be certified because it would have abridged Wal–Mart's statutory right to litigate certain defenses. 131 S.Ct. at 2561 (quoting 28 U.S.C. § 2072(b)). That point is consistent with the Court's past cautionary statements that an overly expansive reading of Rule 23 will violate the Rules Enabling Act. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 845, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) ("The Rules Enabling Act underscores the need for caution. As we said in *Amchem,* no reading of the rule can ignore the Act's mandate that rules of procedure shall not abridge, enlarge, or modify any substantive right." (internal quotation marks omitted)); *Amchem,* 521 U.S. at 613, 117 S.Ct. 2231 ("We therefore follow the path taken by the Court of Appeals, mindful that Rule 23's requirements must be interpreted in keeping with Article III's constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right.'" (quoting 28 U.S.C. § 2072(b))).

In this case, by approving certification of the indirect purchaser class, the Majority proceeds heedless of that advice and endorses the enlarging of substantive rights. Using the Majority's example of a member of the indirect purchaser class asserting under Ohio law a claim based on De Beers's price-fixing, it is indisputable that the same member would, if he tried to bring his claim individually in an Ohio court, be immediately shown the exit. [FN21] **\*353** Controlling law allows no result but dismissal of such a claim. But, under the Majority's class action certification theory, that individual now has a right to share in the settlement fund based on a claim he is otherwise forbidden to bring. If that is not an enlargement or modification of substantive rights, it is hard to know what would be. *Cf. Shady Grove Orthopedic Assocs.,* 130 S.Ct. at 1442

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

(stating that, for purposes of the Rules Enabling Act, a rule is substantive in nature if it alters the rules of decision by which courts adjudicate rights). The Majority seems to have a "no harm, no foul" feeling about dispensing new rights, but legitimate class members are harmed. If we enforced substantive law as we ought to, those who actually have claims would not be required to share the proceeds of a proper settlement with those who do not.[FN22]

FN21. The Majority tries to deny this, saying that a state court would only dismiss the invalid claim upon a motion by the defendant. (Op. at 313 n. 43.) But the procedural mechanism that prompts application of substantive law is irrelevant. Whether or not a motion brings to light a claim's fatal flaw, the flaw is there. To continue with the Ohio law example, there is clearly no colorable claim for an indirect purchaser, and that is true whether or not a defendant chooses to file a motion to dismiss. Ohio law does not depend on the whim of De Beers or any other defendant. It is telling that the Majority's rejoinder on this point is, in effect, "yes, the claimant could be tossed out of state court, but only if there were a motion." That seems a concession that the differing results that now obtain in this Circuit and in Ohio state courts reflect an expansion of substantive rights. As to the "there must be a motion" comment, irrelevant and of questionable accuracy though it may be, it prompts re-emphasis of this fact: there was a motion in this case, in the form of the objections to the nationwide settlement of the indirect purchaser class. Thus, the legal problem was squarely before the District Court, as it is now before us. It does not matter that the motion came from someone other than De Beers. The issue has been raised and cannot be dodged by saying no one brought it up. Nor can it be avoided by saying that De Beers could have settled an individual suit

in Ohio. We are obviously not dealing with the settlement of a dispute between private parties in Ohio state court; we are dealing with a class action settlement binding on absent parties and sanctioned by a federal court purporting to apply Ohio law.

FN22. Herein lies a fundamental flaw in the Concurring Opinion as well, which takes the view that "[u]nder *Amchem* the significance of variations in state law is properly assessed in terms of the interests of absent class members[,]" and that here class members from states adhering to *Illinois Brick* "have lost nothing through inclusion in the class." (Concurrence Op. at 337 n. 7.) Very true. The problem here is not that some absent class members who deserve compensation are left out by the settlement. The problem is that some class members who deserve nothing are included in the settlement and hence are diluting the recovery of those who are entitled to make claims. That harm is real, and the cause of it, the overbreadth of the class, is akin to the problem in *Amchem. See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 ("But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.").

Certifying the indirect purchaser class is, for the same reasons, contrary to principles of federalism. The policy decisions of the constituent states of our country are "fundamental aspect[s] of our federal republic and must not be overridden in a quest to clear the queue in court." *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1020 (7th Cir.2002). When one of those states says to its citizens "you have no claim"—and the law covering many of the class members here is just that clear—but those under that edict nevertheless are joined in a class with people who do have a claim,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

by what logical process consistent with federalism can aggregating the "haves" and the "have-nots" imbue those "have-nots" with the very claim that the state has said is foreclosed to them? There is no sound answer to that question. There is only the Majority's and the Concurrence's policy preference, in derogation of controlling state law, for "global peace" through unfettered access to class action settlements.[FN23]

> **FN23.** The Majority cites *Warfarin Sodium II* in an effort to justify its decision today, but we were careful to say in that case that "there may be situations where variations in state law are so significant so as to defeat commonality and predominance even in a settlement class." 391 F.3d at 529. That observation seems obvious and unassailable, and we are presented here with exactly that kind of situation. If we cannot bring ourselves to say plainly that the certification here was improper, one is forced to wonder what limit is left on the reach of Rule 23.

My colleagues in the Majority of course dispute that certifying this class implicates either the Rules Enabling Act or federalism.**\*354** With respect to the Rules Enabling Act, they say that there has been a "voluntary settlement agreement between parties" (Op. at 312) (quoting *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 593 (3d Cir.2010)), and "a district court's certification of a settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action" (*id.*). That may be so when a settlement involves only private parties who all participate in the settlement process, but it is not true in a class action settlement. In that latter context, the Federal Rules of Civil Procedure require district courts to be intimately involved, because the approval of a class action settlement gives the government's imprimatur to the terms of the settlement and binds absent parties.[FN24] As already

discussed, a court is not supposed to certify a class without determining that there is a "genuine controversy" or, in other words, that there is at least some legal basis for class members to claim relief. If a district court credits potential class members with having a valid claim when the underlying state law says there is none, the court has, by definition, enlarged and modified those class members' rights.

> **FN24.** The Majority also writes that, in *Prudential,* "we agreed with the district court that 'approval of a settlement under Rule 23 merely recognizes the parties' voluntary compromise of their rights and does not itself affect their substantive state law rights,'" and, therefore, held that "the proposed settlement could not violate the Rules Enabling Act." (Op. at 312 (quoting *Prudential,* 148 F.3d at 324).) However, we also held in *Prudential* that the proposed settlement was not contrary to the cited state law, and, therefore, the Rules Enabling Act could not possibly have been implicated. *Prudential,* 148 F.3d at 324 & n. 77.

Moreover, while De Beers is now pleased to stipulate to liability in all fifty states, and, for its own purposes, is willing to forego legal arguments that it could have raised about the substantive rights of class members, a defendant's willingness to waive an argument is not a reason to ignore it. It is rather the very reason that collusive settlements are a problem. No matter how much De Beers wants to bind everyone in America, and no matter how much the attorneys involved stand to gain from their percentage of the settlement, and no matter how laudatory the "global" resolution of a price-fixing case may be as policy matter, there are limits on the power of federal courts to facilitate settlements and bind absent class members and objectors. *Amchem* admonishes courts approving settlement classes to pay "undiluted, even heightened, attention" to issues of predominance as well as to the other requirements of Rule 23 to ensure that a certified

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

class is not overbroad. 521 U.S. at 620, 117 S.Ct. 2231. Approving a class certification that groups together plaintiffs who have claims with those who plainly do not results in such a class.

Furthermore, while the Majority speculates that the approach I suggest will seriously impede class action settlements, it is far from clear that limiting class certification to people who have legal claims would actually undermine the goal of global peace. Indeed, as the Concurrence acknowledges, similar concerns in other cases have proved largely unfounded. (Concurrence Op. at 334.) But even if one assumes that the Majority's concerns about "global peace" have some merit, Rule 23 remains the sole benchmark for determining whether a settlement class can be certified. In *Amchem,* the Supreme Court reiterated that point over Justice Breyer's criticism that the Court had given insufficient weight to the value of settlement. *See Amchem,* 521 U.S. at 629, 117 S.Ct. 2231 (" Rule 23, which must **355** be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load CCR, class counsel, and the District Court heaped upon it."); *id.* (Breyer, J., dissenting) ("I believe that the need for settlement of this mass tort case, with hundreds and thousands of lawsuits, is greater than the Court's opinion suggests."). In *Ortiz,* the Court rejected a settlement expressly designed for "total peace," 527 U.S. at 864–65, 119 S.Ct. 2295, even as several justices acknowledged the need for a resolution to the "elephantine mass of asbestos cases," *id.* at 865, 119 S.Ct. 2295 (Rehnquist, C.J., concurring). We are not free to rewrite the requirements of Rule 23 simply because it would allegedly advance the goal of global peace.

The Majority also dismisses any federalism concern, reasoning that the policy concerns behind *Illinois Brick* do not apply. As the Majority sees it, " *Illinois Brick's* restriction on indirect purchaser recovery was motivated by prudential concerns for manageability; it does not reflect a categorical policy judgment that indirect purchasers do not

merit antitrust protection." (Op. at 313.) Thus, says the Majority, because the "District Court's certification order did not undermine these prudential concerns," the District Court did not "inappropriately subordinate[ ] state sovereignty in certifying the class." (Op. at 314.) But regardless of the Majority's novel views about the policy judgments underlying *Illinois Brick* and whether "indirect purchasers ... merit antitrust protection," the states which have chosen to follow *Illinois Brick* have decided—and plainly stated—that indirect purchasers have no substantive right to recovery under their laws. Principles of federalism do not permit us to write our own exceptions into unambiguous state laws simply because we think that the states would see things differently if only they had our policy insights.[FN25] Somehow, though, the Majority thinks that "the class settlement posture of this case largely marginalizes the objectors' concern that state law variations undermine a finding of predominance." (Op. at 302 – 03.) Once again, the promise of settlement trumps everything else, even variations in state laws as wide as "you have a claim" versus "you have none."

> FN25. The Concurring Opinion's assertion that the settlement of a class action is merely "a contract between the parties" (Concurrence Op. at 338) misses this point, though the opinion adds a reference to Rule 23 (*id.* at 338 n. 8). The states have an interest in not having their laws strained beyond recognition or ignored entirely. A class action settlement, whether it involves a settlement or a litigation class, is not simply a private contract. If it were, it would not need court approval, and federal courts called upon to supervise class actions, including resulting settlements, are obligated to see that Rule 23 does not become a tool for modifying state law.

**V. Conclusion**
I cannot voice strongly enough my disagreement with this elevation of settlement to the status

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736
**(Cite as: 667 F.3d 273)**

of ultimate and overriding good. (*See* Op. at 310) ("[W]ere we to mandate that a class include only those alleging 'colorable' claims, we would effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not."). It has been aptly observed that "[s]ocial peace is not the Article III mission." Paul D. Carrington & Derek P. Apanovitch, *The Constitutional Limits of Judicial Rulemaking: the Illegitimacy of Mass-Tort Settlements Negotiated Under Federal Rule 23*, 39 ARIZ. L.REV. 461, 475 (1997). Rather, we are to "decide cases or controversies." *Id.* Social **\*356** peace becomes a natural and very welcome byproduct of focusing on that specific mission, "because for every carefully wrought judicial decision, there may be hundreds or thousands of matters that are privately resolved 'in the shadow' of the law." *Id.*

On its own terms, then, the Majority's decision is short-sighted and counterproductive. In the interest of short-term peace, it sacrifices long-term legitimacy and, with that, a more stable, lasting peace. By failing to enforce the limits of Rule 23, today's decision will encourage frivolous class action claims and have the predictable consequence of weakening the incentives—the sheltering shadow—under which non-frivolous disputes would otherwise be properly resolved.

In sum, when a federal court issues an order certifying that there are questions of fact or law common to all class members, it necessarily concludes, whether explicitly stated or not, that all class members have at least some colorable legal claim. When there are members of a putative class who do not, under the operative substantive law in a case, have a colorable claim, certification of the class enlarges the substantive rights of those members. Any such order is thus a violation of the Rules Enabling Act, and, when it occurs in a class whose only claims are based in state law, it also violates core principles of federalism. The damage done by that judicial usurpation is not made better by invok-

ing the benefits of social peace through litigation settlement. Private parties have a free hand in settling their own disputes, but class action settlements require federal courts to determine the rights and obligations of people who are not there to speak for themselves—hence the Supreme Court's insistence that class action settlements "demand undiluted, even heightened, attention ...," especially when there is a risk of "unwarranted or overbroad class definitions," Amchem, 521 U.S. at 620, 117 S.Ct. 2231. That risk has been realized here.

C.A.3 (N.J.),2011.
Sullivan v. DB Investments, Inc.
667 F.3d 273, 81 Fed.R.Serv.2d 580, 2011-2 Trade Cases P 77,736

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# **Exhibit B**

6/27/12

A trial law firm for the injured

HOME    ABOUT US    ATTORNEYS & STAFF    PRACTICE AREAS    NEWS & INFO    CONTACT US

Like    Share

Home > Attorneys & Staff > Jan Petrus

# Jan Petrus

Jan's focus is on serious personal injury and assists in all aspects of preparing a case for trial, working with experts and is responsible for coordinating the clients' needs and keeping our client up to date on case progress.

## Legal Assistant



jpetrus@bandaslawfirm.com
Download VCard

Phone: 361.698.5200
Fax: 361.698.5222

500 N. Shoreline Blvd., Suite 1020
Corpus Christi, Texas 78471

Jan was born and raised in South Texas where her legal career began in 1969. After 30 years of dedicated service to her past employer, Jan began practicing with Chris Bandas in February 2000. Jan has significant experience in a variety of legal matters and her focus is on serious personal injury matters boasting 40 years of experience. Today, Jan is the office manager and legal assistant at Bandas Law Firm, P.C. and assists in all aspects of preparing a case for trial. She assists in client intake, fact investigation, calendaring, medical workups, discovery, document production, coordinating depositions, working with experts and is responsible for coordinating the clients' needs and keeping them updated on a regular basis.

## Education

After graduating in 1968, Jan completed several courses at South Texas Business School and has trained in numerous paralegal programs throughout her legal career.

## Experience

**1969 – 1970 –** personal/catastrophic injury, wrongful death, maritime, corporate, real estate, divorce, Wills and probate.
**1970-2000 –** worker's compensation, personal/catastrophic injury, wrongful death, products liability, maritime, divorce, real estate, Wills and probate.
**2000 to date –** personal/catastrophic injury, wrongful death, products liability, corporate.

## Memberships

Member American Trial Lawyers Association Paralegal Organization

## Born

Aransas Pass, Texas, August 21, 1950

### FREE Case Review
Fill out the form below.

First Name

Last Name

Phone Number

Email Address

Briefly Describe Your Case

Accept Terms ✓

**Call for a FREE Consultation**
**(361) 698-5200**
**No Fee Without Recovery**

### Christoper Bandas - Partner



A native Texan, Chris's legal skills have been called on across the state and across the nation. Chris successfully puts his experience to work for plaintiffs, consistently obtaining substantial recoveries against big business. Bandas speaks fluent Spanish and has a reputation for keeping his clients informed and empowered.

Learn more about Christoper Bandas

### Robert J. Sigler - Partner



Robert Sigler is a board certified personal injury trial lawyer by the Texas Board of Legal Specialization and has been with the Bandas Law Firm for several years. Before joining our law firm, Robert worked with the Meredith Donnell and Abernathy, where he was a partner for many years and a member of the firms management committee.

Learn more about Robert Sigler








## Bandas Law Firm, P.C.

500 N. Shoreline Blvd., Suite 1020
Corpus Christi, Texas 78471

P. (361) 698-5200
F: (361) 698-5222

Copyright © 2012. All Rights Reserved

Home | About Us | Attorneys & Staff | Practice Areas | Contact Us | Site Map

Call for a FREE
Consultation
(361) 698-5200
(866) 849-5200

Corpus Christi Trial Attorneys Representing Victims of Negligence in Law suits.

Privacy Policy | Search Marketing by Reardon

# Exhibit C

IN THE CIRCUIT COURT FOR THE FOURTEENTH JUDICIAL CIRCUIT
ROCK ISLAND, ILLINOIS
ENERAL DIVISION

| | |
|---|---|
| LISA BROWN, CYNTHIA CAMP, an Illinois resident, and JOSEPH STANFIELD, an Illinois resident, on behalf of themselves and all others similarly situated,<br><br>                                Plaintiffs,<br><br>                      -v-<br><br>WAL-MART STORES, INC., a Delaware corporation, d/b/a WAL-MART Discount Stores, WAL-MART Supercenters and SAM's CLUB operating segments,<br><br>                                Defendant. | Case No. 01 L 85<br><br><br>FILED in the CIRCUIT COURT<br>OF ROCK ISLAND COUNTY<br>GENERAL DIVISION<br><br>OCT 2 9 2009<br><br>_Sbazk. Luzun_<br>Clerk of the Circuit Court |

## ORDER DENYING OBJECTIONS TO THE SETTLEMENT AND FEES AND THE MOTION TO INTERVENE AND FOR PRO HAC VICE ADMISSION

At the October 29, 2009 Fairness Hearing, this Court reviewed the five objections to the proposed Settlement filed with the Court. One of the objectors has also moved to intervene and her counsel has moved for admission *pro hac vice*.

The Court has considered the objections filed by Shyniea Smothers, Paul Haasz, Edward D. Heath, II, and Debra Jackson and finds them to be without merit for the reasons set forth in Plaintiffs' submissions in support of the Settlement.

The remaining objection (hereinafter, the "Bandas Objection") was filed by Ms. Jill Carlson, by attorney Alan Barinholtz. His co-counsel, Christopher Bandas (who has moved for admission pro hac vice), is a Texas lawyer well known for his practice of routinely filing objections in class action settlements across the country. See Appendix filed by Class Plaintiffs as part of their submission in support of the proposed Settlement and the application for counsel fees and expenses ("Appendix") at Tabs 13-30.

The Court finds that out of 291,266 class members, there were only five objections timely filed with the Court. The Bandas Objection filed on behalf of Ms. Carlson is a generic boilerplate objection prepared and filed by attorneys working for their own personal benefit and not for the benefit of this Class or for those lawyers' client. The record before the Court demonstrates that Bandas is a professional objector who is improperly attempting to "hijack" the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified "legal fees." Bandas has filed virtually identical, frivolous objections in South Carolina, Iowa, Missouri and Florida in settlements of similar wage and hour class actions against Wal-Mart.

In South Carolina, Bandas filed an objection and motion to intervene on behalf of a class member with the assistance of local counsel named Gasper Barr, III. Bandas represented to the court there that he had a pending motion for admission *pro hac vice* when, in fact, no such motion had been or ever was filed. Neither Bandas, Mr. Barr nor their client objector appeared at the South Carolina final fairness hearing. Judge Perry Buckner denied the objection and motion to intervene filed by Bandas and found that Bandas filed an untimely notice of appeal while still failing to file a *pro hac vice* motion. Appendix, Tab 15.

In Missouri, Bandas' local counsel appeared at the final fairness hearing but only to withdraw as counsel due to the fact that he could not in "good conscience....continue to work toward the strategic objectives outlined...by Mr. Bandas." Judge Midkiff entered separate orders nullifying the Bandas objection and denying his motion for

admission *pro hac vice*. Appendix, Tab 19. This did not dissuade Bandas from filing a Notice of Appeal (with new local counsel) on July 2, 2009.

Most recently, in Iowa, Bandas and his co-counsel solicited a class member, Terry Healy, to object to the class settlement and application for attorneys' fees and expenses and to move to intervene in papers substantially similar to those filed here in Illinois. *See Mussmann et al. v. Wal-Mart Stores, Inc. et al.*, No. LACV-27486, Iowa District Court, Clinton County, Order Regarding Terry Healy's Objection and Motion to Intervene, at ¶¶ 2, 13 and 6-13 (Appendix, Tab 25). At his deposition held on October 2, 2009, Mr. Healy learned about Bandas' objections to the Wal-Mart class actions across the nation for the first time. *Id.* at ¶¶ 14-16. As a result, Mr. Healy voluntarily withdrew his objection with prejudice. *Id.* at ¶¶ 16-17. Bandas failed to appear at the hearing on his "client's" motion to intervene. By order dated October 13, 2009, the Iowa court found that Bandas' objection in that case was withdrawn or otherwise denied or struck, and that the motion to intervene was deemed moot or otherwise denied or struck for failure to comply with the requirements of the Iowa Rules of Civil Procedure governing motions to intervene. Neither Bandas nor his client appeared at the final fairness hearing. Bandas' co-counsel is being referred by the Iowa court to the Iowa Supreme Court's disciplinary committee.

In Florida, in *Oualette v. Wal-Mart Stores, Inc.*, File No. 67-01-CA-326, Bandas was one of a group of professional objectors that the Florida court found were "working through collusion for their own benefit and not for the benefit of this class or their clients." The Florida court further found that all of the objectors' counsel — including

Bandas — were engaged "in an effort to extort money from the class and/or class counsel. Appendix, Tab 27.

Apart from these Wal-Mart cases, Bandas has a history as a professional objector in other class actions cases:

- In *In re: Dynamic Random Access Memory Antitrust Litigation* filed in the Northern District of California, Bandas withdrew his objection after "further investigation," which revealed that Bandas wholly failed to adhere to his Rule 11 obligations to thoroughly investigate his client's claims. Appendix, Tab 29, Ex. A.

- In Miller County, Arkansas, attorney Bandas filed a canned objection in *Lane's Gifts and Collectibles, LLC v. Yahoo! Inc.* The court denied the objection. Attorney Bandas then appealed, but he withdrew the appeal 48 hours later. Appendix, Tab 29, Ex. B-D.

- In *Conroy v. 3M Corp.* in the U.S. District Court for the Northern District of California, Bandas submitted an objection that was "unfounded, and . . . unlikely to succeed." No. C 00-2810 CW, 2006 U.S. Dist. LEXIS 96169, at *10-11 (N.D. Cal. Aug. 10, 2006) (Tab 16). Further, the "objections were patently frivolous . . . [and] bore no particular relationship to the circumstances of the settlement . . . ." *Id.* at *11. As a result, the court ordered Bandas to post a $431,000 bond to pursue an appeal of the objection. *Id.* Not surprisingly, Bandas abandoned the appeal. Appendix, Tab 29, Ex. F.

- Most recently, in March 2009, Bandas withdrew an objection to a proposed settlement he filed in a class action pending in Oklahoma, *Sacket v. Great Plains*

*Pipeline Co, et al.* The withdrawal came only after counsel for the class vehemently opposed the objection, highlighting Bandas' history of filing canned objections at the last moment in an effort to extort attorneys' fees. Appendix, Tab 30.

The Court finds that a lack of involvement and participation by Ms. Carlson and her counsel, combined with their attempt to inject themselves at the last minute into this eight year litigation constitutes an effort to extort money from the Class and/or Class Counsel. Though filed by two lawyers, the Bandas Objection offers nothing in the way of specific criticisms of the proposed Settlement. The content of the Bandas Objection demonstrates that neither Ms. Carlson nor her counsel has ever visited the settlement website or read the Stipulation of Settlement in this case. The Bandas Objection ignores the terms of the proposed Settlement before the court. The Bandas Objection offers no legal or factual support for its assertion that the claims deadline is "brief" or that the claims process is difficult. The Class Settlement Amount and the Floor are clearly laid out in the Stipulation of Settlement and in the Class Notice. Bandas' assertions regarding dissemination of Class Notice are also unfounded. The Stipulation of Settlement and the Preliminary Approval Order signed by the Court on July 1, 2009, lay out the form and method of notice and the Mulholland Declaration submitted by Class Counsel confirms that notice was effectuated in a manner that more than satisfies due process and the Illinois rules.

The Bandas Objection's complaints about "other" Wal-Mart settlements are irrelevant to the matter before this Court and the Bandas Objection offers no rationale or basis to the contrary. Each of the settlements to which he refers has been finally

approved by the trial court before which such case was pending and, in virtually each such instance, Bandas' "objections" have been rejected.

In short, the Bandas Objection does not appear to be an effort to enhance the value of the settlement. It is short on specifics, is wholly devoid of evidence or controlling authority, and fails to comply with the procedures ordered the Court for properly objecting to the Settlement. Moreover, it is clear that neither the objector nor her counsel reviewed the Settlement Agreement or any of the voluminous pleadings and appellate briefing that clearly reflect the complexities of this case, and the enormous efforts expended by Class Counsel on behalf of the Class over the last eight years.[1]

The Court therefore strikes the Bandas Objection for failure of proof, and failure to demonstrate that the objector is acting on behalf of the Class.

For the reasons set forth in Plaintiffs' submissions in opposition to the Carlson motion to intervene and for the reasons set out in the record before this Court at the Fairness Hearing, the Carlson motion to intervene and the Bandas motion for *pro hac vice* admission are both denied.

Dated:    October 29, 2009

Honorable Mark VandeWiele

---

[1]    In support of the objection, Bandas attached several documents that pertain exclusively to *Salvas v. Wal-Mart Stores, Inc.*, Supreme Judicial Court, Commonwealth of Massachusetts, SJC No. 10108. Bandas does not even attempt to explain the relevance of these documents in the motion to intervene and objection he filed with this Court.

IN THE CIRCUIT COURT FOR THE FOURTEENTH JUDICIAL CIRCUIT
ROCK ISLAND, ILLINOIS
GENERAL DIVISION

| | | |
|---|---|---|
| LISA BROWN, CYNTHIA CAMP, an Illinois resident, and JOSEPH STANFIELD, an Illinois resident, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>                    -v-<br><br>WAL-MART STORES, INC., a Delaware corporation, d/b/a WAL-MART Discount Stores, WAL-MART Supercenters and SAM's CLUB operating segments,<br><br>                              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 01 L 85<br><br><br><br><br><br>FILED in the CIRCUIT COURT<br>of ROCK ISLAND, COUNTY<br>GENERAL DIVISION<br><br>OCT 29 2009<br><br>*Lisa L. Surine*<br>Clerk of the Circuit Court |

**FINAL ORDER APPROVING SETTLEMENT**

This matter having come before the Court for hearing pursuant to the Court's Preliminary Approval Order dated July 1, 2009, on the application of Class Plaintiffs for approval of the Settlement set forth in the Stipulation and Agreement of Settlement between Class Members and Wal-Mart dated June 30, 2009 (the "Stipulation" or the "Settlement"), and due and adequate notice having been given to the Class as required in the Preliminary Approval Order, and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed in the premises and good cause appearing therefore;

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation, and all capitalized terms used herein have the same meanings as set forth in the Stipulation.

2. This Court has jurisdiction over the subject matter of the Class Action and over all members of the Class.

3. This Court finds that for purposes of settlement only, a sufficient showing has been made to warrant final certification of the Settlement Class under the terms of Section 2-801 *et seq.* of Illinois Code of Civil Procedure, 735 ILCS 5/2-801 *et seq.*

4.    The   notice   given   to   the   Class   of   the   proposed
Settlement  and  the  other  matters  set  forth  in  the  Stipulation
was   the   best   notice   practicable   under   the   circumstances,
including  individual  notice  to  all  members  of  the  Class  who
could  be  identified  through  reasonable  effort.    Said  notice
provided  due  and  adequate  notice  of  these  proceedings  and  of  the
matters  set  forth  in  the  Stipulation,  including  the  proposed
Settlement,  to  all  persons  entitled  to  such  notice,  and  said
notice  fully  satisfied  the  requirements  of  Rule  2-803  of  the
Illinois  Code  of  Civil  Procedure  and  due  process.    Members  of
the  class  have  been  offered  a  full  opportunity  to  object  to  the
proposed  Settlement  and  to  participate  in  the  hearing  thereon.
Thus,  it  is  hereby  determined  that  all  members  of  the  Class  who
did   not   elect   to   exclude   themselves   by   proper   written
communication  postmarked  or  delivered  by  hand  to  the  Claims
Administrator  on  or  before  September  28,  2009,  as  required  per
the  Notice,  Summary  Notice  and  the  Preliminary  Approval  Order,
are  bound  by  this  Order.    Only  those  persons  listed  on  Exhibit  A
to  this  Order  properly  opted  out  of  this  Class  Action  and  are
not  bound  by  this  Order.

5.    The  Settlement  is  approved  as  fair,  reasonable  and
adequate,  within  the  meaning  of  Rule  2-806  of  the  Illinois  Code
of  Civil  Procedure,  and  in  the  best  interests  of  the  Class.    The

2

Parties are directed to consummate the Settlement in accordance with the terms and provisions of the Stipulation.

6. The Class Action, the Amended Complaint, and the claims asserted therein by Class Members are hereby resolved pursuant to the terms of the Settlement in their entirety on the merits and with prejudice, in full and final discharge of any and all claims which were or could have been asserted therein, as against Wal-Mart.

7. The Named Plaintiffs and other Class Members are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, in this Class Action or any other action or proceeding, including in any federal or state court, or in any other court, arbitration proceeding, administrative proceeding, or other tribunal or forum in the United States or elsewhere, any Released Claim against Wal-Mart, regardless of whether any such Named Plaintiff and/or other Class Member ever seeks or obtains any distribution from the Settlement by any means, including, without limitation, by submitting a Claim Form.

8. In consideration of the Class Settlement Amount, and for other good and valuable consideration as set forth in the Stipulation, upon entry of this Order each of the Releasing Class Members shall, by operation of this judgment, have fully, finally and forever released, relinquished, and discharged with

3

prejudice and on the merits, without costs to any party (except as provided in the Settlement), all Released Claims against Wal-Mart in accordance with Paragraphs 27-28 of the Stipulation, shall have covenanted not to sue Wal-Mart with respect to such Released Claims, and shall be permanently barred and enjoined from instituting, commencing, prosecuting or asserting any such Released Claim against Wal-Mart.

9. Neither the Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement, including the certification of the settlement class for settlement purposes: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any Released Claim or of any wrongdoing or liability of Wal-Mart; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of Wal-Mart or for any other purpose, in any civil, criminal or administrative proceeding in any court, arbitration proceeding, administrative agency or other forum or tribunal, other than in such proceedings as may be necessary to consummate or enforce the Stipulation, the Settlement or the Order.

10. Without affecting the finality of this Order in any way, this Court retains continuing and exclusive jurisdiction over the Parties for all matters relating to this Class Action,

4

including (a) the implementation of the Settlement; (b) any award from the Settlement, including interest earned thereon; and (c) all further proceedings concerning the administration, consummation and enforcement of the Stipulation, the Settlement and this Order.

11. There shall be no distribution of the Settlement to any Class Member until the occurrence of the Settlement Effective Date or the issuance of an order by this Court pursuant to Paragraph 37 of the Stipulation, whichever is later.

12. To the extent that any monies distributed to Approved Claimants or in the Second Distribution to Class Members remain unclaimed with the QSF after one (1) year from the date the check was mailed to such Class Member at the address on file with the Claims Administrator, the Court shall appoint an "eligible organization," as defined by Section 807 of the Illinois Code of Civil Procedure and proposed by Class Counsel, to which such monies will be distributed.

13. In the event that the Settlement Effective Date does not occur, this Order shall be rendered null and void and shall be vacated *nunc pro tunc*, and the provisions of paragraphs 52 and 53 of the Stipulation shall apply.

14. The Court finds that Class Plaintiffs and Class Counsel adequately represented the Class for purposes of negotiating, entering into, and implementing the Settlement.

5



| | | | | | | |
|---|---|---|---|---|---|---|
| 100022402 | VICKI | CASE | 5323 S MONITOR AVE | CHICAGO | IL | 60638-2715 |
| 101212790 | MARK | CASE | 110 S WALNUT ST | ONARGA | IL | 60955-1142 |
| 102907470 | STEPHANIE | LORTON | 589 JANSEN TRL | POCAHONTAS | AR | 72455-4749 |
| 103453379 | ANNA | MALKOWSKI | 723 E 3RD ST | CENTRALIA | IL | 62801 |
| 212732292 | SHELBY | MLYNIEC | 2827 BLUFF RIDGE DRIVE | QUINCY | IL | 62305-1391 |
| 103225878 | SANDRA | COPLEA | 1505 N HERSHEY RD APT 1 | BLOOMINGTON | IL | 61704-2474 |
| 104554748 | JENNIFER | HAYS | 701 SAVANNA SPRINGS DRIVE | LAKE VILLA | IL | 60046-6646 |
| 100065232 | PATRICIA | VITTETOW | 38450 PARADISE WAY | CATHEDRAL CITY | CA | 92234-2243 |
| 210896038 | BRIAN | MCGEE | 422 GLENWOOD DRIVE | BELVIDERE | IL | 61008-5928 |
| 105046613 | NICHOLAS | MARTIN | 808 N 19TH | MATTOON | IL | 61938-2808 |
| 108878741 | DAVID | LOOK | 2110 TROY ST. | MADISON | IL | 62060-1649 |
| 105787282 | LORI | MCGEE | 422 GLENWOOD DR | BELVIDERE | IL | 61008-5928 |
| 103789278 | GEORGE | SCHANZ | 917 W EASTWOOD AVE APT 110 | CHICAGO | IL | 60640-6635 |
| 105330034 | JACOB | KUERTH | 7405 PRESTON DR | SPRINGFIELD | IL | 62711-4307 |
| 210210286 | SHARON | GONZALEZ | 902 PARK ST. | SOUTH ROXANA | IL | 62087-1518 |
| 103004925 | GLORIA | STANFIELD | 1240 HIGHLAND AVE | BENTON HARBOR | MI | 49022-3734 |
| 211011517 | GARY | SIMPSON | 708 ABEND ST | BELLEVILLE | IL | 62220-3512 |
| 100064083 | VIOLA | BOSCHELLI | 150 PARKVIEW DR | TRENTON | IL | 62293-1700 |
| 212838105 | EVA | OSBORN | 627 W. PIPER | MACOMB | IL | 61455-2062 |
| 109615821 | MARTHA | PILAND | 865 LACOUNT RD. | GALATIA | IL | 62935-2348 |
| 104732737 | FERN | CALHOUN | 1525 ADAMS | CHARLESTON | IL | 61920-1646 |
| 105457242 | PAULA | HICKS | P.O. BOX 40 DAYTON AVE | HARRISBURG | IL | 62946-0040 |
| 105288920 | STEPHEN | ESTILL | P.O.BOX 176 | NEW HOLLAND | IL | 62671-0176 |
| 100015317 | BILLIE | SCHISLER | 425 HICKORY PT # 1 | QUINCY | IL | 62305-8449 |
| 100219602 | CAROLYN | DUMAS | PO BOX 82 | LELAND | MI | 49654-0082 |
| 102168922 | LINDERMAN | MILLER | 2017 EDGEWOOD DR | NAVARRE | FL | 32566-8201 |
| 102096968 | NORMAN | FUNDERBURK | 149 S 3RD AVE # 1 | KANKAKEE | IL | 60901-3701 |
| 211445133 | ANTHONY | FLETCHER | 14251 LISTER RD | MORRISON | IL | 61270-9658 |
| 106099079 | MARY | HENDERSON | 410 ROOSEVELT CIRCLE | EAST PEORIA | IL | 61611-4221 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 103645753 | WARD | MILLER | 225 N LOCKWOOD AVE | CHICAGO | IL | 60644-2404 |
| 210823718 | ALLEN | MC ALISTER SR. | 1110 CHESTNUT | DIXON | IL | 61021-3809 |
| 106442159 | JENNIFER | HALFACRE | 512 ENTERPRISE AVE | IUKA | IL | 62849 |
| 103924645 | ETHEL | MEINERS | 2974 SHAMROCK CIR | ELGIN | IL | 60124-4354 |
| 105831401 | JOAN | KIRKPATRICK | 130 E. COOK AVE. #418 | LIBERTYVILLE | IL | 60048-2051 |
| 211816556 | WILLIAM | PITSENBARGER | 1226 N 2053 RD | GRAND RIDGE | IL | 61325-9404 |
| 106790431 | BECKIE | WEILMUENSTER | 3020 E. WALLCE AVE. | DECATUR | IL | 62526-5239 |
| 211233682 | MELVIN | STOBER | 611 LILA CT. | NEW BADEN | IL | 62265-1652 |
| 100070117 | DOROTHY | KOSTER | 8010 TUNNEL HILL RD | GOREVILLE | IL | 62939-2828 |
| 212156634 | CHARLES | CHAPMAN | 920 NORTHAMPTON | WOODSTOCK | IL | 60098-2931 |
| 108489706 | RYAN | RICHMOND | 209 DODGE AVE. | DEKALB | IL | 60115-3917 |
| 109532657 | MELISSA | MILLER | 527 S PENNSYLVANIA AVE | BELLEVILLE | IL | 62220-3675 |
| 102230894 | BOBBIE | HELFER | 6125 N 2ND ST STE 1 | LOVES PARK | IL | 61111-4151 |
| 206797099 | PATRICIA | PATCHETT | 1510 VANDALIA RD. | HILLSBORO | IL | 62049-2039 |
| 210627490 | HEATHER | REVELL | PO BOX 66 | SWIFTON | AR | 72471-0066 |
| 104834240 | LINDA | BERNABEI | PO BOX 91 | SPRING VALLEY | IL | 61362-0091 |
| 103337039 | LINDA | MILLER | 104 S JEFFERSON ST | CENTRALIA | IL | 62801-8106 |
| 102884623 | TERRY | MIDLAND | PO BOX 152514 | LUFKIN | TX | 75915-2514 |
| 100045067 | IMOGENE | KUSTER | 860 102ND ST | PLEASANT PRAIRIE | WI | 53158-5436 |
| 101150769 | ROGER | GRISWOLD | 2164 303RD AVE | FORT MADISON | IA | 52627-9302 |
| 105782345 | VICKEY | HUGHES | 225 N. LOCUST APTA | GREENVILLE | IL | 62246 |
| 100172028 | FLORA | OSBORNE | 313 HANNAH DR | WATERLOO | IL | 62298-3260 |
| 103720140 | KIM FREDERICK | GUMMERSHEIMER | 19 S TRACE RD | GLEN CARBON | IL | 62034-2787 |
| 100917007 | JAY | KAISER | 302 N CHARLES ST | CARLINVILLE | IL | 62626-1333 |
| 100037613 | VELMA | CLARY | 19898 JONES CREEK RD | BARNETT | MO | 65011-3404 |
| 211925914 | DONALD | SHORT | R 1 BOX 473 | LAWRENCEVILLE | IL | 62439-9799 |
| 210889238 | NORMAN | GOETZ | 1341 15 STREET A | MOLINE | IL | 61265-4016 |
| 208965614 | DANNY | HONN | 1217 KOEHN | DANVILLE | IL | 61832-3461 |
| 108263570 | ALICIA | OAKLEY | PO BOX 2224 | CARBONDALE | IL | 62902-2224 |
| 210456337 | JEREMIAH | JOHNSON | PO BOX 2224 | CARBONDALE | IL | 62902-2224 |
| 102657443 | BRIGITTE | CURTIS | 1007 E MAIN ST | STREATOR | IL | 61364-3139 |
| 102573407 | BETTY | INTRONA | 3405 CALLE CUERVO NW APT 437 | ALBUQUERQUE | NM | 87114-9227 |

| ID | First | Last | Address | City | State | ZIP |
|---|---|---|---|---|---|---|
| 102252538 | RUTH | CANE | 1155 BROCKTON CT | AURORA | IL | 60504-8957 |
| 104921573 | PATRICIA | COOP | 507 VAN BUREN CIR | SHEBOYGAN | WI | 53083 |
| 208200997 | BONNIE | COOP | EVERGREEN DR | KIRKLAND | IL | 60146 |
| 211162394 | RYAN | ROESER | 112 W 7TH STREET | STERLING | IL | 61081-3522 |
| 210431613 | BRANDY | CRISMAN | 300 BROADWAY ST | MARSEILLES | IL | 61341-1981 |
| 102458864 | PAMMIE | REVELL | 714 W RIDGELAND AVE | WAUKEGAN | IL | 60085-2956 |
| 212071617 | JESSICA | BIRK | 124 WINDSOR PL | BETHALTO | IL | 62010-1737 |
| 109349732 | JEAN | WHEELER | 1526 GREENWOOD CEMETERY RD | DANVILLE | IL | 61832-7726 |
| 103438764 | CLARINCE | FOOTE | 700 HENNING DR APT 140 | SULPHUR | LA | 70663-6956 |
| 211165978 | ALBERT JR | BOUCHEZ | 1009 E JEFFERSON ST | PANA | IL | 62557-1218 |
| 211815883 | JEAN | DUENSING | 14145 FAULKNER CT | PLAINFIELD | IL | 60544-6105 |
| 100088796 | LOIS | CASSIDY | 214 BARNWOOD TRL | MCHENRY | IL | 60050-5407 |
| 104101587 | ROY | FROELICH | 1304 W BUSSE AVE | MOUNT PROSPECT | IL | 60056-2973 |
| 104172426 | DON | CONKLIN | 18 CALADIUM DR | ORMOND BEACH | FL | 32174-1442 |
| 103124781 | EARL | CHENIER | 5818 50TH AVE APT 14 | KENOSHA | WI | 53144-2454 |
| 212512542 | LAURA | BANASIK | 861 BLACKHAWK BLVD. | SOUTH BELOIT | IL | 61080-2201 |
| 100338565 | MICHELLE | RICHERSON | 1492 COUNTY ROAD 2400 N | THOMASBORO | IL | 61878-9636 |
| 104752737 | SUSAN | NORMAN | 115 S. SPRUCE ST. | WASHINGTON | IL | 61571-2736 |
| 210849248 | JUDITH | AINSWORTH | 5801 JUANITA VISTA | CRYSTAL LAKE | IL | 60014-4033 |
| 104151194 | MELVA | WINNIE | 13610 NUTWOOD RD | FIELDON | IL | 62031-1405 |
| 210133683 | SHELLEY | HUCK | 2001 WHITTIER AVE | SPRINGFIELD | IL | 62704-4647 |
| 106832649 | THERESA | POLLACK | 1201 PATTON AVE | LAKE IN THE HILLS | IL | 60156-3311 |
| 104728657 | NANCY | CRAIG | 1910 U.S. HWY 36 | NEWMAN | IL | 61942-8502 |
| 101056500 | HELEN | KLINGER | 5757 S FOX HOLLOW AVE | SPRINGFIELD | MO | 65810-2326 |
| 103853206 | DOROTHY | FREY | 17360 E WEST NEWELL RD | DANVILLE | IL | 61834-7450 |
| 102454086 | AUGUST | CHRISTOPHER | 1940 THEODORE DR | INDIANAPOLIS | IN | 46214-4208 |
| 100016072 | GLORIA | SMITH | 1325 ALPINE ST | LONGMONT | CO | 80504-3047 |
| 100377461 | VERONA | MURSEWICK | 322 N DELAWARE ST | MOUNDS | IL | 62964-1206 |
| 105391466 | TAISHA | WHITE | 9995 LISMORE RD | ROSCOE | IL | 61073-6424 |
| 208688697 | LARRY | MATTHEWS | 300 HICKORY LANE | LINCOLN | IL | 62656-2295 |
| 105726131 | MARY | GOETSCH | 808 5TH AVE | AURORA | IL | 60505-4907 |
| 206815527 | BENNIE | KELLEBREW | 429 NORTH EDWARDSVILLE ST | STAUNTON | IL | 62088-1333 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 100887023 | JANIS | KELLEBREW | 506 S GLOVER AVE UNIT A | URBANA | IL | 61802-4460 |
| 102336462 | CAMILLE | RAUCH | 8735 S TROY AVE | EVERGREEN PARK | IL | 60805-1032 |
| 100072445 | KATHLEEN | WORKMAN | 1197 CASTLEWOOD DR | CLARKSVILLE | TN | 37042-8650 |
| 103636221 | RUTH VON | GUERARD | 3416 W OAKCREST DR APT 3C | PEORIA | IL | 61604-8055 |
| 102545238 | SHIRLEY | RICE | 1044 WRENS GATE | MUNDELEIN | IL | 60060-1269 |
| 101086261 | ROSEMARY | HUTCHISON | 1271 KENMORE PL | NASHVILLE | TN | 37216-3201 |
| 210838671 | CHRISTOPHER | JAHNKE | 7771 FOX ST. APT. 1C | WOODRIDGE | IL | 60517-3250 |
| 103076446 | LINDA | WILSON | 2411 N DELAWARE ST | PEORIA | IL | 61603-2647 |
| 102044722 | JEANETTE | DUNN | 534 N 8TH ST | QUINCY | IL | 62301 |
| 100014468 | PHYLLIS | PLANK | 1725 ELF DR | SEBRING | FL | 33875-5543 |
| 105774139 | KAREN | MCGUIRE | 1531 FAIRWAY | RANTOUL | IL | 61866-3541 |
| 210325797 | VERNA | BRAWNER | PO BOX 2275 | EAST PEORIA | IL | 61611-0275 |
| 211917917 | KATHLEEN | SETTLES | 1876 WOODSONWINCHESTER RD | WINCHESTER | IL | 62694-3617 |
| 211254324 | JAMES | LEMARR | 101LINDWOOD DR | SALEM | IL | 62881 |
| 102592770 | ROSEMARY | WALLIN | 812 W ELM ST | OLNEY | IL | 62450-1125 |
| 106337190 | TERESA | BLAKE | 1571 E. 1293RD ROAD | BROCTON | IL | 61917-8073 |
| 104782123 | DARLENE | HANN | 421 18TH AVE | MOLINE | IL | 61265-3742 |
| 212136670 | MATTHEW | SOWERS | 2314 HOREB AVENUE | ZION | IL | 60099-2107 |
| 101062665 | SHIRLEY | TURPIN | 116 MARYKNOLL DR | MARYVILLE | IL | 62062-5727 |
| 208429229 | DIANE | PARKER | 1510 30TH STREET APT 201 | HIGHLAND | IL | 62249-2730 |
| 210539572 | MARCIA | KASSNER | 2019 N. MAIN ST. APT. 103 B | WHEATON | IL | 60187-3152 |
| 103158608 | RUTH | SMOCK | PO BOX 581 | SHELDON | IL | 60966-0581 |
| 106394345 | VICKI | SNYDER | 219 N OKLAHOMA | MORTON | IL | 61550-2334 |
| 106576632 | MARK | KUSTER | 223 S. BURR BLVD. | KEWANEE | IL | 61443-2942 |
| 106673837 | BRENDA | KUSTER | 223 S. BURR BLVD | KEWANEE | IL | 61443-2942 |
| 211618273 | AMANDA | MACSHANE | 211 CARRIAGE LANE ESTATES | STREATOR | IL | 61364-3995 |
| 102103194 | GINA | SCHRINER | 7521 MOUNTAIN OAK TRL | LIVE OAK | TX | 78233-3112 |
| 208831599 | MARY | POTTER | 23 WILSHIRE BLVD. | MACHESNEY PARK | IL | 61115-2356 |
| 211080967 | ANTHONY | FLEMING | 6202 TIMBER RIDGE DR | PINE BLUFF | AR | 71603 |
| 211517187 | BRIAN | LINDBERG | 2583 PACIFIC PKWY | ROCKFORD | IL | 61114-6419 |
| 105015432 | DEAN | BOGNER | 954 WESTERN RD | HENRY | IL | 61537-9498 |
| 213194738 | LAWRENCE | COLVIN | 9407 N. CROSS ST | PEORIA | IL | 61615-9735 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 213130551 | MERIELLE | CRONINGER | 338 W DECATUR ST. | DECATUR | IL | 62522-3309 |
| 211579690 | TRACY | GRUSHKA | 1132 DOVERCLIFF WAY | CRYSTAL LAKE | IL | 60014-1800 |
| 103030558 | TYRA | HOLLEY | 3227 LIBERTY DR | ROCKFORD | IL | 61101-3323 |
| 211832075 | PATRICIA | DOSS | 500 A W. BELLARMINE DR. | JOLIET | IL | 60436-1800 |
| 212095832 | CHARLOTTE | NICHOLS | 2614 WEST 26TH GRANITE CITY | GRANITE CITY | IL | 62040 |
| 100045738 | SHARON | SLOCUM | 901 N MAIN ST | NORMAL | IL | 61761-1501 |
| 211444213 | TERESA | SALAZAR | 3369 WESTERN AVE. | PARK FOREST | IL | 60466-1837 |
| 103204458 | DANNY | FINN | 18554 W POINT DR | TINLEY PARK | IL | 60477-4931 |
| 103137977 | STACEY | FINN | 519 S JEFFERSON ST | RIPLEY | TN | 38063-2017 |
| 104726176 | CYNTHIA | KLAWONN | 10483 W WINSOW | DURAND | IL | 61024 |
| 104147842 | RICHARD | HILLEBRAND III | 965 OAK CREST DRIVE | GARDNER | KS | 66030-9482 |
| 105994586 | MICHAEL | CRAFT | 812 TOMAHAWK TRAIL | ROUND LAKE HEIGHTS | IL | 60073-1130 |
| 100535217 | FRANK | ZWART | 2200 MARION AVE | MATTOON | IL | 61938-5120 |
| 101559108 | DORTHEY | JANES | 618 BRANDLI DR | WEST BURLINGTON | IA | 52655-1502 |
| 211728639 | BETTY | MCCAULEY | RRT 2 B58 | BEECHER CITY | IL | 62414 |
| 209030542 | VINCENT | GULISANO | 1108 1ST AVE. | STERLING | IL | 61081-2311 |
| 211987860 | JOAN | COTTO CONTARINO | 7215 MULLINSHIRE WAY | MACHESNEY PARK | IL | 61115-7606 |
| 208520876 | NORA | GULISANO | 1108 1ST AVENUE | STERLING | IL | 61081-2311 |
| 101245533 | SHANNON | WILLIAMS | 3 WESTMORLAND DRIVE | BELLA VISTA | AR | 72714-1823 |
| 210808046 | DONALD | DOUGLAS | 422 AUTUMN CT | COLUMBIA | IL | 62236-3315 |
| 102281996 | LISA | STINEHART | 317 ASH LN | EAST PEORIA | IL | 61611-7968 |
| 104142096 | RHONDA | ABEL | 2203 E 2ND ST | COAL VALLEY | IL | 61240 |
| 105447930 | MICHAL | SZCZERBA | 270 COTTONWOOD DR | ELK GROVE VILLAGE | IL | 60007-1805 |
| 100379305 | LISA | DUPOY | 9 BOZARTH EST | GEFF | IL | 62842-1008 |
| 102432227 | MICHELE | THOMPSON | 924 BLUERIDGE DR | DANVILLE | IL | 61832-1949 |
| 209019421 | BARBARA | GUTHRIE | 1601 GOLFVIEW RD | RANTOUL | IL | 61866-3548 |
| 106179689 | TANYA | GONZALEZ | 220 N RIGEMOOR AVE. | MUNDELINE | IL | 60060 |
| 210262869 | JONATHAN | SOLORIO | PO BOX 807 201 MARTANA ST | DEPUE | IL | 61322-0807 |
| 210537557 | STEFANY | WESTWOOD | 821 WASHINGTON AVE | MADISON | IL | 62060-1342 |
| 211451212 | MANILEEN | CABE | 480 JEANNE CT APT 4 | WOOD DALE | IL | 60191-2744 |
| 101320106 | SANDRA | GIOVANNUCCI | 1815 COUNTRY DR APT 304 | GRAYSLAKE | IL | 60030-3165 |
| 102422948 | JANICE | HUMPHREY | 718 OAK AVE | AURORA | IL | 60506-3114 |
| 112121707 | DAWN | TURNAGE | 1211 GARDEN DR APT B | DANVILLE | IL | 61832-2062 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 213066988 | CRAIG | SIDWELL | 15 N. 7TH CARROLLTON IL | CARROLLTON | IL | 62016 |
| 212897684 | JANE | WELCH | 908 BLUEGRASS LANE | PLANO | IL | 60545-2109 |
| 109454349 | LOWELL | MEDIN | 121 S LINDEN AVE | PALATINE | IL | 60074-6342 |
| 104842897 | PATRICIA | KALIPS | 1713 PRIMROSE | GRANITE CITY | IL | 62040-2346 |
| 210681761 | DEBRA | HEWLETT | 6501 GATERIDGE DR APT 206 | RALEIGH | NC | 27613 |
| 106021770 | MARY | LINDNER | 1642 US HIGHWAY 319 N LOT 14 | EAST DUBLIN | GA | 31027 |
| 103953703 | DOROTHY | AUSTIN | 3722 E MEADOWVIEW DR | GILBERT | AZ | 85298-4863 |
| 105949080 | RITA | VALENTINE | 1336 S DOUGLAS AVE APT 20 | MONTGOMERY | IL | 60538 |
| 104463396 | MARGARET | MCDONALD | 527 BROADWAY ST APT 810 | QUINCY | IL | 62301 |
| 102216317 | ANGELA M | MORGAN | 13280 FIELDON HOLLOW RD | FIELDON | IL | 62031-1309 |
| 101136891 | JENNIFER | GEE | 1525 N 11TH ST | HERRIN | IL | 62948-2855 |
| 103478449 | SUZANNE | LOWERY | 161 W UNION ST | SENECA | IL | 61360-9461 |
| 211125286 | ROSALYN M | THOMPSON | PO BOX 612 | SHERIDAN | IL | 60551-0612 |
| 105240922 | LAVERNE | THOMPSON | 2444 N 41ST RD | SHERIDAN | IL | 60551-9461 |
| 210945454 | JAMES | REYNOLDS | 319 .N. JOHNSTON AV. | ROCKFORD | IL | 61101-5405 |
| 206672325 | LAURA | CHRIST | 3415 N ROCHELLE LN APT B10 | PEORIA | IL | 61604 |
| 106212124 | JANET | CARTER | 825 FRIENDSHIP SCHOOL RD | ANNA | IL | 62906 |
| 102326843 | MARY | SIMONSON | PO BOX 125 | LAWRENCEVILLE | IL | 62439-0125 |
| 208684768 | TIMOTHY | JONES | 310 W 5TH ST | BENTON | IL | 62812 |
| 105120963 | JACKIE | KELLEY | P O BOX 187 | HODGE | LA | 71247-0187 |
| 100315762 | RITA | HULL | 508 N 3RD ST | EFFINGHAM | IL | 62401-3328 |
| 100603862 | LINDA | SCHREIBER | 441 S STATE ST | MONTICELLO | IL | 61856-1929 |
| 106555579 | BRIAN | FAVIA | 33 SUNNYSIDE RD | WEST ORANGE | NJ | 07052 |
| 106250985 | KARL | RITTER | 105 N. HICKORY ST | DU QUOIN | IL | 62832-1728 |
| 211786519 | SASA | CVOROVIC | 276 SHOREWOOD DR | GLENDALE HTS | IL | 60139-3434 |
| 105119086 | BECKY | PHILLIPS | 29 WOODSCAPE CT. | PEKIN | IL | 61554-5301 |
| 100514108 | LORELIE | DELBY | 25673 W ARCADE DR S | LAKE VILLA | IL | 60046-7210 |
| 106591612 | ALLISON | SUMNER | P.O. BOX 256 | AVA | IL | 62907-0256 |
| 208966946 | TIMOTHY | KOSLOFSKI | 51 VILLANOVA DR | SPRINGFIELD | IL | 62703 |
| 207364105 | HELEN | MCNEAL | 73 MC MURTRY LANE | SPRINGFIELD | KY | 40059 |
| 207364170 | CHRISTINE | WIG | 404 PARKSIDE DRIVE | SYCAMORE | IL | 60178 |
| 102294734 | BONITA | LOCKE | 643 WINGPOINTE DR | AURORA | IL | 60506-8818 |
| 212631784 | NANCY | DEMOTTO | 488 LAUREL STREET | ELGIN | IL | 60120-6650 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 106102214 | EMILY | HATTON | 864 COUNTY ROAD 950 N | CARMI | IL | 62821 |
| 210281951 | STEPHANIE | BRIGGS | 13006 FRIENDS CREEK PARK RD. | CISCO | IL | 61830-9417 |
| 105300986 | JEREMY | GASKINS | 2628 COUNTY ROAD 2100 E | GIFFORD | IL | 61847 |
| 106766371 | ARTHUR | GALLEGOS | 7731 S OKETO AVE | BRIDGEVIEW | IL | 60455-1340 |
| 101536519 | MARLENE | GALLEGOS | 612 1/2 E COLORADO AVE | URBANA | IL | 61801-5924 |
| 101971697 | MARJLYN | RINALDI | 1401 E 18TH ST | STERLING | IL | 61081-1511 |
| 105251718 | SUK | CHOI | 309 MAPLE KNOLL DR | GARRETT | IN | 46738 |
| 208336455 | MARLENE | SELL | 333 S PROSPECT ST | ROCKFORD | IL | 61104-2427 |
| 212809399 | RITA | SEYLLER | 27793 E. 3000TH ST. | TAMPICO | IL | 61283-9303 |
| 208684343 | DORA | RICHARDS | 315 N COLES ST | VANDALIA | IL | 62471-2004 |
| 104925604 | SARISSA | COCHENET | 20 FURMAN RD. | HAMDEN | CT | 06514-4502 |
| 106586480 | SARAH | GILLIAM | 218 N THEOBALD ST | GREENVILLE | MS | 38701-3720 |
| 104855776 | RACHEL | MASLOVARIC KROLIKOWSK | 3331 SUNNYSIDE AVE # 2 | BROOKFIELD | IL | 60513 |
| 106109591 | RYAN | I | 15228 HUNTINGTON CT | ORLAND PARK | IL | 60462 |
| 102448257 | DEBBIE | ANDRADE | 12929 KYLER CT | MARION | IL | 62959-9307 |
| 100071952 | SANDRA | DUGAN | 1809 SEVEN PINES RD APT 8 | SPRINGFIELD | IL | 62704-5764 |
| 104260860 | PAUL | HANKINS | 1008 3RD | HENRY | IL | 61537-1453 |
| 102441062 | DEBRA | HANKINS | 11154 S HOMEWOOD AVE | CHICAGO | IL | 60643-4285 |
| 101571285 | DARLENE | BONE | 701 FISCHER RD TRLR 259 | CREVE COEUR | IL | 61610-5017 |
| 211893357 | ANDREW | HINTZ | 24466 HAHNAMAN RD. | TAMPICO | IL | 61283-9500 |
| 104638791 | ARTURO | MORENO | 200 PAMELA DRIVE | BOLINGBROOK | IL | 60440-1363 |
| 106446275 | DALE | ELLIS | 230 W. JOLIET HWY | NEW LENOX | IL | 60451-2112 |
| 211993043 | ALYSSA | ZELHART | 437 S. MITCHELL ST | BRACEVILLE | IL | 60407-9744 |
| 201712263 | YOLANDA | GUZMAN | 1515 W MINOOKA RD | MORRIS | IL | 60450-8576 |
| 102776913 | JAMIE | WHEAT | 1634 W OLIVE ST | BLOOMINGTON | IL | 61701-4759 |
| 103889230 | NATHAN | WHEAT | 211 N JACKSON AVE | POLO | IL | 61064-1512 |
| 105356412 | RACHEL | SMITH | RR 1 BOX 223D | GOLCONDA | IL | 62938-9755 |
| 108601168 | NICHOLAS | SMITH | RRI BOX 223 D | GOLCONDA | IL | 62938-9755 |
| 105240893 | DAN | LE | 907 CIMMARON WAY | OTTAWA | IL | 61350 |
| 100769491 | PENNY | BREYMAN | 23963 STAUNTON RD | NEW DOUGLAS | IL | 62074 |
| 210359470 | ELAINE | MOORMAN | 11 LINDEN ROAD | XENIA | IL | 62899-2147 |
| 102396723 | RHEIANNON | GOODELL | 2665 KALIHI ST | HONOLULU | HI | 96819-2811 |
| 210544542 | DUSTIN | EDWARDS | 1470 HAMPSHIRE APT D | QUINCY | IL | 62301-3165 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 201713021 | TREY | MOWDER | 405 EAST EIGHTH STREET | DELAVAN | IL | 61734-7532 |
| 104150307 | BECKY | LANDS | 110 PINEHILL LN | HARRISBURG | IL | 62946 |
| 108201537 | CINDY | WITTBRODT | 295 MUNROE | BETHEL HEIGHTS | AR | 72764-8311 |
| 106842037 | NANCY | YARBROUGH | 1006 EDGEWATER DR | MORRIS | IL | 60450 |
| 211085116 | JANE | PEAK | R 2, BOX 112A | RUSHVILLE | IL | 62681-9626 |
| 102648576 | RUSSELL | CARROLL | 325 SAUGET AVE | CAHOKIA | IL | 62206-1523 |
| 101065455 | MARIE | DOVIN | 220 DALE AVE | OGLESBY | IL | 61348-1538 |
| 105385927 | SCOTT | MERCER | 725 S HIGHLAND AVE | ARLINGTON HEIGH | IL | 60005 |
| 208958887 | BRYAN | KIRCHNER | 411 E WALNUT | WATSEKA | IL | 60970-1454 |
| 211918032 | KRYSTAL | ASAY | 411 E WALNUT | WATSEKA | IL | 60970-1454 |
| 103895626 | JUSTIN | LINDERMAN | 4328 NUTMEG LN APT 116 | LISLE | IL | 60532-1130 |
| 102449359 | WILLIAM | CRONE | 32200 45TH ST LOT 7 | BURLINGTON | WI | 53105-9320 |
| 106799436 | SONYA | MEYERS | 800 E MAIN ST APT 135 | SOMERSET | PA | 15501 |
| 103225874 | KENNETH | VOLK | 7382 E. ANTIOCH LANE | CLAREMONT | IL | 62421-2601 |
| 204207473 | DIANA | RAGSDALE | 227 COX MONUMENT AVE. | POCAHONTAS | IL | 62275-3327 |
| 210476248 | CHRSTOPHER | BROOKS | 420 JADE ROAD | INGRAHAM | IL | 62434-3033 |
| 106904229 | ANDREW | DEUERLING | 6345 S KOLIN | CHICAGO | IL | 60629-5029 |
| 211907535 | DANIEL | FESTEN | 350 GRANT APT. #312 | SYCAMORE | IL | 60178-1730 |
| 210541235 | RICHARD | TAYLOR | 510 E MORGAN ST | DIXON | IL | 61021-2254 |
| 206088532 | LEIGH | TAYLOR | 510 E. MORGAN | DIXON | IL | 61021-2254 |
| 211553304 | JOSEPHINE | MULEYA | 1742 PLUM ST | AURORA | IL | 60506-3460 |
| 100105026 | RENEE | HAM | 550 KENNEDY ST | MARENGO | IL | 60152-9045 |
| 102903187 | ADAM | PECK | PO BOX 752 | WALDPORT | OR | 97394-0752 |
| 106722360 | SEEMA | KHALID | 22099 DAVIDSON RD APT 201 | WAUKESHA | WI | 53186-4069 |
| 106366347 | BALIS | GILMORE | 307 W 4TH ST | BYRON | IL | 61010 |
| 208859462 | SUFIA | SULTANA | 1319 E TRUTLE CREEK APT B | PALATINE | IL | 60074-3125 |
| 109026821 | GARY | WALKER | 758 NORTH BELL SCHOOL ROAD | ROCKFORD | IL | 61107-5204 |
| 102787439 | ZELLINA | HAMPTON | 1213 HARMON ST | DANVILLE | IL | 61832-2972 |
| 103468099 | STACIE | DE WALL | 2716 CHEROKEE ST | SAINT LOUIS | MO | 63118-3036 |
| 106418142 | NOAH | STONE | 401 W SEMINOLE BLVD APT # 220 | SANFORD | FL | 32771-7803 |
| 105975076 | MATTHEW | CAES | 5206 BECKTON RD | AVE MARIA | FL | 34142 |
| 212024217 | TINA | LLOYD | 3118 PLEASURE AVE | WONDER LAKE | IL | 60097-8229 |
| 212623846 | ELYSABETH | YUBLOSKY | 1350 DEVONSHIRE | BUFFALO GROVE | IL | 60089-1157 |

| 108468327 | AMBER | RIGGS | 242 N ADAMS ST | SHEFFIELD | IL | 61361-9649 |
| 211276178 | SEAN | HARVEY | 308 W. WAUPANSIE ST. | DWIGHT | IL | 60420-1277 |
| 105155542 | GREGORY | ODOM | 1110 WASHINGTON AVE APT 3L | SAINT LOUIS | MO | 63101 |

## CERTIFICATE OF SERVICE

This is to certify that on this 28th day of June, 2012, I electronically filed the above with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.  I also served the above on Aaron Petrus,  c/o Jan Petrus, 120 Woodhaven, Ingleside, TX 78362, by overnight delivery.

*/s/ Gregory B. Linkh*

Gregory B. Linkh